UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANE DOE<br>by and through her guardian ad litem,<br>Sarah F. Russell,<br>　　　　　　　　Plaintiff, | : <br> : <br> : <br> : <br> : | |
| V. | : <br> : | Civil Action No.: |
| JAMES DZURENDA, COMMISSIONER,<br>CONNECTICUT DEPARTMENT OF<br>CORRECTION, individually; SCOTT SEMPLE,<br>COMMISSIONER, CONNECTICUT<br>DEPARTMENT OF CORRECTION, individually;<br>CONNECTICUT DEPARTMENT OF CHILDREN<br>AND FAMILIES; JOETTE KATZ,<br>COMMISSIONER, CONNECTICUT<br>DEPARTMENT OF CHILDREN AND<br>FAMILIES, individually and in her official<br>capacity; WILLIAM ROSENBECK, individually<br>and in his official capacity; and THE STATE OF<br>CONNECTICUT,<br>　　　　　　　　Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | <br><br><br><br><br><br><br><br><br><br>April 6, 2015<br><br>**JURY TRIAL DEMAND** |

## COMPLAINT

Plaintiff Jane Doe ("Plaintiff" or "Jane") by and through her guardian ad litem Sarah F.

Russell alleges against Defendants (1) James Dzurenda, former Commissioner of the Department

of Correction ("DOC"); (2) Scott Semple, Commissioner of the Department of Correction; (3)

the Connecticut Department of Children and Families ("DCF"); (4) Joette Katz, the

Commissioner of the Department of Children and Families; (5) William Rosenbeck,

Superintendent of the Connecticut Juvenile Training School ("CJTS"); and (6) the State of

Connecticut (collectively "Defendants") the following claims arising under the Eighth and

Fourteenth Amendments to the U.S. Constitution, the Juvenile Justice and Delinquency

Prevention Act ("JJDPA"), the Prison Rape Elimination Act ("PREA"), the Americans with

Disabilities Act ("ADA"), and the Rehabilitation Act of 1973:

## NATURE OF THIS ACTION

1.      Jane is a seventeen-year-old transgender girl who has been traumatized by a history of neglect and severe sexual and physical abuse.   She spent nearly all of the year 2014 in solitary confinement, with no interaction with peers.   Although Jane was never charged with or convicted of a crime in adult court, she was imprisoned in isolation for almost three months at York Correctional Institution ("York CI" or "York"), Connecticut's high-security women's prison run by DOC.   She spent a further more than seven months in total isolation from peers at CJTS, DCF's high-security facility for juvenile delinquent boys.

2.      On January 31, 2014, following an incident at a residential placement out of state, DCF placed Jane in isolation at CJTS.   On February 4, 2014, DCF sought state court authorization to transfer Jane to Manson Youth Institution ("MYI"), a DOC prison for male offenders.   Jane was ultimately transferred to DOC custody, and DOC determined her placement at York CI.   After arriving at York on April 8, 2014, Jane was under constant watch by correctional officers trained only to guard adult inmates.   She was held alone in isolation—without interaction with other minors and without access to the age-appropriate mental health, educational, and rehabilitative services that she requires based on her history of severe trauma.   On June 24, 2014, DCF exercised its authority to remove Jane from York CI and placed her at the Pueblo Unit, a locked facility for girls adjacent to CJTS.   On July 12, 2014, DCF returned Jane to CJTS, where she was held in total isolation from peers until approximately December 23, 2014.

## JURISDICTION AND VENUE

3.      This Court has subject matter and supplemental jurisdiction over Plaintiff's claims

2

and causes of action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. §1367.

4.     Venue is proper in the District of Connecticut because all of the events or omissions giving rise to Jane's claims occurred at or within various locations within the State of Connecticut.   28 U.S.C. § 1391(b)(2).

## THE PARTIES

5.     Plaintiff Jane Doe sues by and through her guardian ad litem, Sarah F. Russell. Jane, a seventeen-year-old girl, resides in the State of Connecticut.   Her guardian ad litem was appointed by this Court in the related matter *Doe v. Dept. of Corrections, et al.*, 3:14-cv-00469-RNC.

6.     Defendant James Dzurenda served as Commissioner of DOC from approximately April 1, 2013, to August 31, 2014.   He was the prison official chiefly responsible for Jane's health and safety while she was incarcerated by DOC and was the official chiefly responsible for determining the conditions under which she was being held while in DOC custody.   He is sued individually.

7.     Defendant Scott Semple has served as Interim Commissioner of DOC since approximately August 31, 2014.   Previously, he served as Deputy Commissioner and was responsible for making determinations regarding the conditions under which Jane was being held at York CI.   He is sued individually.

8.     Defendant DCF is an agency operated by the State of Connecticut and has control over all children committed to its care by Connecticut's Superior Court for Juvenile Matters. DCF has control over the operation of CJTS and the Pueblo Unit.

9.     Defendant Joette Katz has served as Commissioner for DCF at all times relevant to this complaint.   She is the person ultimately responsible for Jane's health and safety while

3

Jane is in the care and custody of DCF and the person ultimately responsible for Jane's incarceration at an adult prison and conditions of solitary confinement at CJTS.   She is sued individually and in her official capacity.

10.      Defendant William Rosenbeck has served as the Superintendent of CJTS and the Pueblo Unit at all times relevant to this complaint.   He is the person who has been directly responsible for Jane's conditions of confinement while she is at CJTS.   He is sued individually and in his official capacity.

11.      Each of the above defendants acted as an agent or agency of Defendant State of Connecticut.

## FACTUAL BACKGROUND

12.      Jane has been involved with DCF since she was five years old and is dually committed to DCF as the result of both child protection and juvenile delinquency proceedings. DCF is the court-appointed guardian with legal obligations to take actions that serve Jane's best interests.   Conn. Gen. Stat. §§ 46b-121, 46b-129.

### A History of Neglect, Abuse, and Trauma

13.      Beginning in early childhood and persisting throughout her life, Jane has experienced a persistent series of serious traumas, including sexual abuse, physical abuse, verbal abuse, and emotional trauma.   Some of these harms occurred while in DCF residential placements.

14.      As a result of these experiences, Jane has mental impairments that substantially limit one or more of her major life activities, making her an individual with a disability.

15.      At all times relevant to this action, DCF was aware of Jane's history of trauma and impairments.

4

### Transgender Status

16.     Jane is a seventeen-year-old transgender girl who has been and currently is receiving hormone treatments through DCF.   Through medical treatment, she has undergone physical development that conforms to her gender identity, including softening of skin, breast development, lack of facial hair, and other characteristics typically associated with girls. Before the incidents described in this complaint, DCF recognized that Jane is a girl and placed her in facilities with other girls.   Indeed, DCF had provided Jane with medical care for the past several years to support her physical transition.

### Initial Placement at CJTS

17.     Jane was adjudicated delinquent on November 21, 2013, and committed to the custody of DCF for a period not to exceed eighteen months.

18.     On January 31, 2014, following an incident at a residential placement, DCF placed Jane at CJTS in isolation in a housing unit.   She stayed in this unit until April 8, 2014.

19.     DCF placed Jane in solitary confinement at CJTS for conduct that was a direct result of her disability.

20.     For this stay of more than two months, Jane was not permitted to go outdoors and had no contact with an appropriate peer group.

21.     Jane slept in a small locked cell in the housing unit.   The cell had a bed, a desk, and a narrow window looking into the housing unit.

22.     CJTS officers controlled when Jane could enter and exit her cell, and could watch Jane through the window in the door of her cell.

23.     When Jane was permitted to leave her cell, her movement was restricted to the

5

housing unit, which consisted of a large room containing a table, chairs, and a television.

24.     At all times when she was in the housing unit, at least two officers were stationed in the unit and observed Jane.

25.     Jane was confined in the housing unit and was not taken outdoors for recreation or other activities from January 31, 2014 until April 8, 2014.

26.     Some CJTS staff members referred to Jane using a male pronoun and/or used her male given name.

27.     Initially, Jane was the only child in the housing unit.   Later, an injured boy was placed in the unit with her.   Other than interactions with this boy, Jane had no contact with any other child.   With the exception of occasional professional visits, her contact with adults was limited to employees of DCF.

28.     By isolating Jane at CJTS, DCF denied her the ability to participate in and benefit from services and activities provided to other residents at CJTS and the Pueblo Unit, including educational and recreational programming, a "residential milieu," and other specialized programs.

29.     While in isolation at CJTS from January 31, 2014 to April 8, 2014, Jane was confined to her unit for 24 hours a day and did not enjoy the same ability as other residents to spend time in different areas throughout the facility.

30.     While in isolation at CJTS from January 31, 2014 to April 8, 2014, Jane was denied the opportunity to participate in group therapy and to learn from peers in a school setting. She was denied the opportunity to develop healthy attachments to peers and to work on her ability to self-regulate in settings with peers. DCF provided these opportunities to other children in its care.

6

31.     While at CJTS, Jane experienced stress, frustration, anxiety, loneliness, isolation, depression, and trauma.

32.     Jane's distress from the conditions of confinement at CJTS was exacerbated by her history of severe abuse and trauma.

33.     While at CJTS, Jane needed individual psychotherapy multiple times a week from a developmentally, psychodynamically, and trauma-oriented clinician with sensitivity to transgender issues.   DCF did not provide this form of psychotherapy.

34.     On February 4, 2014, DCF moved the Connecticut Superior Court to transfer Jane pursuant to Conn. Gen. Stat. § 17a-12 from DCF custody to MYI, a correctional institution operated by DOC for male prisoners ages 14 to 21 charged with or convicted of offenses in adult court.   DCF was aware of Jane's history of severe trauma and impairments prior to seeking this transfer.   Conn. Gen. Stat. § 17a-12 had been utilized only once in the previous 14 years, for an individual who was not living under the care and custody of DCF's guardianship.   In Jane's case, DCF sought to transfer its own ward—one for whom it has parental obligations—to adult prison.

## Transfer to York CI

35.     On April 8, 2014, the Superior Court (Kaplan, J.), ordered Jane to be placed in the custody of DOC and transferred to York CI.   The Court's order provided that the DOC Commissioner was responsible for determining whether to assign Jane to either MYI or York CI. In addition, the Court ordered that Jane was "to be held in isolation for no more than 72 hours." On April 8, Jane was transferred from CJTS to York CI.

36.     Even after the Superior Court ordered the transfer of Jane to DOC custody, Commissioner Katz had authority under Conn. Gen. Stat. § 17a-13 to remove Jane from York CI

7

at any time and place her "in another facility or in the community or to terminate the commitment."

37.     DCF's mandate is to protect and care by providing treatment and services for abused, neglected, and delinquent children.   Here, DCF effectuated the transfer of a child in its care and custody to an adult correctional setting and held her in prolonged solitary confinement in clear violation of its mandate.

38.     DCF initiated the transfer of Jane to DOC custody for conduct that was a direct result of her disability.

39.     York CI is a high-security prison operated by DOC and Connecticut's only correctional facility for women charged with or convicted of crimes in Connecticut's adult criminal courts.

40.     Jane was held at York CI in isolation and segregation from other prisoners from April 8, 2014 until June 24, 2014.

41.     Jane was not being held at York CI as a result of a new criminal charge or an adult court conviction.

42.     At York CI, Jane was required to wear a prison uniform, had an inmate number, ate inmate meals, was under constant watch by correctional officers trained to guard adult inmates convicted of serious crimes rather than juveniles such as Jane, and was subject to strip searches each time she visited with her attorneys.

43.     Given Jane's history of sexual trauma and her status as a transitioning transgender girl, these strip searches caused her great anxiety and distress.

44.     Other than occasional professional visits, Jane had no contact with anyone other than DOC correctional officers and employees from April 8, 2014 until June 24, 2014.   She had

no contact with other minors.

45.     From April 8, 2014 until May 13, 2014, Jane was held in isolation in the mental health unit at York CI.   She was initially held in one locked concrete cell within the mental health unit and then moved to another locked concrete cell.

46.     While in the mental health unit, Jane could hear screaming, banging, and crying day and night from adult inmates suffering from mental illness or undergoing drug detoxification.   As a result, Jane found it difficult to sleep.

47.     Jane was held in a prison cell in the mental health unit for approximately 21-22 hours per day.   She was provided one hour of solitary recreation each day, and she received limited education services from a prison teacher in another cell in the mental health unit.

48.     While in her cell, Jane was watched at all times by a correctional officer, including when she took a shower, used the toilet, or tried to rest.

49.     On May 13, 2014, Jane was moved to another housing area on the grounds of York CI.

50.     This housing area was a self-contained unit consisting of three rooms and a bathroom.   Jane felt no sense of privacy in this housing unit.   Jane slept in one of the rooms and was observed by correctional officers through a window cut in the door of the room.   In addition, a window was cut in the bathroom door.   At all times, at least two correctional officers were stationed inside the unit to monitor Jane.   At least one additional correctional officer was stationed outside the unit at all times.   Jane was able to walk outside the unit into a small area of outdoor space.

51.     Jane received limited educational services from prison teachers in the housing unit each weekday, and her treatment plan called for visits once a week from the prison

psychologist.   Jane spent approximately 23 hours a day in this housing unit or immediately

outside it; she left for one hour a day for recreation in the prison gym, and for occasional

professional visits.

52.     While Jane was at York CI, DOC said that she could attend "school" with groups

of adult inmates charged or convicted of crimes or attend group meetings with such inmates.

DCF also said that Jane could be transported 30 miles away to CJTS during the day to attend

school with the boys being held in that locked juvenile facility.   Jane declined to place herself in

these environments, where she feared she would be ridiculed, harassed, and physically assaulted.

53.     After arriving at York CI, Jane experienced increasing levels of stress, frustration,

anxiety, loneliness, isolation, depression, and trauma.

54.     Jane's distress from the isolation she experienced at York CI was exacerbated by

her history of severe abuse and trauma.

55.     After arriving at York CI, Jane was monitored by correctional officers

twenty-four hours a day.   Jane's contact with correctional officers did not ameliorate the harm

of isolation and increased the likelihood of harassment by officers, which is far more common

for transgender girls and women than for other prisoners.

56.     At York CI, Jane was fully compliant with DOC rules and had no disciplinary

incidents.   Jane did not engage in any violent conduct at York CI and did not make any verbal

threats to staff or inmates at York CI.

57.     While at York CI, Jane was denied access to benefits and services provided to

other children in DCF custody who have been adjudicated delinquent, including those housed at

CJTS or the Pueblo Unit.   Jane was denied access to age-appropriate educational, vocational,

and mental health services.   DCF and DOC did not provide Jane with intensive individual

10

psychotherapy from a developmentally, psychodynamically, and trauma-oriented clinician with sensitivity to transgender issues.   Jane had no opportunity to participate in programs, recreation, and therapy with other children.

58.   Throughout her stay at York CI, Jane's isolation was indefinite.   Until four days before her transfer to the Pueblo Unit, she was not informed when she would leave York CI and where she would go.   She was given no specific guidelines for what she needed to do to be moved out of the prison.   She was given no maximum end date for her incarceration at York CI.

### Transfer to Pueblo

59.   On June 24, 2014, Commissioner Katz exercised her authority under Conn. Gen. Stat. § 17a-13 to remove Jane from York CI and place her "in another facility or in the community or to terminate the commitment."   Commissioner Katz placed Jane at the Pueblo Unit, a locked facility for girls adjacent to CJTS that is operated by DCF.

60.   At Pueblo, Jane was positively engaged in individual and group therapy and in school work.

61.   On July 12, 2014, Jane was involved in a fight involving three other girls.   This was the first physical altercation involving Jane since the out-of-state incident in January 2014—Jane had no physical conflicts at CJTS or York CI.

62.   On July 12, 2014, immediately after the incident, DCF moved Jane to isolation at CJTS.   DCF placed Jane back in solitary confinement at CJTS for conduct that was a direct result of her disability.

63.   The decision to move Jane to isolation at CJTS was made within hours of the incident at the Pueblo Unit, without time to review records of the incident, interview staff or youth, or convene a treatment team meeting to consider alternatives to solitary confinement as a

11

crisis or behavior management tool.    All four girls involved in the fight were restrained and all

four were described in DCF records as hitting each other and staff.    None of the other girls

involved in the incident were removed from the Pueblo Unit at the time and placed in isolation at

CJTS.    Multiple residents at the Pueblo Unit had histories or patterns of aggressive, assaultive,

and self-injurious conduct, including assaulting staff.

      64.    Due to additional delinquency proceedings relating to the events at Pueblo, Jane

was thereafter committed to DCF custody until April 2016.

### Return to CJTS

      65.    Upon returning to CJTS on July 12, 2014, Jane was placed in solitary

confinement in the same unit she was placed in previously and held in isolation.    Other than her

unauthorized contact with peers on September 16, 2014, Jane's first interaction with peers came

on December 23, 2014.

      66.    From July 12, 2014 until December 23, 2014, Jane was observed by CJTS staff at

all times, and staff controlled when she could exit and enter her cell.

      67.    Jane was required to be in her cell from 8:30 pm to 7:30 am each day.    When she

left her cell, she had access to a large empty room containing only a table, chairs, and a

television.    Two CJTS staff members sat in this room at all times and watched her.    Other

CJTS staff members came to this room to meet with her.

      68.    From July 12, 2014 until August 15, 2014, Jane was not permitted to go outdoors

for recreation or other activities.    Only after a written request by the Office of the Child

Advocate to DCF on August 15, 2014, was Jane permitted to go outdoors for recreation.

Subsequently, she usually went out for one hour a day.    However, some days, staff did not

come to take her outside.    Jane at times declined offers to go outside when the boys were

outside because she did not want to be "paraded around in front of the boys."

69.     Other than contact with peers on September 16, 2014, Jane had no contact with peers from July 12, 2014, until approximately December 23, 2014.   Her only human contact, other than occasional professional visits, was with CJTS staff.   Jane declined DCF's invitation to be housed with and interact with the general male population at CJTS—where she reasonably feared she would be harassed, humiliated, and assaulted.

70.     Jane was not permitted to wear her own clothes, make up, or a wig.   She was required to wear the same uniform as the boys.   Prior to October 2014, when she was allowed to use hair extensions, she could not express herself physically as a girl.   It is psychologically damaging and harmful for a transgender female to be placed in a male facility and to be unable to express herself as female.

71.     Over the course of her isolation, Jane experienced increasing levels of stress, frustration, anxiety, loneliness, isolation, depression, and trauma.

72.     Jane's distress from the isolation at CJTS was exacerbated by her history of severe abuse and trauma.

73.     Throughout most of her stay at CJTS, Jane's isolation was indefinite.   Until shortly before December 23, 2014, she was not informed when she would next interact with peers.   She was given no maximum end date for her incarceration at CJTS.

### Treatment Needs and Harms of Isolation

74.     It is widely recognized by experts that placing a child with a history of trauma in prolonged isolation has harmful psychological effects on the child.   Indeed, Jane suffered from stress, depression, anxiety, loneliness, and trauma during the more than ten months she spent in

13

isolation from an appropriate peer group.    Jane was and is receptive to treatment and services

that are specific to her needs and take into account her age, transgender status, and history of

trauma.

75.    Keeping Jane in isolation at York CI and CJTS indefinitely both severely impeded

her ability to receive appropriate treatment and develop social skills and actively caused her great

psychological harm, with resulting physical consequences.

76.    The experience of isolation for Jane was deeply stigmatizing.    By isolating Jane

from her peers, DCF expressed to this child that she was too dangerous to be around other

children, even those with histories of misbehavior and assaultive conduct.    Jane was the only

child that DCF isolated alone in a unit for many months at CJTS based on purported

dangerousness.    Based on the claim that she was too dangerous for DCF custody, DCF singled

Jane out for transfer under Conn. Gen. Stat. § 17a-12—a statute that DCF had utilized only once

in the previous 14 years.    In a public fashion, DCF conveyed to this child that she was uniquely

damaged and dangerous, and unsuitable for contact with peers.    The experience of being

selected for this extreme and harsh treatment deeply damaged the self-esteem and feelings of

self-worth for this transgender child, who was already deeply traumatized by physical and sexual

abuse.    At the same time that DCF isolated and stigmatized Jane, they also denied her the

ability to express herself as female through prohibiting her from wearing her own clothes, a wig,

or make up—and placing her in a facility for boys.    The combined impact of this treatment

caused Jane to experience acute psychological distress and will have lasting impacts on her sense

identity and self-worth.

77.    Jane requires intensive, trauma-informed treatment, including therapy sessions

multiple times per week with a developmentally, psychodynamically, and trauma-oriented

clinician.

78.     Jane also needs counseling from a therapist who is expert in providing care to transgender adolescents.

79.     In addition, Jane requires the opportunity to participate in group therapy sessions with a focus on transgender youth.   For more than ten months, DCF did not provide this form of therapy to her.   Jane could not participate in group therapy, develop attachments, or work on her ability to self-regulate because she was held in isolation and had no contact with an age- and gender-appropriate peer group.

80.     This period was extremely difficult for Jane, not only because of the prolonged isolation, but because of the uncertainty about its duration.   Isolation with an indeterminate end date has even more serious harmful consequences than other forms of isolation, particularly for children.   Part of Jane's suffering has arisen from the fact that during this period DCF did not communicate to her when she was to be moved, where she would be moved, and what she needed to do in order to be moved.   DCF did not provide her with an end date for her incarceration at York or CJTS or a concrete plan for her future placement.   The American Academy of Child and Adolescent Psychiatry opposes the use of solitary confinement for juveniles, noting that "potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety and psychosis."[1]   The United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which establish minimum standards for the protection of juveniles in correctional facilities, prohibit the solitary confinement of juveniles.

---

[1]  American Academy of Child and Adolescent Psychiatry, Policy Statement, Solitary Confinement of Juvenile Offenders (April 2012), *available at* http://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx (attached as Exhibit A).

National standards regarding the placement of youth in detention recommend against use of solitary confinement except as temporary response to behavior that threatens immediate harm to a youth or others.[2]   The U.S. Attorney General's National Task Force on Children Exposed to Violence recently concluded that "nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement."   The Task Force accordingly proposed abandoning practices like solitary confinement.[3]   In December of 2014, the American Medical Association also voted to adopt a policy opposing most uses of solitary confinement for juveniles.[4]

81.   Studies of the impact of solitary confinement on incarcerated adults have revealed an array of detrimental physiological and psychological effects, including: hypersensitivity to stimuli-perceptual distortions and hallucinations, increased anxiety and nervousness, fears of

---

[2]   Juvenile Detention Alternatives Initiative (JDAI), *A Guide to Juvenile Detention Reform: Juvenile Detention Facility Assessment 2014 Update* 177-80 (2014), *available at* http://www.aecf.org/m/resourcedoc/aecf-juveniledetentionfacilityassessment-2014.pdf#page=3. Other standards regarding the placement of youth in detention or juvenile correctional programs recommend against anything but brief use of solitary confinement as a behavior management strategy.   PbS Learning Inst., PbS Goals, *Standards, Outcome Measures, Expected Practices and Processes* 10 (2007), *available at* http://sccounty01.co.santa-cruz.ca.us/prb/media%5CGoalsStandardsOutcome%20Measures.pdf; Am. Corr. Ass'n, *Performance Based Standards Juvenile Corr. Facilities* 5-52 (4th ed. 2009).

[3]   Att'y Gen.'s Nat'l Task Force on Children Exposed to Violence, *Rep. of the Att'y Gen.'s Nat'l Task Force on Children Exposed to Violence, Defending Childhood: Protect, Heal, Trive* 178 (2012), *available at* http://www.justice.gov/defendingchildhood/cev-rpt-full.pdf.

[4]   The resolution provides: "Our AMA: (1) opposes the use of solitary confinement in juvenile correction facilities except for extraordinary circumstances such as the protection of the juvenile, staff, or other detainees; (2) opposes the use of solitary confinement of juveniles for disciplinary purposes in correctional facilities; and (3) supports that isolation of juveniles for clinical or therapeutic purposes must be conducted under the supervision of a physician. (Res. 3, I-14)" Available at https://www.ama-assn.org/ssl3/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=/resources/html/PolicyFinder/policyfiles/HnE/H-60.922.HTM.

persecution, blunted affect and apathy, talking to oneself, confusing thought processes, sleep disturbances, changes in appetite an weight, withdrawal, depression, and lack of impulse control.[5]   Youth lack the essential coping skills to manage acute and chronic stressors.[6]   As a result, they are less equipped than adults to handle solitary confinement.

82.     Youth exposed to solitary confinement are more likely to commit suicide, attempt suicide, and engage in other acts of self-harm.[7]

83.     Juveniles who are confined in adult facilities are more likely to be physically or sexually abused and to commit suicide than those in juvenile facilities.[8]

84.     Attempts by facilities' staff to protect youth, generally by placing youth in isolation or administrative segregation, can cause even further damage:

> An individual held in solitary confinement for 23 hours a day typically begins to lose his sense of reality, and becomes paranoid, anxious and despondent, all of which can exacerbate existing mental health conditions. Given that many of the youth being held in adult jails have experienced some serious trauma in their lives or have undiagnosed or untreated mental illness, they are particularly vulnerable.[9]

---

[5]  Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry, 1450, 1452 (1983); Richard Korn, *The Effects of Confinement in the High Security Unit at Lexington*, 15 Soc. Just. 8, 15 (1988); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 134 (2003).

[6]  Rudolf H Moos, *Life Stressors, Social Resources, and Coping Skills in Youth: Applications to Adolescents with Chronic Disorders*, 30 J. Adolescent Health 22 (2002).

[7]  Lindsay M. Hayes, Dep't of Justice Office of Juvenile Justice and Delinquency Prevention, Juvenile Suicide in Confinement: A National Survey (2009), *available at* https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf; Carly B. Dierkhising et. al, *Victims Behind Bars: A Preliminary Study of Abuse During Juvenile Incarceration and Post-Release Social and Emotional Functioning*, 20 Psychology, Public Policy & Law 181 (2014).

[8]  Emily Ray, Comment, *Waiver, Certification and Transfer of Juveniles to Adult Court: Limiting Juvenile Transfers in Texas*, 13 Scholar 317, 320 (2010).

[9]  Terry F. Hickey & Camilla Roberson, *Pretrial Detention of Youth Prosecuted as Adults*,

17

85. Experts recognize the similar effects of segregation and isolation on individuals even when they have contact with correctional officers.

86. Youth have a greater need for social stimulation and attachment than adults. Close peer relationships promote healthy adolescent adjustment, high perceived self-worth, pro-social behavior and decreased risk of emotional and behavioral problems.[10] Youth held in solitary confinement are deprived of social stimulation with peers all together.

87. A history of maltreatment, trauma or mental health issues increases the risks associated with solitary confinement.

88. Solitary confinement of youth negatively impacts healthy development, perpetuates maltreatment and trauma, and contributes to the failed success of juveniles post-release.

89. Jane feared that if she were placed in contact with an all-male population she would be assaulted, would experience verbal and physical abuse, stress, and anxiety, and would not feel safe. For women, particularly transgender women in men's facilities, assault is tragically common. According to the recent National Transgender Discrimination Survey, of the 6,450 transgender respondents who had been incarcerated, 37% reported being harassed by officers or staff, 16% reported physical assault by other inmates or staff, and 15% reported sexual assault by other inmates or staff.[11] A study of California prisons found that 59% of transgender

---

44-Dec Md. B.J. 44, 48 (2011).
[10] Deborah Laible et al., *The Differential Relations of Parent and Peer Attachment to Adolescent Adjustment*, 29 J. Youth & Adolescence 46 (2000), *available at* http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1050&context=psychfacpub.

[11] Jamie M. Grant, Ph.D., *et al.*, Injustice at Every Turn: A Report of the National Transgender

respondents reported sexual assault, as compared with 4.4% of non-transgender respondents.[12]

## FIRST CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of Due Process under the Fourteenth Amendment of the United States Constitution against Defendants Katz, individually, and Rosenbeck, individually)**

90.     Plaintiff incorporates herein Paragraphs 1 through 89 of this Complaint.

91.     The Due Process Clause of the Fourteenth Amendment provides constitutional

protections for Jane as an incarcerated juvenile.

92.     Defendants' actions described in this complaint—including but not limited to

confining Jane in isolation for extended and indefinite periods, placing her at a facility for boys,

causing her to be held at an adult prison, and threatening to transfer her to an adult prison for

men—and the policies, procedures, and practices enacted and carried out by the Defendants are

not rationally related to a legitimate, non-punitive governmental purpose and are excessive in

relation to any purpose that Defendants claim.

93.     Defendants' acts, omissions, policies, and practices substantially depart from

accepted professional judgment standards and practices, constitute punishment, and reflect

deliberate indifference to known or obvious consequences to Jane, including actual harm and

pervasive risk of harm.

94.     Defendants' excessive confinement of Jane and the inhumane conditions of

confinement imposed on her have been arbitrary and improper, shock the conscience, offend

---

Discrimination Survey 166-67 (2011), *available at* http://
www.thetaskforce.org/downloads/reports/reports/ntds_full.pdf.

[12]  Valerie Jenness, Ph.D., The California Department of Corrections and Rehabilitation
Wardens' Meeting at 34 (April 8, 2009), *available at* http://
ucicorrections.seweb.uci.edu/files/2013/06/Transgender-Inmates-in-CAs-Prisons-An-Empirical-
Study-of-a-Vulnerable-Population.pdf (last visited Feb. 27, 2014).

notions of fairness, and are offensive to human dignity.

95.     Defendants' actions toward Jane denied her the guaranteed rights and protections of due process required by the Fourteenth Amendment of the United States Constitution.

96.     Based on Jane's placement in isolation at CJTS and isolation at York CI, and as a further direct and proximate result of the Defendants' violations of the Fourteenth Amendment, Jane suffered from harm in the form of illegal incarceration in solitary confinement at a male facility, physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to needed services, and lack of opportunity to form healthy relationships with adult models.

## SECOND CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of Due Process under the Fourteenth Amendment of the United States Constitution against Defendants Dzurenda, individually, and Semple, individually)**

97.     Plaintiff incorporates herein Paragraphs 1 through 96 of this Complaint.

98.     Defendants' actions described in this complaint—including but not limited to confining Jane in isolation for an extended period at York CI—and the policies, procedures, and practices enacted and carried out by the Defendants are not rationally related to a legitimate, non-punitive governmental purpose and are excessive in relation to any purpose that Defendants claim.

99.     Defendants' acts, omissions, policies, and practices substantially depart from accepted professional judgment standards and practices, constitute punishment, and reflect deliberate indifference to known or obvious consequences to Jane, including actual harm and pervasive risk of harm.

100.    Defendants' excessive confinement of Jane and the inhumane conditions of confinement imposed on her have been arbitrary and improper, shock the conscience, offend notions of fairness, and are offensive to human dignity.

101.    Defendants' actions toward Jane denied her the guaranteed rights and protections of due process required by the Fourteenth Amendment of the United States Constitution.

102.    As a direct and proximate result of the Defendants' violations of the Fourteenth Amendment, Jane suffered harm in the form of physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to needed services, and a lack of opportunity to form healthy relationships with adult models.

### THIRD CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Eighth Amendment as Applied by the Fourteenth Amendment of the United States Constitution against Defendants Katz, individually, and Rosenbeck, individually)**

103.    Plaintiff incorporates herein Paragraphs 1 through 102 of this Complaint.

104.    At all times relevant to this complaint Defendants were aware of and consciously disregarded the excessive risk to Jane's health and safety posed by conditions of her confinement.

105.    Defendants' acts, omissions, policies and practices constitute cruel and unusual punishment and subjected Jane to actual harm, to pervasive risk of harm, and to other unlawful conditions in violation of the Eighth Amendment of the United States Constitution (as incorporated by the Fourteenth Amendment).

106.    Based on Jane's prolonged placement in isolation at CJTS and isolation at York CI, and as a further direct and proximate result of the Defendants' violations of the Eighth

21

Amendment, Jane has suffered harm in the form of physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to needed services, and a lack of opportunity to form healthy relationships with adult models.

## FOURTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Eighth Amendment as Applied by the Fourteenth Amendment of the United States Constitution against Defendants Dzurenda, individually, and Semple, individually)**

107.    Plaintiff incorporates herein Paragraphs 1 through 106 of this Complaint.

108.    At all times while Plaintiff was incarcerated at York CI, Defendants were aware of and consciously disregarded the excessive risk to Jane's health and safety posed by conditions of her confinement.

109.    Defendants' acts, omissions, policies, and practices constitute cruel and unusual punishment and subjected Jane to actual harm, to pervasive risk of harm, and to other unlawful conditions in violation of the Eighth Amendment of the United States Constitution (as incorporated by the Fourteenth Amendment).

110.    As a further direct and proximate result of the Defendants' violations of the Eighth Amendment, Jane suffered harm in the form of physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to needed services, and a lack of opportunity to form healthy relationships with adult models.

22

## FIFTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Juvenile Justice and Delinquency Prevention Act against Defendant Katz, individually)**

111.     Plaintiff incorporates herein Paragraphs 1 through 110 of this Complaint.

112.     The Juvenile Justice and Delinquency Prevention Act ("JJDPA"), 42 U.S.C. § 5601 *et. seq*., applies to persons, like Jane, who are under the age of eighteen who have been charged with delinquent offenses and to the State of Connecticut and its agencies.

113.     The State of Connecticut has accepted funds under the JJDPA and has agreed to be bound by its terms.

114.     Jane is entitled to relief for violations of the JJDPA under 42 U.S.C. § 1983.

115.     The JJDPA expressly prohibits the incarceration of juveniles in adult jails or lockups except under very limited exceptions which are inapplicable in this case.    *See* 42 U.S.C. § 5633(a)(13).

116.     York CI is an adult jail or lockup within the meaning of the JJDPA.

117.     Defendants initiated proceedings resulting in Jane being incarcerated at York CI, a DOC facility containing adult inmates in contravention of the JJDPA, between April 8, 2014 and June 24, 2014.

118.     At all times between April 8, 2014 and June 24, 2014, Defendants had the real and legal power to remove Jane from York CI.

119.     Defendants chose not to exercise this authority until approximately June 24, 2014.

120.     As a result of Defendants' violations of the JJDPA with respect to Jane, Jane suffered harm in the form of illegal incarceration, physical pain, shame, humiliation,

degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to services available in juvenile facilities, and a lack of opportunity to form healthy relationships with adult models.

## SIXTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Juvenile Justice and Delinquency Prevention Act against Defendants Dzurenda, individually, and Semple, individually)**

121.    Plaintiff incorporates herein Paragraphs 1 through 120 of this Complaint.

122.    Between April 8, 2014, and June 24, 2014, Defendants incarcerated Jane in an adult prison containing adult inmates in conditions tantamount to solitary confinement or segregation, in contravention of the JJDPA.

123.    DOC officials offered activities to Jane which would involve her interaction with adult prison inmates in further contravention of the JJDPA.   *See* 42 U.S.C. § 5602(26), 5633(a)(12).

124.    As a result of Defendants' violations of the JJDPA with respect to Jane, Jane suffered harm in the form of illegal incarceration, physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to services available in juvenile facilities, and a lack of opportunity to form healthy relationships with adult models.

## SEVENTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Violation of the Prison Rape Elimination Act against Defendants Katz, individually, and Rosenbeck, individually)**

125.    Plaintiff incorporates herein Paragraphs 1 through 124 of this Complaint.

126.    The Prison Rape Elimination Act ("PREA") 42 U.S.C. § 15601 *et. seq.* and 28

C.F.R. 115 *et. seq.*, regulates the treatment and housing of transgender individuals, like Jane.

127.    PREA's regulations in this respect apply in the State of Connecticut.

128.    PREA dictates that "[r]esidents [of juvenile facilities] may be isolated from others only as a last resort when less restrictive measures are inadequate to keep them and other residents safe, and then only until an alternative means of keeping all residents safe can be arranged.    During any period of isolation, agencies shall not deny residents daily large-muscle exercise and any legally required educational programming or special education services. Residents in isolation shall receive daily visits from a medical or mental health care clinician. Residents shall also have access to other programs and work opportunities to the extent possible."   28 C.F.R. § 115.342(b).

129.    PREA also requires that "[i]f a resident is isolated pursuant to paragraph (b) of this section, the facility shall clearly document: (1) The basis for the facility's concern for the resident's safety; and (2) The reason why no alternative means of separation can be arranged." 28 C.F.R. § 115.342(h).

130.    Additionally, under PREA, "[e]very 30 days, the facility shall afford each resident described in paragraph (h) of this section a review to determine whether there is a continuing need for separation from the general population."   28 C.F.R. § 115.342(i).

131.    Defendants' treatment of Jane persistently violated PREA's requirement that residents in juvenile facilities be isolated "only as a last resort when less restrictive measures are inadequate to keep them and other residents safe, and then only until an alternative means of keeping all residents safe can be arranged."

132.    Defendants, further, did not afford Jane the procedural right to a review of her isolation every 30 days as required by PREA.

133. As a result of her illegal incarceration, Jane suffered harm in the form of physical pain, shame, humiliation, degradation, and emotional stress, isolation, separation from other people, lack of opportunity for healthy development of peer relationships, lack of access to services available in juvenile facilities, and a lack of opportunity to form healthy relationships with adult models.

## EIGHTH CAUSE OF ACTION

**(Claims under 42 U.S.C. § 1983—Fourteenth Amendment Due Process Claim through Violations of the Juvenile Justice and Delinquency Prevention Act and the Prison Rape Elimination Act against Defendants Katz, individually, and Dzurenda, individually)**

134. Plaintiff incorporates herein Paragraphs 1 through 133 of this Complaint.

135. Jane is entitled to relief under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

136. JJDPA and PREA create liberty interests protected under the Fourteenth Amendment Due Process Clause.

137. Defendants deprived Jane of the liberty interests created by JJDPA without due process.

138. Defendants deprived Jane of the liberty interests created by PREA without due process.

## NINTH CAUSE OF ACTION

**(Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et. seq.*, against Defendants DCF, Katz and Rosenbeck in their official capacities, and the State of Connecticut)**

139. Plaintiff incorporates herein Paragraphs 1 through 138 of this Complaint.

140. Title II of the ADA provides that "[s]ubject to the provisions of this subchapter,

26

no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

141.    In particular, in providing any aid, benefit, or service, under Title II of the ADA, a public entity "may not ... [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit or service," "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity . . . as that provided to others," or "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others[.]" 28 C.F.R. § 35.130(b)(1)(i), (ii), (iii), and (vii).[13]

142.    Additionally, a public entity "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

143.    A public entity may not (1) "impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary," 28 C.F.R.§ 35.130(b)(8); or (2) "utilize criteria or methods of administration ...

---

[13]  In enacting the ADA, Congress, having found that "[i]solat[ion] and segregat[ion]" were pervasive in areas such as education and institutionalization prior to the ADA's implementation, 42 U.S.C. § 12101(a)(2), (3), directed the Department of Justice ("DOJ") to write regulations implementing Title II's prohibition against discrimination.   42 U.S.C. § 12134.   Pursuant to this mandate, the DOJ has issued these and other regulations defining the forms of discrimination prohibited by Title II of the ADA.   *See* 28 C.F.R. § 35.101 *et. seq.*

that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability … or the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)(ii).

144.    A public entity is also prohibited from aiding and perpetuating discrimination against persons with disabilities in the programs, services, or activities it provides. 28 C.F.R. § 35.130(b)(1)(v).

145.    The ADA's "integration mandate" requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."   28 C.F.R. § 35.130(d); 28 C.F.R. § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs under the program access obligation); *see also* Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services Originally published July 26, 1991, 28 C.F.R. pt. 35, App. B ("Integration is fundamental to the purposes of the Americans with Disabilities Act.   Provision of segregated accommodations and services relegates persons with disabilities to second-class status.").

146.    DCF violated the rights of Jane secured by Title II of the ADA and its implementing regulations.

147.    DCF is currently and at all times relevant to this action has been a "public entity" as defined by the ADA, 42 U.S.C. § 12131(1)(B), and provides a "program, service, or activity" within the meaning of the ADA, including educational and rehabilitative programs and services.

148.    Jane is currently and at all times relevant to this action has been a "qualified individual with a disability" within the meaning of Title II of the ADA.

149.   Specifically, as a result of her long history of exceptionally horrific trauma and abuse, as well as DCF's persistent failure to properly care for and protect her, Jane suffers from significant mental impairments that substantially limit one or more major life activities, including but not limited to her ability to work, live, and communicate with others.

150.   As a child committed to the custody of DCF, Jane was qualified to participate in DCF's programs, services, and activities. DCF provides these services to other children committed to its custody.

151.   DCF has long been aware of the mounting psychological toll that Jane's life course has had on her wellbeing and functioning, as documented both by DCF's own diagnosis of Jane's mental impairments and by reports prepared by other facilities and transmitted to DCF.

152.   When DCF nevertheless locked Jane in solitary confinement, DCF excluded her from participating in and denied her the benefits of DCF's educational and rehabilitative programs, services, and activities by reason of her disabilities.

153.   By locking Jane in solitary confinement at CJTS and refusing to remove Jane from solitary confinement at York CI, DCF failed to house Jane in the most integrated setting appropriate to her needs and deprived her of the social, educational, psychological, and rehabilitative benefits of programs administered by DCF for other children. By locking Jane in solitary confinement at CJTS and failing to remove her from solitary confinement at York CI, DCF denied Jane equal opportunity to benefit from DCF's educational and rehabilitative programs and services.   This deprivation caused her to fall further behind in rehabilitation and education than her non-disabled peers.

154.   By isolating Jane at CJTS, DCF denied her the ability to participate and benefit from services and activities provided to other residents at CJTS and the Pueblo Unit.   *Id.* §

35.130(b)(1)(i).

155.    To the extent Jane was provided with services and activities at CJTS and York CI, these services and activities were unequal to those provided to other residents at CJTS and the Pueblo Unit, as they were provided to her in isolation.   *Id.* § 35.130(b)(1)(iv).   DCF provided Jane a benefit that is not as effective in affording equal opportunity as the benefits offered to her non-disabled peers.

156.    Jane was denied the opportunity to participate in group therapy and to learn from peers in a school setting.   Jane's recreation time was spent alone.   She was denied the opportunity to develop healthy attachments to peers and to work on her ability to self-regulate in settings with peers.   Jane was confined to her unit for 23-24 hours a day and did not enjoy the same ability as other residents to spend time in different areas throughout the facility.   DCF denied Jane the opportunity to go outside for months.

157.    By subjecting Jane to solitary confinement, DCF utilized a method of administration that had the effect of subjecting Jane to discrimination by reason of her disability. DCF's methods of administration with respect to Jane had the purpose and effect of defeating or substantially impairing accomplishments of the objectives of DCF's educational and rehabilitative programs, services, and activities with respect to Jane.

158.    DCF failed to provide reasonable modification to its policies, procedures, and practices regarding Jane, as it was legally required to do.   28 C.F.R. § 35.130(b)(7).   Prior to placing Jane in isolation at CJTS on January 31, 2014—and transferring her to York CI on April 8, 2014—DCF did not attempt accommodations such as increased mental health counseling.   In addition, following the fight at the Pueblo Unit on July 12, 2014, DCF did not attempt or make reasonable modification at the Pueblo Unit such as increased mental health counseling, increased

30

supervision, or positive behavior interventions and supports. Indeed, DCF decided to transfer Jane back to CJTS immediately following the incident—while allowing the other girls involved in the fight to stay at the Pueblo Unit, despite their similar behaviors and histories.

159.    From January 31, 2014 until October 23, 2014, DCF failed to provide Jane with intensive individual psychotherapy from a developmentally, psychodynamically, and trauma-oriented clinician with sensitivity to transgender issues.

160.    By virtue of the fact that DCF did not put these or other reasonable modifications in place, Jane was discriminated against because of her disabilities.

161.    Instead of complying with the ADA, DCF elected to hold Jane in conditions of confinement that violated her rights under the Eighth and Fourteenth Amendments to the United States Constitution.

162.    DCF subjected Jane to unconscionable conditions of solitary confinement for ten months based on her disability-related behavior, and watched her deteriorate mentally because of her disability.

163.    DCF confined Jane in this manner because of her disabilities.

## TENTH CAUSE OF ACTION

**(Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et. seq.*, against Defendants DCF, Katz and Rosenbeck in their official capacities, and the State of Connecticut)**

164.    Plaintiff incorporates herein Paragraphs 1 through 162 of this Complaint.

165.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

31

166.    DCF accepts federal financial assistance and has done so at all times relevant to this complaint. DCF is therefore a "program . . . receiving Federal financial assistance" for purposes of the Rehabilitation Act.

167.    Jane is currently and at all times relevant to this action has been a "qualified individual with a disability" for purposes of the Rehabilitation Act.

168.    By confining Jane in isolation at CJTS and declining to transfer Jane from York CI, DCF deprived Jane of the social, educational, and psychological benefits of programs administered by DCF for other children in violation of the Section 504 of the Rehabilitation Act.

169.    DCF confined Jane in this manner solely because of her disabilities.

**PRAYER FOR RELIEF**

**WHEREFORE,** Jane prays for judgment against Defendants on all claims, as follows:

1.      Compensatory and punitive damages against Defendants Dzurenda, Katz, Semple, and Rosenbeck in their individual capacities;

2.      Compensatory damages against the State of Connecticut, DCF, and Katz and Rosenbeck in their official capacities;

3.      Costs of suit, including litigation expenses and reasonable attorneys' fees;

4.      Such other and further relief as the Court deems just, equitable, and proper.

**DEMAND FOR JURY**

Plaintiff demands a trial by jury on all issues triable by jury.

THE PLAINTIFF

By /s/ David N. Rosen
David N. Rosen
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 789-1605 Fax
CT00196
drosen@davidrosenlaw.com

Sarah French Russell, *as Guardian Ad Litem*
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Ave.
Hamden, CT 06518
(203) 382-3238
(203) 582-3237
CT26604
sarah.russell@quinnipiac.edu

33