# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JANE DOE                                      :         CIVIL ACTION NO. 3:15-CV-498 (RNC)

v.                                                    :

JAMES DZURENDA, ET AL.              :         June 6, 2016

## MOTION FOR PERMISSION TO EXCEED PAGE LIMITATION

Pursuant to Rule 7(a)(3) of the Local Civil Rules of the United States District Court for

the District of Connecticut, Plaintiff Jane Doe moves for permission to exceed the Court's 40-

page limit for Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss, along

with the attached excerpts from legislative history. The Memorandum is 70 pages.  Plaintiff has

requested consent from Defendants but as yet has not learned their position.

In support of this motion Plaintiff represents the following:

1.      Plaintiff's complaint alleges ten separate claims.  It seeks damages for violations

of the Juvenile Justice and Delinquency Prevention Act ("JJDPA"), Prison Rape Elimination Act

("PREA"), Americans with Disabilities Act ("ADA"), Rehabilitation Act of 1973 ("Rehab Act"),

Due Process under the Fourteenth Amendment of the United States Constitution, and the Eighth

Amendment as applied by the Fourteenth Amendment of the United States Constitution.

2.      Defendants' Motion to Dismiss asserts numerous theories for why the claim

should be dismissed, including failure to exhaust pursuant to the Prison Litigation Reform Act,

failure to state valid claims for relief under the PREA, JJDPA, ADA and Rehab Act, sovereign

immunity, Eleventh Amendment immunity, absolute immunity, and qualified immunity.

3.      The motion involves issues of public importance that warrant careful briefing and

implicate a range of case law and legislative history, and response to the motion also requires

substantial discussion of the facts.  Plaintiff believes that the additional length requested is useful for the development of the arguments.

4.      The appendix includes legislative history that Plaintiff believes is relevant and will be helpful to the Court.

WHEREFORE, the Plaintiff requests permission to file the attached brief and appendix.

Respectfully submitted,
THE PLAINTIFF

 /s/ David N. Rosen
David N. Rosen
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 789-1605 Fax
CT00196
drosen@davidrosenlaw.com


Sarah French Russell, *Guardian Ad Litem*
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
(203) 382-3238
(203) 582-3237
CT26604
sarah.russell@quinnipiac.edu

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2016, a copy of the foregoing Motion for Permission to Exceed Page Limitation for Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

   /s/ David N. Rosen
David N. Rosen

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JANE DOE                    :        CIVIL ACTION NO. 3:15-CV-498 (RNC)

v.                          :

JAMES DZURENDA, ET AL.      :        June 6, 2016

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

Jane Doe seeks damages for the harm she suffered when Defendants[1] kept her in solitary

confinement for nearly a year.  Defendants have moved to dismiss the complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6).  The Court should deny the motion.

For most of the year 2014, when Jane was sixteen (and then seventeen) years old, she was

detained in solitary confinement at high security facilities run by either DCF or DOC.  Treating

Jane, a child with a history of extreme trauma, in this way not only harmed her mental and

physical wellbeing, it was also illegal.  By holding Jane in prolonged isolation, Defendants

violated the provision of the Juvenile Justice and Delinquency Prevention Act ("JJDPA")

prohibiting states from incarcerating children in any "jail or lockup for adults," and the

provisions of the Prison Rape Elimination Act ("PREA") that stringently limit any isolation of

children; they violated the anti-discrimination provisions of the Americans with Disabilities Act

("ADA") and the Rehabilitation Act of 1973 ("Rehab Act"); and they deprived Jane of her rights

under the Eighth and Fourteenth Amendments.

---

[1]  Defendants are (1) James Dzurenda, former Commissioner of the Department of Correction
("DOC"); (2) Scott Semple, Commissioner of DOC; (3) the Connecticut Department of Children
and Families ("DCF"); (4) Joette Katz, Commissioner of DCF; (5) William Rosenbeck,
Superintendent of the Connecticut Juvenile Training School ("CJTS"); and (6) the State of
Connecticut (collectively "Defendants").

In summary:

Defendants first argue that Jane did not exhaust administrative remedies before filing suit, and thus the complaint should be dismissed under the Prison Litigation Reform Act ("PLRA").  But Jane is not subject to the PLRA because she was not a "prisoner confined in any jail, prison, or other correctional facility" when she filed suit.  Moreover, failure to exhaust under the PLRA is an affirmative defense, and whether Jane exhausted or was excused from exhausting involves factual issues that cannot be resolved at the motion to dismiss stage.

Defendants do not claim that their alleged conduct complied with the JJDPA and PREA but assert that private plaintiffs cannot sue for violations of the relevant JJPDA and PREA provisions.  But Defendants have overlooked a closely analogous case, *Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015), which held that private plaintiffs may pursue claims under 42 U.S.C. § 1983 for violations of a similarly-structured federal statute (the Food Stamp Act).  *Briggs*, and the Supreme Court cases it relies on, show that Jane may sue for violations of the JJDPA and PREA provisions under § 1983.

Defendants next assert that Jane's Title II ADA claim must be dismissed because she does not allege "discriminatory animus or ill will."  However, the 2001 Second Circuit case upon which Defendants rely has been abrogated in relevant part by the Supreme Court's decision in *United States v. Georgia*, 546 U.S. 151 (2006).  After *Georgia*, a plaintiff may bring a suit for damages under the ADA where she alleges that the conduct also violated substantive due process or Eighth Amendment rights, as Jane does here.  Notably, qualified immunity is not a defense to Jane's ADA and Rehabilitation Act claims, which she brings against the State, DCF, and state officials in their official capacities.  Eleventh Amendment sovereign immunity is also not a defense to these claims, as it has been validly abrogated.

Finally, Defendants claim they are protected by both absolute immunity with respect to some conduct and qualified immunity with respect to all their conduct.  The absolute immunity defense fails because Defendants had wide discretion over Jane's placement and the conditions of her confinement and were not merely "carrying out an order of the court."  (Defs' Mem. at 35).  The qualified immunity defense fails because Plaintiff alleges violations of clearly established federal statutory and constitutional law—and in any case there are factual issues bearing on these claims that must be developed through discovery and resolved with further proceedings in this case.

## **CONTENTS**

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.      DISMISSAL FOR FAILURE TO EXHAUST UNDER THE PRISON LITIGATION
        REFORM ACT IS UNWARRANTED BECAUSE THE COMPLAINT DOES NOT
        SUGGEST, MUCH LESS ESTABLISH, THAT AT THE TIME JANE FILED THIS
        COMPLAINT SHE WAS A "PRISONER CONFINED IN ANY JAIL, PRISON, OR
        OTHER CORRECTIONAL FACILITY." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.      Failure to Exhaust is an Affirmative Defense that Must be Pleaded and Proved by
                Defendants.
        B.      The PLRA's Exhaustion Requirement Applies Only to Prisoners Confined in
                Correctional Facilities on the Date the Complaint is Filed.
        C.      The Face of the Complaint Fails to Establish that Jane was a Prisoner Confined in
                a Correctional Facility When the Complaint was Filed.
        D.      Even if Exhaustion Was Required, the Court Cannot Determine Whether Plaintiff
                Satisfied the Requirement at this Stage of the Litigation.

II.     PRIVATE PLAINTIFFS MAY ENFORCE THE JJDPA'S PROHIBITIONS ON
        PLACING JUVENILES IN ADULT FACILITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . .25

        A.      *Briggs v. Bremby*
        B.      The JJDPA's Provisions are Enforceable Under § 1983

III.    PREA'S STRICT LIMITATIONS ON PLACING JUVENILES IN SOLITARY
        CONFINEMENT MAY BE ENFORCED BY PRIVATE PLAINTIFFS UNDER § 1983.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

IV.   PLAINTIFF STATES A VALID CLAIM UNDER THE ADA AND THE
      REHABILITATION ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . 45

      A.    Plaintiff Need Not Allege Discriminatory Animus or Ill Will to State a Claim
            under the ADA.
      B.    Plaintiff Alleges that Defendants Conduct Violated the Eighth and Fourteenth
            Amendments and Therefore She May Maintain a Title II ADA Claim Without
            Alleging Discriminatory Animus.
      C.    Eleventh Amendment Sovereign Immunity and Qualified Immunity Do Not Bar
            Plaintiff's ADA and Rehab Act Claims.
      D.    Plaintiff Has Properly Alleged a Violation of Title II of the ADA and the Rehab
            Act.

V.    DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY. . . . . . . . . . . 53

VI.   QUALIFIED IMMUNITY DOES NOT BAR RELIEF AND, IN ANY EVENT,
      INVOLVES FACTUAL ISSUES THAT CANNOT BE RESOLVED AT THIS STAGE
      OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...........  . . . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## FACTS

The facts relevant to the motion to dismiss are drawn from the Complaint and
summarized here for the Court's convenience.

Jane Doe's involvement with DCF began when she was five years old.  (Compl. ¶ 12).

Beginning in early childhood and continuing throughout many years, Jane was subjected to

severe neglect, as well as physical, sexual, and emotional abuse.  (*Id.* ¶ 13).  Some of these harms

occurred when she was in DCF residential placements.  (*Id.*)  During the time periods relevant to

this action, Jane was committed to DCF as the result of both child protection and juvenile

delinquency proceedings.  (*Id.* ¶ 12).  As her court-appointed guardian, DCF had legal

obligations to take actions that served Jane's best interests.  Conn. Gen. Stat. §§ 46b-121, 46b-

129.

As a result of Jane's long history of horrific trauma and abuse, as well as DCF's persistent failure to care for or protect her, Jane suffers from mental impairments that substantially limit her ability to work, navigate life, and communicate with others.  (Compl. ¶ 149).  Accordingly, she is an individual with a disability within the meaning of the Americans with Disabilities Act.  (*Id.* ¶ 148).  At all times relevant to this action, DCF was aware of Jane's history of trauma and her impairments.  (*Id.* ¶ 15).

Jane is a transgender girl.  (*Id.* ¶ 16).  Starting in her teenage years, DCF provided Jane with medical treatment to support her physical transition, resulting in physical development that conforms with her gender identity, including softening of skin, breast development, lack of facial hair, and other characteristics typically associated with girls. (*Id*)  Until the time period covered by this complaint, DCF recognized that Jane is a girl and placed her in facilities and programs with other girls.  (*Id*).

### January 31-April 8, 2014: Isolation at Connecticut Juvenile Training School

On November 21, 2013, the Superior Court for Juvenile Matters committed Jane as a delinquent to the custody of DCF for a period not to exceed eighteen months.[2] (*Id.* ¶ 17).  On January 31, 2014, after an incident at a residential facility, DCF placed Jane in isolation for more than two months in a housing unit at the Connecticut Juvenile Training School ("CJTS")— DCF's locked facility for boys.  (*Id.* ¶ 18).  DCF placed Jane in solitary confinement at CJTS for conduct that was a direct result of her disability.  (*Id.* ¶ 19).  During these months at CJTS, Jane experienced stress, frustration, anxiety, loneliness, isolation, depression, and trauma.  (*Id.* ¶ 31).  Her distress at the conditions of her confinement was exacerbated by her history of severe abuse and trauma.  (*Id.* ¶ 32).

---

[2]  The commitment was later extended to April 6, 2016. (Compl. ¶ 64).

During her detention at CJTS from January 31 to April 8, 2014, Jane was not permitted to leave her housing unit or go outdoors. (*Id.* ¶¶ 18, 20). While in the housing unit, Jane slept in a small locked cell. (*Id.* ¶ 21). CJTS officers controlled when Jane could enter and exit her cell. (*Id.* ¶ 22). When Jane was permitted to leave her cell, her movement was restricted to the housing unit, which consisted of a room containing a table, chairs, and a television. (*Id.* ¶ 23). At all times when she was in the unit, at least two officers were stationed in the unit and observed Jane. (*Id.* ¶ 24).

During this time, Jane had no contact with other children, except for an injured boy who was placed in the housing unit with her for a period of time. (*Id.* ¶ 27). With the exception of occasional professional visits, her contact with adults was limited to DCF employees. (*Id.* ¶ 27). By isolating Jane at CJTS, DCF denied her the ability to participate in and benefit from services and activities provided to other children in DCF's care, including educational and recreational programming, a residential milieu, and other specialized programs. (*Id.* ¶ 28). DCF denied Jane the opportunity to participate in group therapy with an appropriate peer group, learn from peers in a school setting, develop healthy attachments to peers, and work on her ability to self-regulate in settings with peers. (*Id.* ¶ 30). DCF also failed to provide Jane with appropriate psychotherapy from a clinician equipped to meet her complex needs as a transgender girl with an extensive trauma history. (*Id.* ¶ 33).

**April 8, 2014 Transfer**

On February 4, 2014, DCF moved the Connecticut Superior Court to transfer Jane pursuant to Conn. Gen. Stat. § 17a-12 from DCF custody to Manson Youth Institution ("MYI"), a correctional institution operated by DOC for male prisoners ages 14 to 21 charged with or

convicted of offenses in adult court.[3]  DCF had used this mechanism to transfer a child from

DCF custody to DOC custody only once in the previous 14 years.  (Compl. ¶ 34).  DCF initiated

the transfer of Jane to DOC custody for conduct that was a direct result of her disability.  (*Id.* ¶

38).

On April 8, 2014, the Connecticut Superior Court (Kaplan, J.), ordered Jane to be placed

in the custody of DOC and transferred to York CI, a high-security adult prison that is

Connecticut's only correctional facility for women charged with or convicted of crimes in

Connecticut's adult courts.  The Superior Court's order provided:

> She is ordered transferred to Niantic as a transgender female.  She is to be held in
> isolation for no more than 72 hours.  She is to be examined, evaluated and
> classified under the appropriate State and Federal statutes, guidelines, rules and
> procedures.  Following the classification process, the Commissioner of Correction
> shall make his own placement determination.  This transfer shall be reviewed by
> the court every 6 months to determine whether it should be continued or
> terminated, unless the Commissioner of DCF has already exercised the powers
> granted said Commissioner under § 17a-13 by removing [Jane] from the John R.
> Manson Youth Institution, Cheshire, or the Connecticut Correctional Institution,
> Niantic.  The transfer shall terminate upon the expiration of the commitment in
> this juvenile matter.

Thus, even after Jane was transferred to DCF custody, DCF's Commissioner had the authority

under Conn. Gen. Stat. § 17a-13 to remove Jane from York CI at any time and place her "in

---

[3]  The statute in effect at the time provided in relevant part:

> When, in the opinion of the commissioner, or the commissioner's designee, a
> person fourteen years of age or older is dangerous to himself or herself or others
> or cannot be safely held at the Connecticut Juvenile Training School, if a male, or
> at any other facility within the state available to the Commissioner of Children
> and Families, the commissioner, or the commissioner's designee, may request an
> immediate hearing before the Superior Court on the docket for juvenile matters
> where such person was originally committed to determine whether such person
> shall be transferred to the John R. Manson Youth Institution, Cheshire, if a male,
> or the Connecticut Correctional Institution, Niantic, if a female.

Conn. Gen. Stat. § 17a-12(a).

another facility or in the community or to terminate the commitment."[4]

**April 8-June 24, 2014: Isolation at York CI**

Jane was held at York CI in isolation and segregation from other prisoners for eleven weeks—from April 8, 2014 until June 24, 2014.  (Compl. ¶ 40).  Other than occasional professional visits, Jane had no contact with anyone other than DOC correctional officers and employees.  Significantly, Jane had no social contact with other minors.  (*Id.* ¶ 44).

Although Jane was not charged with or convicted of a crime in adult court, at York CI she wore a prison uniform, had an inmate number, ate inmate meals, was subject to strip searches, and was under constant watch by correctional officers trained to guard adult inmates convicted of serious crimes.  (*Id.* ¶ 42).  The strip searches, which were performed each time she met with her attorneys, caused her great anxiety and distress given her history of sexual trauma and her status as a transitioning transgender girl.  (*Id.* ¶ 43).

For the first five weeks of her imprisonment at York CI, Jane was detained alone in a locked concrete cell in the mental health unit of the prison.  (*Id.* ¶ 45).  Day and night, she could hear the screaming, banging, and crying of adult inmates who were mentally disturbed and/or undergoing detoxification from drugs.  (*Id.* ¶ 46).  While in her cell, she was under constant watch by correctional officers.  (*Id.* ¶ 48).  Jane was in her cell for approximately 21-22 hours a

---

[4] Conn. Gen. Stat. § 17a-13 provided:

> Any person committed to the Department of Children and Families who is transferred to the John R. Manson Youth Institution, Cheshire, or the Connecticut Correctional Institution, Niantic, pursuant to section 17a–12, shall be deemed, while so transferred, to be under the jurisdiction of the Department of Correction except that the Commissioner of Children and Families shall retain his powers to remove such person and to place him in another facility or in the community or to terminate the commitment. The jurisdiction of the Department of Correction shall terminate upon the expiration of the commitment as provided in subsection (a) of section 17a–8.

day—leaving for one hour each day for recreation, which she did alone in the prison gym, and for one or two hours of "school" (which involved sitting with a teacher in another concrete cell). (*Id.* ¶ 47).

On May 13, 2014, DOC moved Jane out of the mental health unit and into another housing area.  (*Id.* ¶ 49).  This housing area was a self-contained unit consisting of three rooms plus a bathroom.  Jane slept in one of the rooms and was observed by correctional officers through a window cut in the door of the room.  In addition, a window was cut in the bathroom door.  At all times, at least two correctional officers were stationed inside the unit to monitor Jane.  At least one additional correctional officer was stationed outside the unit at all times.  Jane was able to walk outside the unit into a small area of outdoor space.  (*Id.* ¶ 50).  Jane spent approximately 23 hours a day in this housing unit or immediately outside it; she left for one hour a day for recreation in the prison gym, and for occasional professional visits.  (*Id.* ¶ 51).

While at York CI, Jane was denied access to benefits and services provided to other children in DCF custody.  In particular, she was denied access to age appropriate educational, vocational, and mental health services.  (*Id.* ¶ 57).  Jane received limited educational services from prison teachers in the housing unit each weekday, and her treatment plan called for visits once a week from the prison psychologist.  DCF and DOC did not provide Jane with the intensive psychotherapy from an appropriate clinician that she required, and Jane had no opportunity to participate in group therapy with other children.  (*Id.* ¶¶ 57, 58).

While Jane was at York CI, DOC offered that she could attend "school" or meetings with groups of adult inmates charged or convicted of crimes.  DCF also said that Jane could be transported 30 miles away to CJTS during the day to attend school with the boys being held in

that locked juvenile facility.  Jane declined to place herself in these environments, where she feared she would be ridiculed, harassed, and physically assaulted.  (*Id.* ¶ 42).

While at York CI for eleven weeks, Jane felt no sense of privacy: she felt constantly exposed and on display.  Yet she was profoundly lonely and isolated, as her only regular human contact was with prison officials charged with detaining her.  Jane experienced high levels of stress, frustration, and anxiety.  (*Id.* ¶ 53).

Jane was fully compliant with DOC rules during her time at York CI; she did not engage in any violent conduct or make verbal threats to staff or inmates.  (*Id.* ¶ 56).  Yet despite the lack of disciplinary incidents at York, Jane's imprisonment at York CI was indefinite.  Until four days before her transfer out of the prison, she was not informed when she would leave York CI or where she would go.  She was given no specific guidelines for what she needed to do to be removed from the prison. (*Id.* ¶ 58).  Jane's youth and history of trauma would make any period of incarceration in isolation in an adult prison difficult for her to withstand.  But Jane's anguish was exacerbated by the indefinite nature of her imprisonment.  (*Id.* ¶ 80).

### June 24-July 12, 2014: Pueblo Unit

On June 24, 2014, the DCF Commissioner exercised her authority under Conn. Gen. Stat. § 17a-13 to remove Jane from York CI and place her "in another facility or in the community or to terminate the commitment."  The DCF Commissioner placed Jane at the Pueblo Unit, a locked facility for girls adjacent to CJTS that is operated by DCF.  (*Id.* ¶ 59).  At the Pueblo Unit, Jane was positively engaged in individual and group therapy and in school work.  (*Id.* ¶ 60).

On July 12, 2014, Jane was involved in a fight involving three other girls.  This was the first physical altercation involving Jane since January 2014.  (*Id.* ¶ 61).  Within hours of the incident, DCF decided to move Jane back to isolation at CJTS.  (*Id.* ¶ 63).  DCF's decision was made without time to review records of the incident, interview staff or youth, or convene a

treatment team meeting to consider alternatives to solitary confinement.  (*Id.* ¶ 63).  All four of the girls involved in the incident were described as hitting each other and staff, yet none of the other girls was removed from the Pueblo Unit and placed in isolation at CJTS.  (*Id.*).  DCF placed Jane back in solitary confinement at CJTS for conduct that was a direct result of her disability.  (*Id.* ¶ 62).

## July 12-December 23, 2014: Renewed isolation at CJTS

On July 12, 2014, DCF placed Jane back in isolation in the same unit at CJTS that they had held her in previously.  (*Id.* ¶ 65).  As before, staff controlled when she could leave her cell. (*Id.* ¶ 66).  For the first month back at CJTS, she was not permitted to go outdoors.  (*Id.* ¶ 68). Other than her unauthorized contact with peers on September 16, 2014, Jane's first interaction with peers came on December 23, 2014.  (*Id.* ¶ 65).  Jane declined DCF's offer to place her in general population with the boys at CJTS, because she feared harassment and assault.  (*Id.* ¶ 69).

Prior to October 2014, when she was allowed to use hair extensions, Jane was not permitted to express herself physically as a girl during this stay at CJTS: she was not permitted to wear her own clothes, make up, or a wig.  (*Id.* ¶ 70).  It is psychologically damaging and harmful for a transgender girl to be placed in a male facility and to be unable to express herself as female.  (*Id.*)  Over the course of her isolation, Jane experienced increasing levels of stress, frustration, anxiety, loneliness, isolation, depression, and trauma.  (*Id.* ¶ 71).  Throughout most of her stay at CJTS, Jane's isolation was indefinite.  Until shortly before December 23, 2014, she was not informed when she would next interact with peers.  (*Id.* ¶ 73).

## Treatment Needs and Harms of Isolation

On account of her trauma history and disability Jane requires intensive, trauma-informed treatment, including psychotherapy sessions multiple times per week with a developmentally, psychodynamically, and trauma-oriented clinician.  (*Id.* ¶ 77).  Jane needs a clinician with

experience and expertise in providing care to transgender adolescents. She also needs the opportunity to participate in group therapy sessions with a focus on transgender youth. (*Id.* ¶ 78, 79). For more than ten months, DCF did not give Jane the opportunity to participate in group therapy, develop attachments, or work on her ability to self-regulate because she was held in isolation and had no contact with an age- and gender-appropriate peer group. For most of her isolation, she was also denied appropriate individual psychotherapy.

Experts recognize that placing a child with a history of trauma in prolonged isolation has harmful psychological effects on the child. (*Id.* ¶¶ 74, 80-89). Indeed, Jane suffered from stress, depression, anxiety, loneliness, and trauma during the more than ten months she spent in isolation from an appropriate peer group. (*Id.* ¶ 74). Keeping Jane in isolation prevented her from receiving appropriate treatment and developing social skills, and actively caused her great psychological harm, with resulting physical consequences. (*Id.* ¶ 75). Jane's contact with adult correctional officers and prison employees did not ameliorate the harm of isolation. (*Id.* ¶¶ 55, 85).[5]

The period was particularly difficult for Jane, not only because of the prolonged isolation but because of the uncertainty about its duration. (*Id.* ¶ 80). Isolation with an indeterminate end date has even more serious harmful consequences than other forms of isolation, particularly for children. Part of Jane's suffering arose from the fact that during this period DCF did not tell her when she was to be moved, where she would be moved, and what she needed to do in order to be

---

[5] "Solitary confinement," as defined by the American Academy of Child and Adolescent Psychiatry, is "the placement of an incarcerated individual in a locked room or cell with minimal or no contact with people *other than staff of the correctional facility*." American Academy of Child and Adolescent Psychiatry, Policy Statement on Solitary Confinement of Juvenile Offenders (April 2012) (emphasis added)*, available at* http://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx.

moved.  DCF did not provide her with an end date for her incarceration at York or CJTS or a concrete plan for her future placement.  (*Id.*).

The experience of isolation for Jane was also deeply stigmatizing.  By isolating Jane from her peers, DCF expressed to this child that she was too dangerous to be around other children, even those with histories of misbehavior and assaultive conduct.  Jane was the only child that DCF isolated alone in a unit for many months at CJTS based on purported dangerousness.  Based on the claim that she was too dangerous for DCF custody, DCF singled Jane out for transfer to an adult prison under Conn. Gen. Stat. § 17a-12—a statute that DCF had utilized only once in the previous 14 years.  In a public fashion, DCF conveyed to this child that she was uniquely damaged and dangerous, and unsuitable for contact with peers.  The experience of being selected for this extreme and harsh treatment deeply damaged the self-esteem and feelings of self-worth for this transgender child, who was already deeply traumatized by physical and sexual abuse.  At the same time that DCF isolated and stigmatized Jane, they also denied her the ability to express herself as female through prohibiting her from wearing her own clothes, a wig, or make up—and placing her in a facility for boys.  The combined impact of this treatment caused Jane to experience acute psychological distress and is likely to have a lasting impact on her sense of identity and self-worth.  (*Id.* ¶ 76).

## Procedural History

On April 9, 2014, the day after Jane was transferred to York CI, a predecessor to this action was filed, alleging violations of Jane's statutory and constitutional rights, and seeking injunctive relief.  (Doe v. Corrections et al, 3:14-cv-00469-RNC).  On May 2, 2014, the Court appointed Sarah F. Russell as guardian ad litem pursuant to Fed. R. Civ. P. 17(c)(2).  On June 24, 2014, the day before a scheduled preliminary injunction hearing, the DCF Commissioner

removed Jane from York CI and placed her at the Pueblo Unit.  After Jane was released from

CJTS, Plaintiff filed this new action on April 6, 2015, seeking only damages.  The next day, the

court again appointed Attorney Russell as guardian ad litem, and Plaintiff filed a notice of

dismissal of the original action, without prejudice, pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).

The Court approved the dismissal on April 8.


## ARGUMENT

Defendants argue that (1) Jane's complaint should be dismissed under the PLRA for

failure to exhaust administrative remedies, (2) private plaintiffs cannot pursue claims for

violations of the JJDPA and PREA, (3) Jane did not state a valid claim under the ADA and

Rehabilitation Act, and (4) they are protected by absolute and qualified immunity.  We address

these arguments in turn.  None has merit.

## I.   DISMISSAL FOR FAILURE TO EXHAUST UNDER THE PRISON LITIGATION REFORM ACT IS UNWARRANTED BECAUSE THE COMPLAINT DOES NOT SUGGEST, MUCH LESS ESTABLISH, THAT AT THE TIME JANE FILED THIS COMPLAINT SHE WAS A "PRISONER CONFINED IN ANY JAIL, PRISON, OR OTHER CORRECTIONAL FACILITY."

Defendants assert that it is apparent from the face of the complaint and public records

that Jane failed to exhaust administrative remedies pursuant to the Prison Litigation Reform Act

("PLRA") and so dismissal is required.  But, first, the PLRA applies only to an individual who,

*on the date the complaint is filed*, is a "prisoner confined in any jail, prison, or other correctional

facility."  42 U.S.C. § 1997e(a).  The face of the complaint does not establish that Plaintiff was a

prisoner confined in such a facility on the date of filing, April 6, 2015. [6]  The Court should reject

Defendants' expansive view that the PLRA applies to any child committed to DCF custody for a

---

[6]  As Defendants are aware, Jane was no longer detained at CJTS on the date the complaint was filed and was instead living at a group home.

delinquency matter—regardless of whether the child is placed by DCF in a detention facility, in an unlocked group home, or at home with her parents. Second, even if Jane were subject to the PLRA's exhaustion requirement, it is not apparent from the face of the complaint and public records that she failed to exhaust. Defendants' argument is that exhaustion of *judicial* remedies is required by the PLRA, so that the absence of a public record of Plaintiff's appeal of administrative proceedings to Connecticut courts establishes a failure to exhaust. But the PLRA does not require exhaustion of judicial remedies. Because several factual issues bear on whether Plaintiff exhausted, or was required to exhaust,[7] the exhaustion issue cannot be resolved at the motion to dismiss stage.[8]

### A.   Failure to Exhaust is an Affirmative Defense that Must be Pleaded and Proved by Defendants.

The Supreme Court has established that a plaintiff's failure to exhaust under the PLRA is an affirmative defense that defendants must plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-3 (2007); *see also Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009). A complaint may be

---

[7] Plaintiff's view is that when Jane was a resident of the group home she was not a "prisoner" who was "confined" in a "correctional facility" under the PLRA. But in any event, the issue turns on facts that are not part of the pleadings and will need to be developed in discovery.

[8] Because Jane is no longer in DCF custody, she ordinarily could take the PLRA off the table entirely by dismissing voluntarily under Fed. R. Civ. P. 41(a)(1) and refiling prior to the January 30, 2017 statute of limitations date. *See Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (plaintiff whose suit is dismissed under three strikes provision but has been released can refile and seek in forma pauperis status like any other non-prisoner litigant); *Cox v. Mayer*, 332 F.3d 422, 425-26 (6th Cir. 2003); *Dixon v. Page*, 291 F.3d 485, 488 n.1 (7th Cir. 2002); *Dilworth v. Goldberg*, 2011 WL 3501869, *15 (S.D.N.Y., July 28, 2011) (declining to dismiss case refiled after release for non-exhaustion, notwithstanding that plaintiff previously filed some of the same claims while incarcerated); *Bloothoofd v. Danberg*, 2011 WL 1230268, *3 (D. Del., Mar. 31, 2011) (approving plaintiff's filing of new action after release to avoid the exhaustion requirement); *Michalski v. Krebs*, 2010 WL 1032647, *2 (S.D. Ill., Mar. 17, 2010) (plaintiff whose case is dismissed for non-exhaustion can refile without exhaustion after release).
      However, because Jane previously dismissed once voluntarily under Rule 41(a)(1) (because she was a prisoner when she initially filed suit), the Court would need to order the dismissal under Rule 41(a)(2) and refrain from deeming the dismissal "with prejudice."

dismissed based on an affirmative defense only where the defense appears on the face of the complaint.  *See McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004).  As explained below, because the face of the complaint does not establish Jane's failure to exhaust, dismissal under the PLRA is improper.

B.     **The PLRA's Exhaustion Requirement Applies Only to Prisoners Confined in Correctional Facilities on the Date the Complaint is Filed.**

Under the PLRA, individuals are not required to exhaust administrative remedies if they are not prisoners detained in correctional facilities on the date the complaint is filed in court. The PLRA's exhaustion requirement provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Accordingly, a plaintiff is subject to the exhaustion requirement only if the plaintiff is a "prisoner" who is "confined in any jail, prison, other correctional facility" *at the time the suit is filed*.  *See Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) ("Here, we hold that litigants—like Greig—who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements of this provision.").

Simply because a plaintiff may have been a prisoner subject to the exhaustion requirement at one point does not mean she needs to exhaust if suit is filed later.  In *Greig*, the Second Circuit held that plaintiffs who file prison condition actions after release from confinement are no longer subject to the PLRA's exhaustion requirement.  *Greig*, 169 F.3d at 167; *see also Talamantes v. Leyva*, 575 F.3d 1021, 1023-24 (9th Cir. 2009) (holding that "only those individuals who are prisoners (as defined by 42 U.S.C. § 1997e(h)) *at the time they file suit* must comply with the exhaustion requirements of 42 U.S.C. § 1997e(a)") (emphasis added); *Doe*

16

*v. Washington Cty.*, 150 F.3d 920, 924 (8th Cir. 1998) (holding that a plaintiff who files a prison condition action after release is no longer subject to the exhaustion requirement). A plaintiff is subject to the exhaustion requirement of § 1997e(a) if, and only if, she "was a confined prisoner at the time [s]he filed [her] lawsuit." *Berry v. Kerik*, 366 F.3d 85, 87 (2d. Cir. 2003); *see also Lopez v. City of New York*, No. 05-10321, 2009 WL 229956, *3-4 (S.D.N.Y., Jan. 30, 2009) (plaintiff jailed repeatedly need not have exhausted if she filed when not in jail).

**C. The Face of the Complaint Fails to Establish that Jane was a Prisoner Confined in a Correctional Facility When the Complaint was Filed.**

The complaint contains no information about where Jane was located on April 6, 2015, the day she filed her complaint. It states that Jane was adjudicated delinquent on November 21, 2013 and committed to DCF for a period not to exceed eighteen months. (Compl. ¶ 17). Thereafter, as a result of additional delinquency proceedings, her commitment to DCF was extended to April 2016. (Compl. ¶ 64). The Complaint states that DCF moved Jane from a residential placement to the Connecticut Juvenile Training School ("CJTS") on January 31, 2014, where she was held until April 8, 2014. (Compl. ¶ 18). On April 8, 2014, Jane was placed in the custody of the Department of Corrections ("DOC") and transferred to York CI where she remained until her June 24, 2014 transfer to the Pueblo Unit. (Compl. ¶¶ 35, 59). Shortly thereafter, on July 12, 2014, DCF returned Jane to CJTS where she remained in isolation from peers until on or about December 23, 2014. (Compl. ¶ 66).

Defendants say, never mind, Plaintiff is subject to the PLRA's exhaustion requirement for the entire duration of her commitment to DCF. In Defendants' view, a child committed to DCF custody for a delinquency violation is required by the PLRA to exhaust administrative remedies prior to filing to suit regardless of whether she is living at an adult prison, at the Connecticut Juvenile Training School, in an unlocked group home in the community, with foster

parents, or at home with her own parents.  As we now explain, this hyper-expansive reading of

the PLRA's exhaustion requirement is inconsistent with the plain language of the statute and

applicable case law.

> **1.    A Child Committed to DCF for a Delinquency Violation is Not Necessarily Placed in a Correctional Facility.**

Under Connecticut law, the Commissioner of DCF has broad discretion regarding the

placement of children committed to the custody of DCF for delinquency violations and need not

place them in correctional facilities.  Conn. Gen. Stat. § 46b-140(j)(2) provides that a child

convicted as delinquent may be:

> committed to the Commissioner of Children and Families for placement by the
> commissioner, in said commissioner's discretion, (A) with respect to the juvenile
> offenders determined by the Department of Children and Families to be the
> highest risk, in the Connecticut Juvenile Training School, if the juvenile offender
> is a male, or in another state facility, presumptively for a minimum period of
> twelve months, or (B) in a private residential or day treatment facility within or
> outside this state, or (C) on parole.

*Id.*; *see also Earl B. v. Comm'r of Children & Families*, 288 Conn. 163, 177-78 (2008).

Moreover, Conn. Gen. Stat. § 17a-12(a) provides that when the Commissioner or her designee

determines that "a change of program is in the best interest of any child or youth committed or

transferred to the department" the Commissioner or designee "may transfer such person to any

appropriate resource or program administered by or available to the department, to any other

state department or agency, or to any private agency or organization within or without the state

under contract with the department."  All children committed to the custody of the

Commissioner as delinquent "shall remain in such custody until the earliest of the following: (1)

The date such commitment expires as provided by order of the Superior Court, (2) the date such

commitment terminates as provided by order of the Superior Court, or (3) the date the child or

youth attains the age of twenty."  Conn. Gen. Stat. § 17a-8(a).  Furthermore, the Commissioner

may, "when deemed in the best interests of a child committed to the custody of the commissioner as delinquent by the Superior Court, place such child on parole under such terms or conditions as the commissioner or the commissioner's designee deem to be in the best interests of such child." *Id*. § 17a-7.

Accordingly, a child committed to DCF as delinquent is not necessarily confined in a locked facility with other children who have been adjudicated delinquent, such as the Connecticut Juvenile Training School.  Instead, the child may be placed in other locations such as with her own parents at home, with a foster care family, or in a privately-run unlocked group home in the community.

> **2.      Under the Plain Language of the Statute, a Child Placed in the Community and Not at a Correctional Facility Does Not Need to Exhaust.**

The PLRA's exhaustion requirement applies only to "a prisoner confined in any jail, prison, or other correctional facility."  42 U.S.C. § 1997e(a).  The PLRA defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h); *see also* 28 U.S.C. § 1915(h); 28 U.S.C. § 1915A(c).  The PLRA does not explicitly define "jail," "prison," "other correctional facility," "confined," "incarcerated," or "detained."  Accordingly, the Court should consider the plain meaning of these words in construing the statute.  *Levin v. United States*, 133 S. Ct. 1224, 1231 (2013) ("In determining the meaning of a statute, we look first to its language giving the words used their ordinary meaning.") (citation and internal quotation marks omitted).

Turning to their commonly accepted meanings, the word "jail" is defined as "a building for the confinement of persons held in lawful custody (as for minor offenses or some future judicial proceeding)." *Webster's Third New International Dictionary* 1208 (1993). The word prison is defined as "a place or condition of confinement or restraint (as of a person)." *Id.* at 1804. "Incarcerate" is defined as "to put in prison" or "to shut up or away" and "detain" is defined as "to hold or keep in or as if in custody." *Id.* at 1141, 616.

Under the plain language of the PLRA, a person living at home or in the community cannot be considered a "prisoner confined in a jail, prison or other correctional facility." Neither a home nor community placement would "confine" or "detain" a person in a manner consistent with the commonly understood meaning of those words, which is to hold or shut away.

Similarly, under the plain language of the PLRA, someone on parole is by definition not a prisoner. The PLRA defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the *terms and conditions of parole*, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h) (emphasis added). The statutory definition of a prisoner encompasses those who are incarcerated or detained for violations of the conditions of their parole. This language, therefore, necessarily excludes those who have been released on parole.

### 3.   Courts Have Held that Individuals Placed in Homes and/or on Parole Need Not Exhaust.

Individuals not confined in a jail, prison, or other correctional facility at the time they file suit need not exhaust administrative remedies under the PLRA. For example, courts have held that individuals on home detention are not prisoners for the purposes of the PLRA exhaustion requirements. *See, e.g., Blank v. Eavenson*, No. 3:11-CV-01327-K-BK, 2012 WL 685460, *4 (N.D. Tex. Feb. 14, 2012) ("Under the plain language of section 1997e(a), plaintiff's court-

ordered restriction to a private home does not equate to him being "confined in any jail, prison, or other correctional facility."), report and recommendation adopted, 2012 WL 690671 (N.D. Tex., Mar. 1, 2012), *aff'd*, 530 Fed. Appx. 364 (5th Cir. 2013).

Likewise, individuals on parole are not prisoners for the purposes of the PLRA.  *See, e.g.*, *Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998) ("The statutory language does not leave wriggle room; a convict out on parole is not a 'person incarcerated or detained in any facility who is . . . adjudicated delinquent for, violations of . . . the terms and conditions of parole'"); *Phelan v. Madding*, 9 Fed. Appx. 751 (9th Cir. 2001) ("Because Phelan was on parole when he filed his complaint in October 1999, he was not a prisoner within the meaning of the Prison Litigation Reform Act."); *Calia v. Werholtz*, 408 F. Supp. 2d 1148, 1151-52 (D. Kan. 2005) (holding that a former state inmate, who was released on parole prior to filing the § 1983 action against corrections officials, was not a "prisoner" within the meaning of the PLRA).

### 4.    The Complaint Does Not Establish that Jane was Confined in a Correctional Facility When She Filed Suit.

As Defendants acknowledge, the Complaint establishes merely that Jane was committed to DCF as a result of a delinquency violation at the time she filed suit.  Defendants' argument for dismissal of the Complaint under the PLRA depends on the conclusion that all children committed to DCF custody for delinquency violations are prisoners confined in correctional facilities who must exhaust under the PLRA prior to filing suit.  For the reasons discussed above, the exhaustion requirement does not sweep so broadly.

### D.    Even if Exhaustion Was Required, the Court Cannot Determine Whether Plaintiff Satisfied the Requirement at this Stage of the Litigation.

Defendants assert that the Court can determine based on the face of the complaint and public records that Plaintiff has failed to exhaust under the PLRA.  In particular, Defendants

claim that exhaustion of administrative remedies under the PLRA requires appealing DCF

administrative decisions all the way to the Connecticut Supreme Court.  Defendants ask the

Court to infer that Jane did not exhaust because there is no public record of an appeal in the

Connecticut courts regarding Jane's conditions of confinement.  This argument should be

rejected because the PLRA's exhaustion requirement does not require appealing administrative

proceedings to the courts.  In addition, determining whether a prisoner has exhausted

administrative remedies—or is excused from exhaustion—involves factual issues that cannot be

resolved at the motion to dismiss stage.  Thus, even if Jane was a "prisoner" subject to the

PLRA, the Court cannot conclude at this stage that she did not satisfy the PLRA's exhaustion

requirement.

### 1.    The PLRA Does Not Require Exhaustion of State Judicial Remedies.

First, the Defendants incorrectly assert that the PLRA required Jane to appeal any

administrative decisions relating to her conditions of confinement to Connecticut courts.

However, judicial remedies, including appeals from the agency to a court, need not be exhausted

under the PLRA.  *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) ("Exhaustion under

§ 1997e(a) is administrative only; a prisoner who uses all administrative options that the state

offers need not also pursue judicial review in state court . . . ."); *Jenkins v. Morton*, 148 F.3d 257,

259-60 (3d Cir. 1998) (a prisoner "need not exhaust state judicial remedies" under section

1997e(a)); *Black v. Michigan Dept. of Corrections*, No. 2:10–CV–11211, 2012 WL 994768, *10

(E.D. Mich. Feb. 29, 2012) ("plaintiff's available judicial remedies need not be exhausted before

bringing a 42 U.S.C. § 1983 claim"), report and recommendation adopted, No. 10–11211, 2012

WL 987781 (E.D. Mich. Mar. 23, 2012); *cf. Andrews v. Whitman*, No. 06cv2447-LAB (NLS),

2008 WL 878466, *6 (S.D. Cal. Mar. 28, 2008) (prisoner who received no response to his

grievance was not required to petition a state court for a writ of mandate).  Accordingly,

Defendants cannot establish by reference to public judicial records that Jane failed to exhaust her

administrative remedies.

> **2.      The Court Cannot Determine if the Exhaustion Requirement Was Met, or is Excused, without More Factual Information.**

The Court also cannot determine at this stage that Jane failed to exhaust available

administrative remedies.  The failure to exhaust administrative remedies is an affirmative

defense, *Jones v. Bock*, 549 U.S. at 212, and the burden of demonstrating failure to exhaust rests

with the Defendants, *Gonzales v. Lantz*, No. 303-CV-2264-SRUWIG, 2005 WL 1711968, at *2

(D. Conn. July 20, 2005).  A complaint may be dismissed based on an affirmative defense only

where the defense appears on the face of the complaint.  *See McKenna v. Wright*, 386 F.3d 432,

436 (2d Cir. 2004).  Because exhaustion is an affirmative defense, the plaintiff need not allege

any facts relating to exhaustion in the complaint at all.

Where a complaint does not acknowledge a failure to exhaust administrative remedies, it

may not be dismissed under the PLRA at the motion to dismiss stage.  Instead, there must be

factual development relating to whether the plaintiff exhausted.  Whether the PLRA's exhaustion

requirement is satisfied depends on a factual question regarding what administrative remedies

were actually available to a prisoner.  *See Hemphill v. New York*, 380 F.3d 680, 686-90 (2d Cir.

2004).  The issue of the availability of remedies is a factual matter that cannot be resolved at this

motion to dismiss stage.

Moreover, there are exceptions to the exhaustion requirement which can only be resolved

through factual inquiry.  The Second Circuit has held that certain "special circumstances" may

justify the failure to exhaust.  *See Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004) (holding

that plaintiff's failure to exhaust claim through the grievance process was justified because

"plaintiff reasonably interpreted DOCS regulations to mean that his only administrative recourse was to appeal his disciplinary conviction"); *Ziemba v. Wezner*, 366 F.3d 161, 163-64 (2d Cir. 2004) (remanding case to district court to determine whether prison officials' actions estopped them from asserting argument that prison inmate failed to exhaust administrative remedies prior to filing suit); *Camp v. Brennan*, 219 F.3d 279, 280-81 (3d Cir. 2000) (holding that a complaint regarding use of force was properly exhausted when it was investigated and rejected by the Secretary of Correction's office and thus did not need to be further exhausted).

Accordingly, unless it is apparent from the face of the complaint that a plaintiff both failed to exhaust available administrative remedies *and* was not excused from exhaustion, the court must deny a motion to dismiss. *See Gonzales*, 2005 WL 1711968, at *2 (denying defendants' motion to dismiss for failure to exhaust noting: "The court cannot conclude that Gonzalez would not be able to provide evidence of his attempts to exhaust his administrative remedies . . . or provide evidence that special circumstances existed to excuse his failure to fully or properly exhaust his administrative remedies"); *Ziemba v. Clark*, No. 302-CV-1609-AWTDFM, 2003 WL 22918308, at *3 (D. Conn. Dec. 4, 2003) (denying the defendants' motion to dismiss on the grounds that plaintiff failed to exhaust administrative remedies because "this issue cannot be resolved without considering information beyond the pleadings"). Here, not surprisingly, the face of the complaint does not preclude the existence of circumstances that would excuse exhaustion.

In sum, failure to exhaust administrative remedies under the PLRA is an affirmative defense that must be pleaded and proved by Defendants, and here both pleading and proof are entirely absent.

## II.   PRIVATE PLAINTIFFS MAY ENFORCE THE JJDPA'S PROHIBITIONS ON PLACING JUVENILES IN ADULT FACILITIES.

The JJPDA expressly prohibits states receiving federal block grants from placing juveniles in any "jail or lockup for adults" except under specific, limited circumstances that are inapplicable in Jane's case.  *See* 42 U.S.C. § 5633(a)(13).[9]  The JJPDA defines "jail or lockup for adults" to mean "a locked facility that is used by a State, unit of local government, or any law enforcement authority to detain or confine adults—(A) pending the filing of a charge of violating a criminal law; (B) awaiting trial on a criminal charge; or (C) convicted of violating a criminal law."  42 U.S.C. § 5603(22).  As the complaint alleges, upon DCF's request, Jane was

---

[9]  The JJDPA requires states receiving block grants to submit a plan.  The statute provides in relevant part:

> In accordance with regulations which the Administrator shall prescribe, such plan shall— . . . .

> (13) provide that no juvenile will be detained or confined in any jail or lockup for adults except— . . . .

42 U.S.C. § 5633(a)(13).  The statute then provides two exceptions.  The first exception covers "juveniles who are accused of nonstatus offenses" who are being held for processing or release, awaiting a transfer to a juvenile facility, or are making a court appearance.  Such juveniles may be detained a jail or lockup for adults for no more than 6 hours after being taken into custody and only if "such juveniles do not have contact with adult inmates" and there is "in effect in the State a policy that requires individuals who work with both such juveniles and adult inmates in collocated facilities have been trained and certified to work with juveniles."  *Id.* § 5633(a)(13)(A).

The second exception covers juveniles accused of nonstatus offenses "who are awaiting an initial court appearance that will occur within 48 hours after being taken into custody (excluding Saturdays, Sundays, and legal holidays)."  This exception is limited to facilities in rural or remote areas, or areas where conditions of safety (such as severe weather) exist.  These juveniles must not have contact with adults while in the adult facilities, and staff must "have been trained and certified to work with juveniles."  *Id.* § 5633(a)(13)(B).

A separate provision of the JJDPA requires that the state plan provide that "juveniles alleged to be or found to be delinquent or juveniles within the purview of paragraph (11) will not be detained or confined in any institution in which they have contact with adult inmates" and that "there is in effect in the State a policy that requires individuals who work with both such juveniles and such adult inmates, including in collocated facilities, have been trained and certified to work with juveniles."  *Id.* § 5633(a)(12).

transferred to the custody of DOC.  DOC held her at York CI, an adult women's prison,

notwithstanding that Jane was then a sixteen-year-old who had not been charged with, much less

convicted of, any crime in adult court.[10]  Because none of the JJDPA's narrow exceptions

allowing the placement of juveniles in adult facilities applied in Jane's case, Defendants violated

the statute.

Notably, Defendants do not claim that placing Jane at York CI complied with the JJDPA,

only that children victimized by statutory violations cannot sue.  Defendants are wrong.  Their

argument is inconsistent with recent Second Circuit precedent that they have apparently

overlooked.  In *Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015), the court held that the statutory

time limits for allocating food stamps are privately enforceable under 42 U.S.C. § 1983.  Since

*Briggs*, it is quite clear that a juvenile can enforce in court, through § 1983, the JJDPA's

command that juveniles not be detained in adult facilities except in limited circumstances.

A.      ***Briggs v. Bremby***

The plaintiff in *Briggs v. Bremby* brought suit under § 1983 against the Commissioner of

the Connecticut Department of Social Services ("DSS") to enforce the Food Stamp Act's time

limits for awarding food stamp benefits.  The Food Stamp Act provides that states must submit

"a plan of operation," and the plan "shall provide" that the state agency will follow certain time

limits regarding awards of food stamps.  7 U.S.C. § 2020(d); (e)(3), (9).  In considering whether

the plaintiff could sue under § 1983 to enforce the Act's provisions, the Second Circuit followed

*Blessing v. Freestone*, 520 U.S. 329 (1997).  The Court explained:

---

[10]  The JJDPA defines an "adult inmate"—someone who may lawfully be placed in an adult facility—as an individual who "has reached the age of full criminal responsibility under applicable State law" and "has been arrested and is in custody for or awaiting trial on a criminal charge, or is convicted of a criminal offense."  42 U.S.C. § 5603(26).  Thus, Jane was not an "adult inmate" when she was at York CI because she was under 18 years old and not charged with or convicted of a criminal offense.

In *Blessing v. Freestone*, 520 U.S. 329 (1997), the Supreme Court established a three-part test for determining whether a federal law creates a right that can presumptively be enforced by private suit through § 1983: 1) "Congress must have intended that the provision in question benefit the plaintiff," 2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence," and 3) "the statute must unambiguously impose a binding obligation on the States." *Id.* at 340–41 (internal citations and quotation marks omitted). The Court has further clarified that "it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced" under § 1983, and that nothing short of an "unambiguously conferred right" will support a cause of action under § 1983. *Gonzaga University v. Doe*, 536 U.S. 273, 283 (2002). If these requirements are met, then there is a rebuttable presumption that the statutory right can be enforced through § 1983. *Id.* at 341.

*Briggs*, 792 F.3d at 242. The *Briggs* Court concluded that "[t]he two statutory time limits at issue in this case clearly meet the second and third prongs of the *Blessing* test" because "[t]hey establish a right that is neither vague nor amorphous (both provisions require the allotment of food stamps within a definite number of days), and they impose binding obligations on the States (both provisions use the mandatory 'shall')." *Id.* at 242. It also found the first requirement—that Congress intended the provisions to benefit food stamp applicants—satisfied. The Court rejected the defendants' argument that the time limits "were meant only to guide the States in how to marshal their resources when administrating food stamp programs." *Id.*

The Court cited *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990), which held that plaintiffs could sue under § 1983 to enforce a reimbursement provision of the Medicaid Act. *Briggs* recognized that *Wilder* "demonstrates that a statute imposing a requirement on a 'State plan' for administering a social welfare program may nevertheless in appropriate circumstances give rise to a right enforceable under § 1983, for instance if it includes a specific mandate intended to give rights to a particular group." *Briggs*, 792 F.3d at 243-44. The *Briggs* Court continued: "while the Food Stamp Act's time limits are written as requirements for a 'State plan of operation,' the Court in *Wilder* concluded that such a formulation can be fully consistent with

a legislative intent to confer enforceable rights upon the relevant plaintiffs." *Id.* at 244 (citations

omitted); *see also id.* (adding: "Indeed, it is commonplace that laws designed to protect

individual rights are formulated as restrictions on government action."). *Briggs* also relied on

*Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987), which

held that tenants had a right to sue under § 1983 for violation of a rent ceiling provision of the

Public Housing Act.

  *Briggs* rejected the argument that *Gonzaga University v. Doe*, 536 U.S. 273 (2002),

required a different result. *Gonzaga* held that a provision of the Family Educational Rights and

Privacy Act ("FERPA") could not be enforced by private plaintiffs through § 1983.[11] *Briggs*

distinguished *Gonzaga* as follows:

> Unlike the funding provision involved in *Gonzaga*, the Food Stamp Act's time
> limits (1) contain language that is focused on the interests of the applicant
> households and calibrated to their economic needs, (2) create a specific
> requirement that must be followed for every food stamp applicant, rather than a
> generalized "policy or practice," and (3) do not merely direct the distribution of
> funds. These factors establish that Congress has conferred individual rights upon
> food stamp applicants in clear and unambiguous terms, and Gonzaga is thus
> distinguishable.

*Id.* at 244-45.

  Thus, the Second Circuit in *Briggs* concluded that the Food Stamp Act's provisions

satisfied the *Blessing* test and "therefore create a rebuttable presumption that the time limits in

those sections are privately enforceable under § 1983." *Id.* at 245. The Court noted that the

---

[11] The provision in *Gonzaga* provided:

> No funds shall be made available under any applicable program to any
> educational agency or institution which has a policy or practice of permitting the
> release of education records (or personally identifiable information contained
> therein . . . ) of students without the written consent of their parents to any
> individual, agency, or organization.

*Gonzaga*, 536 U.S. at 279 (internal quotation marks omitted).

presumption can be overcome "if Congress precluded recourse to § 1983 either 'expressly,' or 'impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'"  *Id.* (quoting *Blessing*, 520 U.S. at 341).  The *Briggs* Court held that although Congress granted enforcement power to the Secretary of Agriculture with the Food Stamp Act, the Act contains no agency process for addressing individual complaints that could take the place of private lawsuits.  *Id.* at 245.  Thus, the Court concluded that Congress did not impliedly preclude private enforcement of the Act's time limits by granting enforcement power to the Secretary of Agriculture.  *Id.* at 245-46.

### B.     The JJDPA's Provisions are Enforceable Under § 1983

Applying the analysis of *Briggs* and the Supreme Court cases upon which it relies, the JJDPA's restrictions on placing juveniles in adult facilities can be enforced through a private right of action under § 1983.  Not surprisingly, multiple courts have held that the JJDPA's restrictions on placing juveniles with adults creates rights that may be enforced through a private lawsuit under § 1983.[12]  *See, e.g.*, *Horn by Parks v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 658 (6th Cir. 1994) ("Having thus determined that the Act [JJDPA] creates a federally secured right and that Congress has not foreclosed private enforcement, we hold that appellant was and is entitled to seek relief through a private cause of action under 42 U.S.C. § 1983.  Although we are aware of no circuit court decisions on this issue, our conclusion is consistent with the majority of district court decisions on point."); *Grenier By & Through Grenier on Behalf of Grenier v. Kennebec Cnty., Me.*, 748 F. Supp. 908, 915-18 (D. Me. 1990) ("Congress intended sections

---

[12]  The adult lockup provisions of the JJDPA were first enacted in 1980 and then amended several times.  *See* Juvenile Justice Amendments of 1980, Pub. L. No. 96-509, § 11, 94 Stat. 2750; *see also, e.g.,* Juvenile Justice and Delinquency Prevention Act of 1992, Pub. L. No. 102-586, § 2, 106 Stat. 4982 (amending the provision).  The most recent amended language, enacted in 2002, makes the requirements of the statute even clearer.  *See* 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 102-273, § 12209, 116 Stat. 1758 (2002).

5633(a)(12) and (13) to create enforceable rights for juvenile detainees" and thus "Grenier may use section 1983 to seek relief from the alleged injuries he has suffered as a result of the alleged infringement of his rights under the Juvenile Justice Act"); *Hendrickson v. Griggs*, 672 F. Supp. 1126, 1135 (N.D. Iowa 1987) (rejecting defendants' argument that JJDPA's adult lockup provisions are simply a "nudge in a preferred direction," and holding that those provisions create enforceable rights).[13]

Applying *Blessing*'s three-part test, the JJDPA's restrictions on placing juveniles in adult facilities creates a right that can presumptively be enforced by private suit through § 1983. Because Congress did not preclude enforcement under § 1983 by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983, Plaintiff has a private right of action.

Plaintiff's JJDPA claim easily passes the test that "the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence." The JJDPA defines a right that is simple for courts to enforce: apart from very brief detention in

---

[13] Various other courts have also concluded that JJDPA provisions are enforceable under § 1983. *See James v. Jones*, 148 F.R.D. 196, 199-200 (W.D. Ky. 1993); *Doe v. Borough of Clifton Heights*, 719 F. Supp. 382, 384 (E.D. Pa. 1989), *aff'd without opinion*, 902 F.2d 1559 (3d Cir. 1990), *cert. denied* 498 U.S. 941 (1990); *Hendrickson v. Griggs*, 672 F. Supp. 1126, 1133–37 (N.D. Iowa 1987); *Kentucky Ass'n for Retarded Citizens v. Conn*, 510 F. Supp. 1233, 1246–50 (W.D. Ky. 1980) (recognizing the right sub silentio), *aff'd* 674 F.2d 582 (6th Cir. 1982); *Doe v. Knauf*, No. 91–187, 1992 WL 672296 (E.D. Ky. Aug. 24, 1992); *James v. Wilkinson*, No. 89–139, 1991 WL 626750 (W.D. Ky. May 20, 1991).

The district courts are not quite unanimous in holding that provisions of the JJDPA can be enforced under § 1983; Defendants have found two cases. (*See* Defs' Mem. at 18, citing *Doe v. McFaul*, 599 F. Supp. 1421 (D.C. Ohio 1984) and *Cruz v. Collazo*, 84 F.R.D. 307 (D. P.R. 1979)). However, both cases are outdated. *Cruz* involved a different provision of the JJDPA— and in fact was decided before the adult lockup provisions were even enacted. *Doe* declared the adult lockup provision in effect at the time unenforceable through § 1983 but did not engage in any analysis of the issue. Ten years later, the Sixth Circuit observed that "the *Doe v. McFaul* ruling can no longer be viewed as reliable" because the case was "decided prior to the Supreme Court's instructive decisions in *Wright*, *Wilder* and *Suter*." *Horn by Parks v. Madison Cnty. Fiscal Court*, 22 F.3d at 659.

clearly defined circumstances, juveniles may not be placed in adult facilities.  The JJDPA

requires that the state plan "shall . . . provide that no juvenile will be detained or confined in any

jail or lockup for adults."  42 U.S.C. § 5633(a)(13), excepting only for short-term detention,

measured in hours, in connection with processing, transfer, court appearances, or release.  *Id.* §

5633(a)(13)(A), (B).

  *Blessing* also requires that "the statute must unambiguously impose a binding obligation

on the state."  The JJDPA is phrased in mandatory language, stating that the state plan "shall"

"provide that no juvenile will be detained or confined in any jail or lockup for adults" except

under the limited circumstances described above.  In *Briggs*, the Second Circuit found that

language stating that a state plan "shall provide" certain procedures imposed binding obligations

on states under *Blessing.  Briggs*, 792 F.3d at 242.  Thus, as in *Briggs*, the statute is binding on

states.  *See, e.g.*, *Horn by Parks*, 22 F.3d at 658 (finding the restrictions on placing juveniles in

adult facilities are definite, specific, and mandatory, in holding that the statute is binding on

states).

  Finally, under the *Blessing* test, Congress must have intended that the provision in

question benefit the plaintiff.  As *Briggs* noted, the Supreme Court's decision in *Gonzaga*

*University v. Doe*, 536 U.S. 273, 283 (2002), clarifies that "it is rights, not the broader or vaguer

'benefits' or 'interests,' that may be enforced" under § 1983.  In finding that the Food Stamp

Act's time limits created *rights* for recipients, *Briggs* observed that the provisions were drafted in

a way that "focuses on the needs of the individual beneficiaries" by requiring that households'

eligibility be determined "promptly" and that allotments be provided retroactive to the period of

application.  *Briggs*, 792 F.3d at 244.  Also, the time limit provisions were "calibrated to

household income" so that especially needy families will receive benefits more promptly.  *Id.*

Likewise here, the JJDPA provision at issue is plainly directed at protecting the rights of individual juveniles.  By referring to treatment that "no juvenile" should experience, the provisions "contain language that is focused on the interests of the [individual]."  *Id*.  In addition, the JJDPA provisions "create . . . specific requirement[s] that must be followed," rather than merely referencing "a generalized 'policy or practice.'"  *Id.*  Finally, as in *Briggs*, the JJDPA requirements are calibrated to protect the rights of juveniles depending on their particular circumstances.  Juveniles accused of status offenses have the right not to be detained in adult facilities at all.  Juveniles accused of non-status offenses may be detained in such facilities, but only for very brief time periods, and only under a very specific set of circumstances.  Moreover, where placement in an adult facility is permitted, the statute gives a juvenile protection from contact with adults and requires supervision by staff with training to work with juveniles.  Thus, the statute not only creates rules that focus on juveniles and their needs: it calibrates these rules to the juvenile's circumstances.

Indeed, in enacting the restrictions on the placement of juveniles in adult facilities, Congress considered the detrimental effects of adult incarceration on children.[14]  The adult lockup provisions were first enacted with the Juvenile Justice Amendments of 1980.  The Senate Judiciary Committee held hearings in March 1980 to consider what became the adult lockup provisions.  To begin the hearings, Deputy Attorney General Charles Renfrew, a former federal judge, testified that the jailing of children with adults was "a national catastrophe," presented research documenting its harms, and called on Congress to "absolutely prohibit" the incarceration of children in adult facilities.  Reauthorization of the Juvenile Justice and Delinquency Prevention Act of 1974: Hearings Before the S. Comm. on the Judiciary, 96th

---

[14]  We include excerpts from the JJDPA's legislative history in an appendix.

Cong. 26-30 (March 27 and 28, 1980) (Statement of Deputy Attorney General Renfrew).[15]

Judge Renfrew's testimony on behalf of the Department of Justice was adopted and endorsed by several witnesses, who presented further research supporting his conclusions.  *See, e.g.*, *id*. at 94 (Statement of Judge Carolyn Lathrop) ("Deputy Attorney General Charles Renfrew made one of the most important and, we believe, most enlightened proposals to emerge from the administration."); *id.* at 107 (Testimony of Sally Maxton) ("We would like to strongly support the recommendation that the act mandate that no youth be held in jail with adults"); *id.* at 112 (Prepared Statement of Sally Maxton) ("[T]he Act must be strengthened to mandate that no youth in this country be held in jail with adults."); *id.* at 133 (Statement of Mark A. Thennes) ("The [National Youth Work] Alliance supports the removal of all children from adult jails."); *id.* at 155 (Statement of Barbara T. Sylvester) ("The harms and tragedies that result from the jailing of juveniles are well documented . . . ."); *id.* at 160 (Statement of Pearl West, quoting Department of Justice policy statement) ("[T]he arguments against holding juveniles in jail are pervasive and along scientific lines.").

That May, the House Committee on Education and Labor and the Senate Judiciary Committee issued favorable reports containing the adult lockup provisions within the Juvenile Justice Amendments of 1980.  According to the House Report, the adult lockup provisions would "require the removal of juveniles from jails and lock-ups for adults," after states were given five years to comply.  *See* Juvenile Justice Amendments of 1980: Report together with Supplemental and Individual Minority Views, H. Comm. on Education and Labor, H. Rpt. 96-946 (May 13, 1980).  The House Report takes notice of the Senate hearings and states that "[s]tatistics on

---

[15]  Judge Renfrew's testimony to Congress highlighted the harms of placing juveniles into isolation at adult facilities, explaining that "juveniles are highly vulnerable to emotional pressure," making "isolation of the type provided in adult facilities" a serious threat to children's long-term mental health.  *Id.* at 27.

inappropriate placements, the evidence of harm, the growing body of constitutional law, and the expressed belief that properly planned and implemented removal of juveniles from all adult jails and lock-ups is economically feasible, promoted the committee amendment." *Id.* at 24-5. During debate on the floor, House members described the harms from incarcerating children with adults and hailed the bill's mandatory requirements for removal of children from adult jails and lockups.  *See* Juvenile Justice Amendments of 1980 (floor debate).  126 Cong. Rec. p. H10921 (Nov. 19, 1980) (Statement of Rep. Coleman); *see also id.* at H10922 (Nov. 19, 1980) (Statement of Res. Comm. Corrada) ("Recognizing the detrimental effect of allowing close contact with convicted criminals, this act requires participating States to remove juveniles from adult jails."); *id.* at H10922 (Statement of Rep. Railsback) ("Some young people simply lack the maturity' to cope with the adult offender, and as a matter of fact many of them have even committed suicide rather than continue to endure abuse"); *id.* at H10923 (Statement of Rep. Weiss) ("In particular, the requirement that juveniles be removed from adult prisons and lockups is critically important.").  President Carter, signing the Juvenile Justice Amendments into law, made a statement applauding the adult lockup provisions, "which will result in the removal of juveniles from adult jails and lockups."  *See* Statement on Signing S. 2441 Into Law, 16 Weekly Compilation of Presidential Documents 50 (December 8, 1980), p. 2787-88.

Judge Renfrew's testimony set the tone for what became the JJDPA adult lockup provisions, laying out the "statistics . . ., the evidence of harm, the growing body of constitutional law," and then-emerging consensus that incarceration of children in adult facilities —and the isolation that results—subjects them to physical and mental harm, and violates their rights.  The concerns remained present throughout the Senate hearings, House and Senate reports, floor debates, and President Carter's signing statement for the Juvenile Justice

Amendments of 1980.  Without question, Congress considered the harms to children from

incarceration within adult facilities—and then, took action to protect them by giving them the

right not to be housed in these facilities except under the narrowest of circumstances.

   *Briggs* makes clear that the fact that a provision is directed at state actors and sets forth

requirements for a "state plan" does not mean the terms cannot be enforced through private

lawsuits under § 1983.  Rather, *Wilder* and *Briggs* both addressed requirements of "state plans"

and yet found these requirements enforceable by individual plaintiffs because the language

indicated a clear intent to benefit these individuals.  *See Briggs*, 792 F.3d at 244 (stressing that

"while the Food Stamp Act's time limits are written as requirements for a 'State plan of

operation,' the Court in *Wilder* concluded that such a formulation can be fully consistent with a

legislative intent to confer enforceable rights upon the relevant plaintiffs").  The Food Stamp

statute at issue in *Briggs*, like the JJDPA, was enacted under Congress' Spending Clause and

involved state-plan requirements.  Yet the Second Circuit found that it created rights enforceable

under § 1983.

   Defendants acknowledge that the *Blessing* test applies in determining whether Jane can

sue for a violation of the JJDPA under § 1983, but they say that the test's requirements are not

met.  (Defs' Mem. at 29).  The problem, Defendants say, is that Congress was naïve: "Congress,"

they assure the Court, "never contemplated a juvenile delinquent that was so violent and

dangerous as to be unsuitable for confinement in any secure juvenile facility."  (*Id.*).  Nor,

according to Defendants, did Congress contemplate "a state statutory scheme" where after a

hearing "it was determined that the plaintiff should be confined in an adult correctional facility."

(*Id.*).  In short, therefore, the argument concludes, Defendants should be excused from

compliance with the plain language of the JJDPA.  This argument is entirely misconceived.  The

relevant question under *Blessing* is whether the JJDPA's restrictions on placing juveniles in adult facilities are intended to benefit and create rights for juveniles. Such juveniles can either sue under § 1983 for violations of the JJDPA's adult lockup provisions or they cannot. Courts will not decide based on an individual child's characteristics in each case whether there is a private cause of action.

Defendants also claim that the JJDPA does not unambiguously impose a binding obligation on the state because the provisions of the statute "allow the states flexibility to experiment and devise various state plans and approaches," and gives states the ability to amend plans. (Defs' Mem. at 29). However, the focus in this case is the JJPDA's requirement that state plans "shall provide" specific restrictions on housing juveniles in adult facilities. *See* 42 U.S.C. § 5633(a). This "shall provide" language is identical to the state plan language of the statute in *Briggs*, which the Second Circuit concluded created a binding obligation.

Defendants rely heavily on *Gonzaga University v. Doe*, 536 U.S. 273 (2002). But *Gonzaga* is easily distinguishable, as it was in *Briggs*. *Briggs* noted that unlike the funding provision in *Gonzaga*, the Food Stamp Act's time limits: "(1) contain language that is focused on the interests of the applicant households and calibrated to their economic needs, (2) create a specific requirement that must be followed for every food stamp applicant, rather than a generalized 'policy or practice,' and (3) do not merely direct the distribution of funds." *Briggs*, 792 F.3d at 244. Here too, the JJDPA contains language that is focused on the interests of juveniles and is calibrated to their needs. It is certainly in the interest of juveniles not to be detained in adult facilities. Under the limited circumstances when juveniles can be placed temporarily in adult facilities, the JJDPA prohibits contact with adults and requires staff present who are trained and certified to work with them. In addition, as in *Briggs*, the JJDPA provision

creates a specific requirement that must be followed for all juveniles, rather than a generalized "policy or practice," as with the statute in *Gonzaga*. Finally, the Act does not merely direct the distribution of funds. Rather, it provides concrete rules regarding the conditions under which juveniles may be detained. These factors show that Congress has conferred individual rights upon juveniles in clear and unambiguous terms.[16]

Thus, under *Blessing*, there is a rebuttable presumption that the JJDPA's restrictions on placing juveniles in adult facilities are privately enforceable under § 1983. This presumption could be overcome if "Congress precluded recourse to § 1983 either 'expressly,' or 'impliedly,' by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Briggs*, 792 F.3d at 245 (quoting *Blessing*, 520 U.S. at 341). But Congress did no such thing: the JJPDA contains no express prohibition on § 1983 lawsuits. Moreover, the JJPDA does not create an enforcement scheme incompatible with individual enforcement under § 1983.[17] In *Gonzaga*, weighing against private lawsuits was the fact that FERPA created a comprehensive agency hearing procedure to address individual complaints. Here, the JJDPA creates no such mechanism for addressing individual complaints by juveniles. *See Briggs*, 792 F.3d at 245 ("In stark contrast with FERPA, however, the Food Stamp Act contains no similar agency adjudication process or enforcement structure that could take the place of private lawsuits. Rather, the statute before us is analogous to those in *Wright* and *Wilder*. The statutes in both of those cases gave the appropriate federal agencies the power to

---

[16]  It bears noting that *Briggs* did not involve a Medicaid statute. Thus, Defendants' argument that the JJDPA does not create enforceable rights because it does not fall under the so-called *Suter* amendment—which addressed Medicaid statutes—is unpersuasive. (Defs' Mem at 27 n.13).

[17]  Under the JJDPA, the consequence for a state that fails to comply with the adult lockup provision is a substantial reduction in funding for the following year, or even termination of funding. 42 U.S.C. § 5633(c).

exercise oversight and withhold funds, but that authority was held to be consistent with a private right to sue under § 1983 because the statutes at issue did not construct frameworks for resolving individuals' complaints."); *Horn by Parks*, 22 F.3d at 659 (noting that Congress did not intend to preclude reliance on § 1983 because the JJPDA "contains no provision for private judicial or administrative enforcement" and "[t]hat the Act gives the Administrator of the Office of Juvenile Justice and Delinquency Prevention the power to terminate or withhold funding does not manifest congressional intent to foreclose reliance on § 1983 to vindicate federal rights").

Finally, Defendants' reliance on *Sossamon v. Texas*, 563 U.S. 277 (2011), misses the point of that case. *Sossamon* held *that the private action provision of the statute at issue,* the Religious Land Use and Institutionalized Persons Act ("RLUIPA") did not waive the state's sovereign immunity from suit for money damages. RLUIPA itself contains an express private cause of action for "appropriate relief against a government," including states, their officers, and person acting under color of state law. *Id.* at 282; 42 U.S.C. § 2000cc-2(a). Sossamon sued the State of Texas and prison officials for injunctive and monetary relief related to policies that prevented prison inmates from attending religious services. The Court strictly construed the phrase "appropriate relief" in favor of the state, and concluded that "it does not include suits for damages against a State." *Sossamon*, 563 U.S. at 282. Rather, the phrase permitted only injunctive relief. The Court noted that its analysis related to scope of an *express* cause of action in a statute, and cases related to implied rights of action did not "translate to this context." *Id.* at 289.

Unlike RLUIPA, the JJPDA does not contain an express cause of action. The question is, instead, whether private plaintiffs can pursue relief against state officials for violations of the JJPDA through § 1983. The scope of the phrase "appropriate relief" that appears in the express

cause of action set forth in RLUIPA is simply not relevant to whether plaintiffs can sue state officials under § 1983 for JJPDA violations.  The relevant analysis is in *Briggs*.  If a statutory right is enforceable under § 1983, plaintiffs can seek both injunctive relief and damages—because § 1983 itself provides both of these remedies.[18]

## III.   PREA'S STRICT LIMITATIONS ON PLACING JUVENILES IN SOLITARY CONFINEMENT MAY BE ENFORCED BY PRIVATE PLAINTIFFS UNDER § 1983.

As with the JJDPA, Jane seeks to vindicate her Prison Rape Elimination Act of 2003 (PREA) rights through § 1983, not, as Defendants assume, via a private right of action under PREA itself.  Section 7 of PREA, 42 U.S.C. § 15607, provides for states' adoption of "national standards for the detection, prevention, reduction, and punishment of prison rape."  The provision requires states to submit to the Attorney General "a certification that *the State has adopted*, and is in *full compliance* with, the national standards" in order to avoid reductions in federal funding "for prison purposes."  42 U.S.C. § 15607(e)(2)(A) (emphasis added).  PREA Section 7 therefore creates rights defined by the National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106-01 (2012), and § 1983 provides the cause of action to enforce them.  *See Briggs v. Bremby*, 792 F.3d 239 (2d Cir. 2015); *Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015).

The regulations define a robust set of important rights applicable to Jane's solitary confinement within a juvenile facility.  The regulations provide:

---

[18]  *Sossamon* addressed suits for money damages against the State.  As Defendants note, the Second Circuit later clarified that RLUIPA's express cause of action (providing for "appropriate relief") also does not authorize suits for money damages against state officials in their individual capacity.  *See Washington v. Gonyea*, 731 F.3d 143 (2d Cir. 2013).  Significantly, Plaintiff here is proceeding under § 1983, which permits plaintiffs to sue state officials in their individual capacities for damages.

**§ 115.342 Placement of residents in housing, bed, program, education, and work assignments.**

(b) Residents may be isolated from others only as a last resort when less restrictive measures are inadequate to keep them and other residents safe, and then only until an alternative means of keeping all residents safe can be arranged.

. . . .

(h) If a resident is isolated pursuant to paragraph (b) of this section, the facility shall clearly document:

      (1) The basis for the facility's concern for the resident's safety; and
      (2) The reason why no alternative means of separation can be arranged.

(i) Every 30 days, the facility shall afford each resident described in paragraph (h) of this section a review to determine whether there is a continuing need for separation from the general population.

28 C.F.R. § 115.342 (effective date August 20, 2012). Jane was never afforded the 30-day review PREA requires. (Compl. ¶ 132). Even worse, she was not held in isolation as a "last resort." (Compl. ¶ 131). In electing to hold Jane in prolonged isolation, DCF flouted PREA's regulations, exposing Jane to the precise harm that the law was intended to prevent.[19] By improperly placing Jane in isolation and failing to afford her a 30-day review, DCF violated Jane's PREA rights defined the regulations and adopted by Connecticut. 42 U.S.C. § 15607(e)(2)(A); 28 C.F.R. § 115.342; Conn. Gen. Stat. § 18-81cc.

This case follows *a fortiori* from *Briggs. Briggs* held that time limits for awarding food stamp benefits were enforceable through § 1983 even though the time limits are contained within requirements for "state plan[s] of operation" submitted to the Secretary of Agriculture. *Briggs*,

---

[19] 42 U.S.C. § 15602 ("The purposes of this chapter are to . . . . (7) protect the Eighth Amendment rights of Federal, State, and local prisoners."); 42 U.S.C. § 15601(13) ("The Eighth Amendment rights of State and local prisoners are protected through the Due Process Clause of the Fourteenth Amendment. Pursuant to the power of Congress under Section Five of the Fourteenth Amendment, Congress may take action to enforce those rights in States . . . ."). As the Department of Justice recognized in adopting the regulations codified in §115.342, "[i]solation is known to be dangerous to mental health, especially among youth." National Standards to Prevent, Detect, and Respond to Prison Rape, 77 Fed. Reg. 37106-01 (2012).

792 F.3d at 241.  Here, (1) Congress surely intended to benefit plaintiffs like Jane by creating national standards to protect them; (2) the national standards define specific rights that are well within judicial competence to enforce; and (3) by facilitating the standards' adoption nationwide, Congress unambiguously imposed binding obligations on states, like Connecticut, that have adopted them.

First, in enacting PREA, Congress intended to benefit plaintiffs like Jane.  PREA was passed to protect inmates' rights, including residents at juvenile correctional facilities.  *See* 42 U.S.C. § 15602 ("The purposes of this chapter are to . . . . (7) protect the Eighth Amendment rights of Federal, State, and local prisoners."); 42 U.S.C. § 15609(7) (for purposes of the Act, "[t]he term 'prison' means any confinement facility of a Federal, State, or local government . . . *and includes . . . any juvenile facility used for the custody or care of juvenile inmates*") (emphasis added).  DCF flouted PREA regulations that specifically protect residents of juvenile facilities, like Jane, who are placed in solitary confinement.  28 C.F.R. § 115.342.

Second, Jane's rights were specifically defined by PREA regulations.  "When a federal statute creates a right enforceable through 42 U.S.C. § 1983, federal regulations may be relevant in determining the scope of the right conferred by Congress."  *Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015) (citing *Shakhnes v. Berlin*, 689 F.3d 244, 251 (2d Cir.2012)) (quotation marks omitted).  PREA regulations define the statutory rights of residents of juvenile facilities who, like Jane, are placed into isolation.  28 C.F.R. § 115.342(b).  The regulation requires facilities to use isolation only as a "last resort," when "less restrictive measures" are inadequate, and only until an alternative means of safety can be arranged.  *Id.* § 115.342(b).  The regulation, § 115.342(h), also requires juvenile facilities to document the basis for considering isolation, § 115.342(h)(1), and the reason why no alternative means of separation can be

41

arranged, § 115.342(h)(2), making it easier to review the basis for isolation and determining whether it was used as a last resort.  Once placed in isolation, § 115.342(i) grants residents at juvenile facilities a right to a review every 30 days of "whether there is a continuing need for separation from the general population."  None of the substantive and procedural rights protected by PREA are "so vague and amorphous that its enforcement would strain judicial competence." *Briggs*, 792 F.3d at 242.  The rights are well-defined and specific, and are well within judicial competence to enforce.

Third, by seeking states' adoption of and compliance with the national standards, Congress imposed binding obligations on the states.  In seeking the creation and adoption of national standards, Congress invoked its power to enforce "[t]he Eighth Amendment rights of State and local prisoners" as "protected through the Due Process Clause of the Fourteenth Amendment."  42 U.S.C. § 15601 (13).  PREA Section 7, titled "[a]doption and effect of national standards," uses rights-creating language, requiring "a certification that the State *has adopted*, and is in *full compliance* with," standards issued by the Attorney General "for the detection, prevention, reduction, and punishment of prison rape" in order to remain fully eligible for federal funds.  42 U.S.C. § 15607 (emphasis added).  The final rule issued by Department of Justice is clear that the standards "apply to facilities operated by, or on behalf of, State and local governments."  77 Fed. Reg. at 37107.  PREA facilitates the adoption of the national requirements using Congress's spending power, penalizing states that fail to adopt the standards, but individual rights can be found even within statutes passed exclusively under the Spending Clause, let alone laws also passed pursuant to Fourteenth Amendment enforcement power.  *See Briggs,* 792 F.3d at 245-46 (finding individual rights enforceable through § 1983 within the Food Stamp Act, a statute passed exclusively under Congress's Spending Power).

Defendants cite many cases for the proposition that "PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue. The statute does not grant prisoners any specific rights."  *See* Defs' Mem. at 16-17 (quoting *Breer v. Medor*, 2:12-CV-53, 2013 WL 4456896 (D. Vt. Aug. 16, 2013)) (citing *Chinnici v. Edwards*, 2008 WL 3851294, at *3 (D. Vt. 2008)); *see also Ball v. Beckworth*, No. CV 11-00037-H-DWM, 2011 WL 4375806, at *4 (D. Mont. Aug. 31, 2011) ("PREA provides for the reporting of incidents of rape in prison, the allocation of grants, and it created a study commission").  The proposition originates in cases from before the PREA national standards were made effective in August 2012 and none of the cases cited by defendants reexamines the proposition in light of the standards.  *See, e.g.*, *Simmons v. Solozano*, No. 3:14CV-P354-H, 2014 WL 4627278, at *4 (W.D. Ky. Sept. 16, 2014) (construing a *pro se* claim as being alleged under PREA and relying on *Chinnici* to dismiss claim); *Montgomery v. Harper*, No. 5:14CV-P38-R, 2014 WL 4104163, at *2 (W.D. Ky. Aug. 19, 2014) (construing a *pro se* claim as alleging a violation of PREA and relying on *Chinnici* to dismiss claim); *Breer*, 2013 WL 4456896 at *6 (relying on *Chinnici* and other earlier cases); *Chapman v. Willis*, No. 7:12-CV-00389, 2013 WL 2322947, at *4 (W.D. Va. May 28, 2013) (relying on *Chinnici* and *Ball*); *Holloway v. Dep't of Corr.*, No. 3:11VCV1290 VLB, 2013 WL 628648, at *2 (D. Conn. Feb. 20, 2013) (relying on *Chinnici* and *Ball*); *Chao v. Ballista*, 772 F.Supp.2d 337 (D. Mass. 2011) (relying on cases that were decided in 2009 or earlier including *Chinnici*).  PREA "authorizes grant money, and creates a commission to study the issue," *Chinnici*, 2008 WL 3851294, at *3, but it has also done much more.  PREA, "the first federal law to address the sexual abuse of prisoners," *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015), "represents a sea change in public consciousness and in national commitment to protecting individuals under correctional supervision from sexual

43

abuse." *National Prison Rape Elimination Commission Report* 24 (2009).  The State of New

Jersey describes PREA as follows:

> This act was established to provide for the analysis of the incidence and effects of
> prison rape in Federal, state, and local institutions and provide information,
> resources, and recommendations and funding to protect individuals from prison
> rape, sexual abuse, and sexual harassment.  The major provisions of PREA
> include adherence to a zero-tolerance standard for the incidence of inmate sexual
> assault and rape, the development of standards for the detection, prevention,
> reduction, and punishment of prison rape, and the collection and dissemination of
> information on the incidence of prison rape.

N.J. Admin. Code § 10A:9-1.3; *see also* 22 La. Admin. Code Pt I, 341("*Prison Rape Elimination*

*Act of 2003 (PREA)*--a federal law enacted to establish a zero-tolerance standard for the

incidence of sexual assault within an institutional setting.").  PREA's new standards have been

adopted, and are thus binding, in most states, including Connecticut.[20]  Thus, the PREA cases

cited by defendants have become outdated.

Most of the cases cited by defendants were decided before PREA regulations provided

well-defined standards that brought PREA's mandates within judicial competence to enforce.

And none of the cases cited by defendants, even the most recent ones, involved a juvenile—for

whom regulations define additional protections—let alone a juvenile placed in solitary

confinement, circumstances very specifically regulated by PREA.  Indeed, no federal court has

yet construed the extent of the rights defined by PREA regulations concerning juvenile facilities.

---

[20]  *See, e.g.*, Conn. Gen. Stat. § 18-81cc; Idaho Admin. Code r. 05.01.02.220 (regulations
regarding PREA compliance); 505 Ky. Admin. Regs. 1:170 (incorporating PREA regulations by
reference); Mont. Admin. R. 20.7.910(2)(i) (requiring private contractors to have PREA
compliance policies); 81 Neb. Admin. Code Ch. 10, 003.06 (requiring facilities to "maintain
compliance with standards set forth in the Prison Rape Elimination Act"); N.M. Admin. Code
8.14.5.24 ("The department maintains a comprehensive written procedure regarding the
detection, prevention, reduction and punishment of sexual misconduct consistent with the Prison
Rape Elimination Act (PREA), a copy of which is kept at each facility."); 37 Tex. Admin. Code
§ 344.620 (requiring juvenile probation officers to pass a competency exam on topics including
PREA compliance).

The PREA cases cited by defendants, in addition to being outdated, are therefore distinguishable as well.

## IV.     PLAINTIFF STATES A VALID CLAIM UNDER THE ADA AND THE REHABILITATION ACT.

Defendants' argument that the complaint fails to state a claim for relief under the ADA or the Rehabilitation Act reflects a misunderstanding of immunity doctrines and relies on a Second Circuit case that has been abrogated in relevant part by a Supreme Court case.  The Court should not dismiss the claims.

### A.     Plaintiff Need Not Allege Discriminatory Animus or Ill Will to State a Claim under the ADA.

Citing *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F. 3d 98, 107 (2d Cir. 2001), Defendants assert that Plaintiff's claim for monetary damages for violations of Title II of the ADA must be dismissed because Plaintiff did not allege that the violations were motivated by discriminatory animus or ill will due to Plaintiff's disability.  (Defs' Mem. at 31).[21]

However, Defendants do not recognize that *Garcia*'s holding is inapplicable after the Supreme Court's decision in *United States v. Georgia*, 546 U.S. 151 (2006), and the Second Circuit's decision in *Bolmer v. Oliveira*, 594 F.3d 134, 139 (2010).  *Georgia* held that Title II of the ADA validly abrogated state sovereign immunity to create a private right of action for money damages against the State for conduct that "actually violates" the Fourteenth Amendment in addition to the ADA.  Because Jane alleges that Defendants' conduct actually violated the

---

[21]  Defendants also assert that "all ADA claims against the four individual defendants in their individual capacities must be dismissed."  (Defs' Mem. at 32).  However, Plaintiff has not sued state officials in their individual capacities for violations of Title II of the ADA (or for violations of § 504 of the Rehabilitation Act).  The Ninth Cause of Action, alleging a violation of the ADA, names officials only in their official capacity.  The Tenth Cause of Action, alleging a violation of the Rehab Act, does the same.  Thus, this Court need not dismiss ADA or Rehab Act claims against anyone in their individual capacity.

Fourteenth Amendment (and the Eighth Amendment), Plaintiff may maintain a claim for money damages under the ADA against the State and its agencies for this conduct—and need not allege discriminatory animus or ill will.

In *Georgia*, a paraplegic inmate brought a suit for damages under Title II of the ADA against the State of Georgia, the Department of Corrections, and several individual prison officials alleging that he was confined to his cell for 23-24 hours per day and had been denied access to prison programs and services on account of his disability. *See id.* at 154-55. The Supreme Court remanded the case to the Eleventh Circuit, holding that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id.* at 159. On remand, the Eleventh Circuit was instructed to determine "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 159.[22]

Notably, the Supreme Court did not require the plaintiff in *Georgia* to allege discriminatory animus or ill will on the basis of the plaintiff's disability. Following *Georgia*, in *Bolmer v. Oliveira*, 594 F.3d 134 (2010), the Second Circuit held that discriminatory animus need not be alleged when a plaintiff alleges that a defendant's conduct violated both Title II and

_____

[22] Congress explicitly abrogated the States' Eleventh Amendment immunity when a State is sued under Title II of the ADA. 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter.").

46

substantive due process rights under the Fourteenth Amendment.[23]   The Second Circuit rejected the argument that *Garcia* controlled, holding that "(1) *Garcia* is not applicable when Congress's abrogation is supported by its enforcement of the substantive due process right not to be involuntarily committed absent a danger to self or others" and "under *Georgia* and *Lane*, Congress validly abrogated states' Eleventh Amendment immunity where the same conduct by the defendant violated both Title II and substantive due process."  *Id.* at 149.[24]

> **B.   Plaintiff Alleges that Defendants Conduct Violated the Eighth and Fourteenth Amendments and Therefore She May Maintain a Title II ADA Claim Without Alleging Discriminatory Animus.**

Plaintiff has alleged that Defendants' conduct violated not only Title II of the ADA, but also Jane's Eighth Amendment and substantive due process rights under the Fourteenth Amendment.  (Compl. First Cause of Action (Fourteenth Amendment violation); Second Cause

---

[23]   In *Bolmer*, a plaintiff who had a history of mental illness brought suit against a doctor and the state agency DMHAS, alleging that the doctor violated his Fourth and Fourteenth Amendment rights by having him involuntarily committed and that DMHAS violated "Title II of the ADA by stereotyping [him] as an unreliable individual who manifested delusions because of his disability." *Id.* at 139.  Citing *Garcia*, DMHAS asserted that the district court should have required a showing of discriminatory animus or ill will before denying it summary judgment on its Eleventh Amendment immunity defense to the plaintiff's Title II ADA claim.  *Id.* at 136.

[24] Numerous district courts in this Circuit have recognized that, after *Georgia*, *Garcia*'s "discriminatory animus or ill will" requirement does not apply where a plaintiff complains of conduct that actually violates the Fourteenth or Eighth Amendments.  *See, e.g.*, *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 410 (S.D.N.Y.), on reconsideration, 452 F. Supp. 2d 328 (S.D.N.Y. 2006) (on reconsideration, denying defendants' motion to dismiss Title II ADA claim where plaintiff alleged that conduct also violated the Eighth Amendment; applying *Georgia* and noting that *Garcia*'s animus requirement did not apply); *Skipp v. Connecticut Judicial Branch*, No. 3:14-CV-00141 JAM, 2015 WL 1401989, at *7 (D. Conn. Mar. 26, 2015) ("To the extent that Count Four of the second amended complaint alleges state actions that violate both Title II of the ADA and the Fourteenth Amendment, Congress has abrogated sovereign immunity for such claims."); *see also Mercer v. Champion*, 139 Conn. App. 216, 227, 55 A.3d 772, 781 (2012) ("Therefore, in accordance with *Georgia*, as followed in *Mercer*, as long as the private cause of action against the state for money damages stems from conduct that violates the fourteenth amendment, Title II validly abrogates state sovereignty without necessitating a showing of discriminatory animus or ill will.").

of Action (Fourteenth Amendment violation); Third Cause of Action (Eighth Amendment violation); Fourth Cause of Action (Eighth Amendment violation); ¶ 161 ("Instead of complying with the ADA, DCF elected to hold Jane in conditions of confinement that violated her rights under the Eighth and Fourteenth Amendments of the United States Constitution).

Without acknowledging either *Georgia* or *Bolmer*, Defendants assert that a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by discriminatory animus or ill will.  (Defs' Mem. at 31).  As discussed above, under *Georgia* and *Bolmer*, Congress's abrogation of Eleventh Amendment immunity is valid as to a Title II claim if a state defendant's conduct has also violated the Eighth or Fourteenth Amendment.  Under these circumstances, discriminatory animus need not be alleged.  Jane has alleged that Defendants' conduct violated the Eighth and Fourteenth Amendments in addition to Title II of the ADA.  Accordingly, there is no basis for dismissing her Title II ADA claim for failure to allege discriminatory animus.

### C. Eleventh Amendment Sovereign Immunity and Qualified Immunity Do Not Bar Plaintiff's ADA and Rehab Act Claims.

In Defendants' view, Plaintiff's ADA and Rehab Act claims should be dismissed based on Eleventh Amendment sovereign immunity and qualified immunity.  However, these immunity doctrines do not apply to these claims.

Defendant asserts that Plaintiff's claims against the State of Connecticut and DCF for violations of the ADA and Rehab Act are barred by sovereign immunity.[25]  However, as discussed above, as along as a Title II ADA claim for money damages stems from conduct that violates the Fourteenth (and/or Eighth) Amendment, Title II validly abrogates state sovereign

---

[25]  Defendants assert that all claims against the State of Connecticut and DCF are barred by Eleventh Amendment sovereign immunity.  (Defs' Mem. at 30).  Plaintiff has sued the State of Connecticut and DCF only for ADA and Rehab Act violations.

immunity.  Sovereign immunity is thus no defense to Jane's Title II ADA claims because

Defendants placed her in conditions that also violated the Eighth and Fourteenth Amendments.

Significantly, even if the Court determined that Jane had not alleged a Fourteenth or Eighth

Amendment violation, the Court would need to determine whether sovereign immunity was

nonetheless abrogated with respect to the conduct alleged.  *See Georgia*, 546 U.S. at 159

(instructing the Eleventh Circuit on remand to determine "(1) which aspects of the State's

alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth

Amendment; and (3) insofar as such misconduct violated Title II but did not violate the

Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to

that class of conduct is nevertheless valid.").  To make this determination at step 3, "courts must

analyze whether there is 'congruence and proportionality between the injury to be prevented or

remedied and the means adopted to that end.'" *Dunion v. Thomas*, 457 F. Supp. 2d 119, 122 (D.

Conn. 2006) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 521 (1997)); *see also Andino v.

Fischer*, 698 F. Supp. 2d 362, 377-78 (S.D.N.Y. 2010) ("If the court finds that state conduct did

not violate the Fourteenth Amendment, the third prong of the *Georgia* analysis requires the court

to consider the *City of  Boerne* tripartite congruence and proportionality inquiry to determine

whether abrogation in this case would be deemed a valid exercise of Congressional power under

§ 5 of the Fourteenth Amendment.  Courts that have reached this final prong have addressed it as

a case-specific inquiry.") (citations omitted). Accordingly, the ADA claim should not be

dismissed based on sovereign immunity.

     In addition, there is no sovereign immunity with respect to the Rehab Act claim:

Defendants have waived any sovereign immunity by accepting federal funds.  *See, e.g.*, *Mutts v.

S. CT State Univ.*, No. 3:04 CV 1746 (MRK), 2006 WL 1806179, at *4 (D. Conn. June 28, 2006)

*aff'd sub nom. Mutts v. S. Connecticut State Univ*., 242 F. App'x 725 (2d Cir. 2007); *Super v. J. D'Amelia & Associates, LLC*, No. 3:09CV831 SRU, 2010 WL 3926887, at *12 (D. Conn. Sept. 30, 2010); 42 U.S.C. § 2000d–7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of Section 504 of the Rehabilitation Act of 1973 . . .").

Moreover, although Defendants assert that "qualified immunity bars all money damages in this case," (Defs' Mem. at 36) qualified immunity is not a defense to a claim brought under Title II of the ADA and the Rehab Act against the state and its officials in their official capacities.  Qualified immunity is a potential defense for state officials sued *in their individual capacities* under § 1983 for violations of the Constitution and federal statutes.  *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).  Qualified immunity is not a defense at all to Plaintiff's ADA or Rehab Act claims, which she brings against the State of Connecticut, DCF, and state officials in their official capacities.  (Compl. Ninth Cause of Action; Tenth Cause of Action).

Significantly, Plaintiff need not allege that Defendants violated *clearly established* Eighth Amendment or Fourteenth Amendment rights in order to pursue her claim for money damages under Title II of the ADA.  Instead, an allegation simply of the constitutional violation suffices.  Accordingly, by showing that she was placed in solitary confinement in violation of the ADA, Jane may recover damages arising from the unconstitutional conditions of her confinement even if Defendants would otherwise be entitled to qualified immunity on the constitutional claims.

**D.     Plaintiff Has Properly Alleged a Violation of Title II of the ADA and the Rehab Act.**

Defendants say that the complaint fails to allege a violation of a specific title of the ADA. (Defs' Mem. at 31 n.14).  Not so: The Ninth Cause of Action in the complaint alleges in detail a violation of Title II of the ADA.

50

In addition, contrary to Defendants' assertion, the complaint is obviously sufficiently descriptive about the nature of Jane's disability to put the Defendants on notice of the nature of her claim.  Jane's well-documented history of traumatic experiences—including while in DCF custody—have demonstrably disrupted the course of her mental, social, psychological, and emotional development and have substantially impaired her abilities to work, live, and communicate with others.  (*See* Compl. ¶ 149 ("[A]s a result of her long history of horrific trauma and abuse, as well as DCF's persistent failure to properly care for and protect her, Jane suffers from significant mental impairments that substantially limit one or more major life activities, including but not limited to her ability to work, live, and communicate with others.")).  The complaint also alleges in detail how Jane's mental state deteriorated while she was held in isolation.  (*Id*. ¶¶ 74-80).  As a result of these impairments, Jane is a "qualified individual with a disability" and falls within the protection of the ADA and Rehabilitation Act.

Moreover, the complaint is specific in describing the many ways in which Defendants violated numerous requirements of Title II of the ADA and the Rehab Act.  Title II of the ADA provides that "[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The "integration mandate" detailed by the ADA regulations requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); *id.* § 35.152(b)(2) (requiring that prisoners with disabilities be housed in the most integrated setting appropriate to their needs).

As the complaint details, in violation of the ADA, DCF singled Jane out for decidedly non-integrated treatment, choosing to warehouse her in isolation rather than provide her with appropriate psychological and social programming.  Such treatment constituted discrimination based on Jane's disabilities.  Moreover, by isolating Jane, DCF denied her the ability to participate in and benefit from services and activities provided to other children in DCF custody, including those at CJTS and the Pueblo Unit.  Such unequal and inferior treatment violated the ADA, *id.* § 35.130(b)(1)(i), (iv), as did DCF's failure to make reasonable modifications and provide Jane with the treatment and support that she needed, *id.* § 35.130(b)(7).[26]

Much like the ADA, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  DCF isolated Jane from her peers and placed her in prolonged solitary confinement because of their alleged concern about Jane's behavior and instability.  These behaviors are directly attributable to her disabilities, and thus Defendants' illegally isolated and discriminated against Jane solely because of her disability within the meaning of the Rehabilitation Act.

In urging dismissal of Plaintiff's ADA and Rehab Act claims, Defendants also assert: "[T]o the extent plaintiff alleges that she could not participate in programs, this was solely due to her state court lawyers instructing her to refuse to participate, and not due to any discriminatory animus or lack of opportunity to participate.  Plaintiff declined to participate, for example, in

---

[26]  The U.S. Department of Justice has detailed how juvenile justice facilities violate the ADA by failing to provide reasonable programming modifications enabling youth with disabilities to avoid imposition of seclusion due to their disability-related behaviors.  *See* Statement of Interest of the United States in *G.F. v Contra Costa County*, No. 3:13-cv-03667-MEJ (N.D. Cal.), available at http://www.justice.gov/crt/about/spl/documents/contracosta_soi_2-13-14.pdf.

recreation in the gymnasium, where she might have been able to interact with one or more other youthful offenders confined at Yok (sic) CI at that time." (Defs' Mem. at 32). With these statements, Defendants are improperly inserting claimed facts that are outside the face of the complaint. Suffice it to say, that is not Plaintiff's version of events. The Court obviously cannot resolve these factual disputes now. Rather, these Defendants' statements reveal that there are many factual issues bearing on the ADA and Rehab Act claims that must be developed through discovery and resolved at a later stage of the case.

## V.    DEFENDANTS ARE NOT ENTITLED TO ABSOLUTE IMMUNITY

Defendants claim that they are entitled to absolute immunity "for all claims arising from the initial placement of Jane Doe at York CI as they relied in good faith on valid order of the Superior Court for Juvenile Matters, which, after a six day evidentiary hearing order that Jane Doe be transferred to DOC." (Defs' Mem. 33-34). Defendants assert that state officials who carry out court orders are "acting in a quasi-judicial capacity" and thus entitled to absolute immunity. According to Defendants, they are entitled to absolute immunity because they "were carrying out an order of the court, in good faith, and in accordance with sound professional judgment, as determined by experienced mental health and correctional professionals." (Defs' Mem. at 35-36).

Whether Defendants were in fact acting in accordance with "sound professional judgment"—as determined by mental health and correctional professionals—is of course a factual question that cannot be resolved at this stage of the litigation. But in any event, absolute immunity doctrines simply do not protect Defendants here.

The Supreme Court has been "quite sparing" in its recognition of absolute immunity. *Burns v. Reed*, 500 U.S. 478, 487 (1991). "The presumption is that qualified rather than absolute

immunity is sufficient to protect government officials in the exercise of their duties." *Id.*; *accord DiBlasio v. Novello*, 344 F.3d 292, 296-97 (2d Cir. 2003). "Absolute immunity is accorded to judges and prosecutors functioning in their official capacities and, under certain circumstances, is also extended to officials of government agencies 'performing certain functions analogous to those of a prosecutor' or a judge." *DiBlasio*, 344 F.3d at 297.[27] The focus in assessing whether absolute immunity applies is the function performed by an individual, rather than the title or identity of the person. *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995). Absolute immunity does not extend to any acts by any individual that are classified as administrative or executive tasks. *Id.*

In determining the location and conditions of Jane's confinement, Defendants were not merely carrying out an order from the Court or acting in a "quasi-judicial" capacity. *See, e.g.*, *Hamilton v. Leavy*, 322 F.3d 776, 785 (3d Cir. 2003) (prison officials not entitled to absolute immunity because "[t]he Superior Court's orders entered in this case did not direct the defendants—expressly or otherwise—to confine Hamilton in conditions that they knew posed a substantial risk of serious harm").

On April 8, 2014, the Superior Court for Juvenile Matters (Kaplan, J.) ordered as follows:

---

[27] Courts have extended absolute immunity to non-judicial officials only in limited circumstances, where the officials had an integral relationship with the judicial process. *See, e.g.*, *Kermit Constr. Corp. v. Banco Credito Y Ahorro Ponceno*, 547 F.2d 1, 3 (1st Cir. 1976) (a court-appointed receiver "who faithfully and carefully carries out the orders of his appointing judge must share the judge's absolute immunity"); *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238-39 (7th Cir. 1986) ("It is difficult to think of a task more intimately related to a judicial proceeding than that of enforcing a money judgment entered by a court. Because the Sheriff was acting in furtherance of his 'official duties in aid of the court,' he is entitled to quasi-judicial absolute immunity from suit for damages arising from those acts.") (citation omitted); *Tarter v. Hury*, 646 F.2d 1010, 1013 (5th Cir. 1981) ("Court clerks enjoy an even narrower ambit of immunity than judges and prosecutors. They have absolute immunity from actions for damages arising from acts they are specifically required to do under court order or at a judge's direction, and only qualified immunity from all other actions for damages.").

> She is ordered transferred to Niantic as a transgender female. She is to be held in isolation for no more than 72 hours. She is to be examined, evaluated and classified under the appropriate State and Federal statutes, guidelines, rules and procedures. Following the classification process, the Commissioner of Correction shall make his own placement determination. This transfer shall be reviewed by the court every 6 months to determine whether it should be continued or terminated, unless the Commissioner of DCF has already exercised the powers granted said Commissioner under § 17a-13 by removing [Jane] from the John R. Manson Youth Institution, Cheshire, or the Connecticut Correctional Institution, Niantic. The transfer shall terminate upon the expiration of the commitment in this juvenile matter.

The court order did not strip Defendants of all discretion and authority regarding Jane's placement and conditions of confinement. Rather, Defendants retained the authority and responsibility to set the conditions of confinement after Jane's transfer was ordered by the court. The order specifically directs the Commissioner of Correction to "make his own placement determination" and reminds the DCF Commissioner of her statutory authority to remove Jane from DOC custody at any time. Thus, the order provided wide discretion for both the Commissioner of Correction and the DCF Commissioner to determine the location and conditions of Jane's confinement. Accordingly, Defendants cannot claim that the conditions under which they held Jane were mandated by court order. Indeed, the conditions they chose for Jane were in direct conflict with Judge Kaplan's order. Not only did they hold Jane in isolation for far longer than 72 hours, they did not detain her in accordance with governing federal statutes.

Following the transfer of a child to the custody of the Commissioner of Correction under Conn. Gen. Stat. § 17a-12, the DCF Commissioner retains the authority to remove the child from DOC custody at any time. *See* Conn. Gen. Stat. § 17a-13 ("Any person committed to the Department of Children and Families who is transferred to the John R. Manson Youth Institution, Cheshire, or the York Correctional Institution, pursuant to section 17a-12, shall be

deemed, while so transferred, to be under the jurisdiction of the Department of Correction except that the Commissioner of Children and Families shall retain his powers to remove such person and to place him in another facility or in the community or to terminate the commitment."). Indeed, the DCF Commissioner ultimately exercised her authority to remove Jane from DOC custody pursuant to § 17a-13 on June 24, 2014.  Thus, at any time prior to that date, the DCF Commissioner could have removed Jane from York CI and put her in a suitable placement.

In addition, Conn. Gen. Stat. § 18-87 provides that the Commissioner of Correction "may transfer any inmate of any of the institutions of the Department of Correction to any other appropriate state institution with the concurrence of the superintendent of such institution or to the Department of Children and Families when the Commissioner of Correction finds that the welfare or health of the inmate requires it." Conn. Gen. Stat. § 18-87.[28]  Thus, the DOC Commissioner could have transferred Jane to a different state institution.  Moreover, even while keeping Jane under the custody of the DOC Commissioner, DOC and DCF officials could have worked to ensure that Jane had necessary treatment and regular contact with an appropriate peer group.

Defendants' actions with respect to the location and conditions of Jane's confinement were administrative—not adjudicative or prosecutorial.  Judge Kaplan's order granted Defendants wide discretion over placement and conditions of Jane's confinement, and Defendants were not merely carrying out Judge Kaplan's order.  In fact, Defendants violated the order by holding Jane in isolation for more than 72 hours and in conditions that violated federal law.  Accordingly, the order does not afford Defendants absolute immunity.  Defendants were in no way acting in a "quasi-judicial" capacity.

---

[28]  Only inmates under age 18 may be transferred by DOC to DCF, and only if the DCF Commissioner consents.  Conn. Gen. Stat. § 18-87.

**VI.    QUALIFIED IMMUNITY DOES NOT BAR RELIEF AND, IN ANY EVENT, INVOLVES FACTUAL ISSUES THAT CANNOT BE RESOLVED AT THIS STAGE OF THE CASE.**

Defendants assert that "qualified immunity bars all money damages in this case" because "the rights alleged by plaintiff to have been violated or infringed were not clearly established at the time of the events giving rise to this action." (Defs' Mem. at 36). As described above, qualified immunity is not a defense at all to Plaintiff's ADA and Rehabilitation Act claims. In addition, it would be inappropriate to dismiss Plaintiff's claims brought under § 1983 on qualified immunity grounds at this stage of the litigation because numerous factual questions bear on the issue.

Qualified immunity is an "affirmative defense on which the defendant officials bear the burden of proof." *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013); *see also Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) (stating that qualified immunity is "an affirmative defense on which [the defendant] has the burden of proof either at trial or on a motion for summary judgment"). The Second Circuit has explained that "a qualified immunity defense can be presented in a Rule 12(b)(6) motion, but . . . the defense faces a formidable hurdle when advanced on such a motion and is usually not successful." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006). On a motion to dismiss, a "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004).

Qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001). The relevant question is whether the "state of the law" at the time of the defendants' conduct gave them "fair warning that their alleged treatment of [the

57

plaintiff] was unconstitutional." *Id.* "[O]fficials can still be on notice that their conduct violates

established law even in novel factual circumstances." *Id.* at 741; *see also id.* ("Although earlier

cases involving 'fundamentally similar' facts can provide especially strong support for a

conclusion that the law is clearly established, they are not necessary to such a finding."); *Jones v.*

*Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) ("Finally, we are mindful that the right at issue in a

qualified immunity case need not be limited to the specific factual situation in which that right

was articulated.").

Qualified immunity plainly does not bar relief for Plaintiff for her claims brought under §

1983 for violations of the JJDPA and PREA because Defendants violated the clear language of

those provisions.  Regarding the applicability of qualified immunity to Plaintiff's JJDPA and

PREA claims, Defendants make no claim that the conduct alleged in the complaint complied

with those statutes.  Rather, Defendants assert that because there is no "clearly established"

Second Circuit law on whether plaintiffs can sue for a violation of the JJPDA through § 1983,

they are entitled to qualified immunity.  (Defs' Mem. at 20 n.9).  Presumably they would say the

same for the PREA claim.  But the qualified immunity defense relates to whether defendants

should have known that their conduct violated the constitution or federal statute.  Qualified

immunity does not turn on whether it was clearly established that private plaintiffs could sue for

damages as a result of the violation.  *See, e.g.*, *Henry A. v. Willden*, 678 F.3d 991, 1006 n.7 (9th

Cir. 2012) ("[W]hether a federal statute is privately enforceable and whether an official is

entitled to qualified immunity for a violation of that statute are two separate inquiries.  There

need not be 'clearly established law' showing that a statute is privately enforceable."); *Del A. v.*

*Edwards*, 855 F.2d 1148, 1152 (5th Cir. 1988) ("[T]he Supreme Court's tests for qualified

immunity naturally focus on the conduct of the reasonable official in light of the asserted right

58

and the particular circumstances.  The ultimate test is whether 'a reasonable official would understand that what he is doing violates that right.'  The test is not whether a reasonable official would understand that he ultimately faces possible liability.  Under the latter test, an official would be accorded decision making protection not only when the right is not clearly established, but also when the right is clearly established but the question of whether the individual has a private right of action for damages is unclear.  Such broad protection is unnecessary to protect the integrity of the decision-making process; if the right is clearly established so that a reasonable official would understand how the law requires him to act, the official will know what to do to avoid possible liability.") (citation omitted);[29] *Thrower v. Pennsylvania*, 873 F. Supp. 2d 651, 657 (W.D. Pa. 2012) ("This test does not require courts to evaluate whether defendants knew liability would be imposed when they acted; rather, the inquiry focuses on whether the right itself was clearly established at the time defendants acted."); *Johnson ex rel. Estate of Cano v. Holmes*, 377 F. Supp. 2d 1084, 1090 (D.N.M. 2004) ("In short, the law only requires that a plaintiff demonstrates that a reasonable official would understand that what he is doing violates a federal statutory right.  The law of qualified immunity does not require that a plaintiff demonstrate that her right to recover monetary damages, i.e., their remedy, was clearly established when the violation of her rights occurred.") (citation omitted).

Plaintiff's complaint alleges that Defendants' conduct violated the plain language of the JJDPA and PREA.  Defendants do not claim that their conduct complied with these statutes, or that the statutes were in some way unclear.  Because the complaint alleges a violation of clearly

---

[29]  This case was vacated by the Fifth Circuit for rehearing en banc, 862 F.2d 1107 (5th Cir. 1988), but then the appeal was dismissed before the en banc decision.  *See* 867 F.2d 842 (5th Cir. 1989).

established federal statutory law, the JJDPA and PREA claims should not be dismissed on qualified immunity grounds.

Defendants also seek dismissal of Jane's constitutional claims on qualified immunity grounds.  As a child held by the state for non-criminal confinement, Jane is protected not only by the Eighth Amendment's prohibition on cruel and unusual punishment but also by heightened requirements of substantive due process under the Fourteenth Amendment.  Individuals held by the state for non-criminal purposes are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *Santana v. Collazo*, 714 F.2d 1172, 1180 (1st Cir. 1983) (applying *Youngberg* analysis, explaining that "the conditions of juvenile confinement, like those of confinement of the mentally ill, are subject to more exacting scrutiny than conditions imposed on convicted criminals").

Under the *Youngberg*'s Fourteenth Amendment analysis, when conditions of confinement reflect a "substantial departure from accepted professional judgment, practice, or standards," they violate the Constitution.  *Youngberg*, 457 U.S. at 323.  The complaint alleges that Defendants' extreme departures from accepted practice—including placing Jane in prolonged solitary confinement in an adult prison—have placed their conduct well outside the permissible realm of professional discretion.  *See, e.g.*, *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1155 (D. Haw. 2006) (concluding that "the defendants' use of isolation [on children] was not within the range of acceptable professional practices and constitutes punishment in violation of the plaintiffs' Due Process rights").

The complaint alleges that Jane—a child with a history of extraordinary trauma and resulting mental health impairments— suffered terribly under the conditions of her confinement

at York CI and CJTS.  In particular, Jane suffered from stress, depression, anxiety, loneliness, and trauma during the more than ten months she spent in isolation.  (Compl. ¶ 74).  Keeping Jane in isolation and denying her necessary treatment caused her great psychological harm, with resulting physical consequences.  (*Id*. ¶ 75).  The experience of isolation for Jane was acutely stigmatizing—as DCF expressed to this child that she was too dangerous to be around other children and singled her out for transfer under a provision used only once in the last 14 years.  In a public fashion, DCF conveyed to this child that she was uniquely damaged and dangerous, and unsuitable for contact with peers.  The experience of being selected for this extreme and harsh treatment was deeply damaging to Jane's feelings of self-worth, particularly given how traumatized she already was from past physical and sexual abuse.  (*Id*. ¶ 76).

The harm that results from placing children in solitary confinement is well-established, particularly where the child suffers from mental illness.  Indeed, officials were well aware of these harms 35 years ago when Congress enacted the JJDPA's strict restrictions on placing juveniles in adult facilities—where they had often been held in isolation.  *See* Reauthorization of the Juvenile Justice and Delinquency Prevention Act of 1974: Hearings Before the S. Comm. on the Judiciary, 96th Cong. 26-30, 27 (March 27 and 28, 1980) (Statement of Deputy Attorney General Renfrew) (highlighting the harms of placing juveniles into isolation at adult facilities, explaining that "juveniles are highly vulnerable to emotional pressure," making "isolation of the type provided in adult facilities" a serious threat to children's long-term mental health).

President Obama has banned solitary confinement entirely for juvenile offenders in the federal system.[30]  In 2014, the American Medical Association, "[r]ecognizing the harmful

---

[30]  *See* Barack Obama: *Why We Must Rethink Solitary Confinement*, Washington Post, January 25, 2016; *see also* White House, Office of the Press Secretary, Fact Sheet: Department of Justice

physical, emotional and psychological impact of solitary confinement," adopted a policy

opposing juvenile solitary confinement except in limited, extraordinary circumstances.[31]  In

doing so, the AMA joined numerous other official bodies that have likewise recognized youths'

vulnerability to the effects of solitary confinement.[32]

---

Review of Solitary Confinement (Jan. 26, 2016), https://www.whitehouse.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement.

[31] "AMA Adopts New Policies to Improve Health of Nation at Interim Meeting," November 11, 2014. Available at http://www.ama-assn.org/ama/pub/news/news/2014/2014-11-20-ama-policies-improve-health-of-nation.page. The policy provides that "Our AMA: (1) opposes the use of solitary confinement in juvenile correction facilities except for extraordinary circumstances such as the protection of the juvenile, staff, or other detainees; (2) opposes the use of solitary confinement of juveniles for disciplinary purposes in correctional facilities; and (3) supports that isolation of juveniles for clinical or therapeutic purposes must be conducted under the supervision of a physician. (Res. 3, I-14)." Available at https://www.ama-assn.org/ssl3/ecomm/PolicyFinderForm.pl?site=www.ama-assn.org&uri=/resources/html/PolicyFinder/policyfiles/HnE/H-60.922.HTM.

[32] For example, the American Academy of Child and Adolescent Psychiatry opposes the use of solitary confinement altogether for juveniles, noting that "potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety and psychosis." American Academy of Child and Adolescent Psychiatry, Policy Statement, Solitary Confinement of Juvenile Offenders (April 2012), available at http://www.aacap.org/aacap/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx. The Attorney General's National Task Force on Children Exposed to Violence concluded that "nowhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement." The Task Force accordingly proposed abandoning practices like solitary confinement. Att'y Gen.'s Nat'l Task Force on Children Exposed to Violence, *Rep. of the Att'y Gen.'s Nat'l Task Force on Children Exposed to Violence, Defending Childhood: Protect, Heal, Trive* 178 (2012), *available at* http://www.justice.gov/defendingchildhood/cev-rpt-full.pdf.  Former Attorney General Eric Holder recently stressed that "[a]cross the country, far too many juvenile detention centers see isolation and solitary confinement as an appropriate way to handle challenging youth, in particular youth with disabilities." He warned that solitary confinement is "particularly detrimental to young people with disabilities—who are at increased risk under these circumstances of negative effects including self-harm and even suicide." Press Release, Department of Justice (May 14, 2014), http://www.justice.gov/opa/pr/attorney-general-holder-criticizes-excessive-use-solitary-confinement-juveniles-mental. The United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which establish minimum standards for the protection of juveniles in correctional facilities, prohibit the

Studies of the impact of solitary confinement on incarcerated adults have revealed an array of detrimental physiological and psychological effects.[33]  Indeed, a district court in the Southern District of New York has observed that even with respect to adult prisoners, "[t]he consequences of long-term solitary confinement are so well-known that numerous medical associations, including the American Psychiatric Association, the American Public Health Association, the National Alliance on Mental Illness, the Society of Correctional Physicians, and Mental Health America, have all issued formal policy statements opposing the practice— especially with regard to mentally ill inmates, on whom the effects of solitary confinement are particularly pronounced."  *Peoples v. Annucci*, No. 11-CV-2694 (SAS), 2016 WL 1464613, at *3 (S.D.N.Y. Apr. 14, 2016).

Youth lack the essential coping skills to manage acute and chronic stressors.[34]  As a result, they are less equipped than adults to handle solitary confinement.  In addition, youth have a greater need for social stimulation and attachment than adults.  Close peer relationships

---

solitary confinement of juveniles. Available at
http://www.un.org/documents/ga/res/45/a45r113.htm.

[33] Effects include hypersensitivity to stimuli-perceptual distortions and hallucinations, increased anxiety and nervousness, fears of persecution, blunted affect and apathy, talking to oneself, confusing thought processes, sleep disturbances, changes in appetite an weight, withdrawal, depression, and lack of impulse control.  *See, e.g.*, Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450, 1452 (1983); Richard Kom, *The Effects of Confinement in the High Security Unit at Lexington*, 15 Soc. Just. 8, 15 (1988); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 134 (2003); *see also* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 333 (2006); Lindsay M. Hayes, *And Darkness Closes in . . . a National Study of Jail Suicides*, 10 Crim. Just. & Behav. 461, 471, 475, 480 (1983); Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104-05 (2010); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 543 (1997).

[34] Rudolf H. Moos, *Life Stressors, Social Resources, and Coping Skills in Youth: Applications to Adolescents with Chronic Disorders*, 30 J. Adolescent Health 22 (2002).

promote healthy adolescent adjustment, high perceived self-worth, pro-social behavior and decreased risk of emotional and behavioral problems.[35]  Youth exposed to solitary confinement are more likely to commit suicide, attempt suicide, and engage in other acts of self-harm.[36]  Indefinite isolation (isolation with no defined end date), as Jane experienced, is particularly harmful.

Numerous courts have recognized the harm to youth from isolation and have found due process violations in cases involving youth placed in solitary confinement.  *See generally H.C. v. Jarrard*, 786 F.2d 1080, 1088 (11th Cir. 1986) ("Juveniles are even more susceptible to mental anguish than adult convicts."); *Santana v. Collazo*, 793 F.2d 41, 48 (1st Cir. 1986) (remanding for further proceedings, noting that "defendants have failed to meet their burden of showing a legitimate interest in confining juveniles in isolation for as long as twenty days"); *Santana v. Collazo*, 714 F.2d 1172 (1st Cir. 1983) (experts' testimony on lack of therapeutic and disciplinary benefits from isolation sufficient to warrant remand for further factual findings); *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1155 (D. Haw. 2006) (concluding that "the defendants' use of isolation [on children] was not within the range of acceptable professional practices and constitutes punishment in violation of the plaintiffs' Due Process rights;" noting that "[t]he expert evidence before the court uniformly indicates that long-term segregation or isolation of

_____

[35] Deborah Laible et al.. The Differential Relations of Parent and Peer Attachment to Adolescent Adjustment, 29 J. Youth & Adolescence 46 (2000), available at http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1050&context=psvchfacpub.

[36] Lindsay M. Hayes, Dep't of Justice Office of Juvenile Justice and Delinquency Prevention, Juvenile Suicide in Confinement: A National Survey (2009), available at https://www.ncjrs.gov/pdffilesl/ojjdp/213691.pdf; Carly B. Dierkhising et. al, *Victims Behind Bars: A Preliminary Study of Abuse During Juvenile Incarceration and Post-Release Social and Emotional Functioning*, 20 Psychology, Public Policy& Law 181 (2014); *see also* Sandra Simkins et al., *The Harmful Use of Isolation in Juvenile Facilities: The Need for Post-Disposition Representation*, 38 Wash. U. J.L. & Pol'y 241 (2012).

youth is inherently punitive and is well outside the range of accepted professional practices" and "[c]ourts that have considered this issue have likewise concluded that the use of isolation for juveniles, except in extreme circumstances, is a violation of Due Process"); *Feliciano v. Barcelo*, 497 F. Supp. 14, 35 (D.P.R. 1979) ("Solitary confinement of young adults is unconstitutional."); *Morgan v. Sproat*, 432 F. Supp. 1130, 1140 (S.D. Miss. 1977) (holding that a facility's use of isolation for juveniles violated their due process and Eighth Amendment rights; limiting isolation to no more than 24 hours and only "where there is substantial evidence that [juveniles] constitute an immediate threat to the physical well-being of themselves or others"); *Pena v. N.Y. Div. for Youth*, 419 F. Supp. 203, 210-11 (S.D.N.Y. 1976) (holding that boys' placement in isolation for punitive reasons violates due process where there was no treatment and infrequent assessment for release); *Inmates v. Affleck*, 346 F. Supp. 1354, 1372 (D.R.I. 1972) (noting that "[t]his court is convinced that solitary confinement [for juveniles] may be psychologically damaging, anti-rehabilitative, and at times inhumane" and violate due process rights); *Lollis v. N.Y. State Dep't of Soc. Servs.*, 322 F. Supp. 473, 480 (S.D.N.Y. 1970) (concluding that plaintiff's solitary confinement was unconstitutional after considering extensive expert testimony stating that the extended use of isolation on children is "cruel and inhuman," and "counterproductive to the development of the child"). *Cf. Turner v. Palmer*, 84 F. Supp. 3d 880, 883 (S.D. Iowa 2015) (denying defendants' motion to dismiss on qualified immunity grounds where plaintiff alleged constitutional claims "under the Fifth, Eighth, and Fourteenth Amendments for Defendants' alleged continuous and systematic use of isolation cells at the Iowa Juvenile Home;" noting that case involved "a factual inquiry that cannot be accomplished at this stage of the proceedings, so long as Plaintiff has alleged facts that generate a plausible claim").

In addition to violating the Fourteenth Amendment, Jane's conditions of confinement violated the Eighth Amendment, given the obvious risk—and outright harm—to Jane's health and safety that resulted from the prolonged and indefinite isolation.  The Supreme Court has established a two-part test for determining whether conditions of confinement are "cruel and unusual" in violation of the Eighth Amendment.  First, "the deprivation alleged must be, objectively, sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).  For a claim based on a failure to prevent harm, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.* Second, the plaintiff must demonstrate that the defendants showed "deliberate indifference to inmate health and safety."  *Id*. (internal quotation marks omitted)*.*  Deliberate indifference exists when a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Id.* at 847.  "Officials need only be aware of the risk of harm, not intend harm.  And awareness may be proven 'from the very fact that the risk was obvious.'"  *Spavone v. New York State Dep't of Corr. Servs*., 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Farmer*, 511 U.S. at 842) (citation omitted).  The law is clear that "[t]he Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners, which includes needs for mental health care." *Id*. at 138 (citations and internal quotation marks omitted).

Here, officials should have been well aware that placing a child with mental illness in prolonged isolation without access to necessary treatment creates a substantial risk of serious harm.  Jane's history of extreme trauma and resulting impairments, of which state officials were aware, made her particularly vulnerable to the harms of isolation.  The risk of harm was particularly pronounced given Jane's placement in an adult prison environment at York CI,

66

where staff was trained to guard adults convicted of serious crimes (rather than trained to work with children with complex needs). The risk of harm was still worse given the stigmatizing nature of Jane's confinement in a facility for boys and DCF's decision to single her out for transfer to an adult prison (a decision they had made for only one other child in 14 years). Finally, while placing Jane in these conditions of extreme isolation, Defendants denied Jane mental health treatment appropriate to her needs. These circumstances suffice to show that state officials were deliberately indifferent to the risks posed to Jane by the conditions of her confinement, and that they did not take reasonable measures to abate the harms.

Jane's complaint alleges that Defendants' conduct substantially departed from accepted professional standards and thus that Defendants did not actually exercise professional judgment in their actions. (Compl. First Cause of Action; Second Cause of Action). She has thus alleged a violation of clearly established law under the Fourteenth Amendment. *See Youngberg*, 457 U.S. at 323. Her complaint also alleges that that state officials were deliberately indifferent to the substantial risk of harm to her from the conditions of her confinement in violation of the Eighth Amendment. (Compl. Third Cause of Action; Fourth Cause of Action). A prisoner's right under the Eighth Amendment to be free from deliberate indifference to her serious medical or mental health needs has been clearly established for decades. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

"Dismissal under Rule 12(b)(6) is only appropriate if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 92 (2d Cir. 2006) (internal quotation marks omitted). The Second Circuit has stressed that qualified immunity defenses will rarely succeed at the motion to dismiss stage. *See Field Day*, 463 F.3d at 191-92 (stating that "a qualified

immunity defense can be presented in a Rule 12(b)(6) motion, but . . . the defense faces a formidable hurdle when advanced on such a motion and is usually not successful"); *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013) (stressing that "[d]efendants moving to dismiss a suit by reason of qualified immunity would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c)"); *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 793 (2d Cir. 2002) (concluding that qualified immunity inquiry "turns on factual questions that cannot be resolved at this stage of the proceedings").

District courts within this Circuit recognize that qualified immunity involves a fact-specific inquiry and thus it is usually premature to address the defense in a motion to dismiss. *See Castro v. Narcisse*, No. 3:12-CV-01535 VLB, 2013 WL 5423689, at *7 (D. Conn. Sept. 26, 2013) (noting that "[t]he Second Circuit has unflinchingly held that a defendant advancing a qualified immunity defense at the motion to dismiss stages faces a 'formidable hurdle,' is 'usually not successful,' and 'would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c)'"); *Yeomans v. Wallace*, 291 F. Supp. 2d 70, 76 (D. Conn. 2003) (denying motion to dismiss on qualified immunity grounds because "[a]dditional facts are required to determine the reasonableness of [the defendant's] actions"); *Woodhouse v. City of Mount Vernon*, No. 13-CV-189, 2016 WL 354896, at *6 (S.D.N.Y. Jan. 27, 2016) ("The claim may not be dismissed on qualified immunity grounds because [the plaintiff] sufficiently alleged a claim of excessive force and the right to be free from excessive force is clearly established."); *France v. Cty. of Westchester*, No. 12-CV-5576 (KMK), 2016 WL 1270259, at *9 (S.D.N.Y. Mar. 30, 2016) (declining to dismiss claim on qualified immunity grounds at motion to dismiss stage); *Simmons v. Kelly*, No. 06CIV6183RJS, 2009 WL

857410, at *8 (S.D.N.Y. Mar. 31, 2009) ("Here, Defendants' qualified immunity defense turns on an issue of material fact that cannot be resolved without discovery, and so, 'any ruling regarding the availability of the qualified immunity affirmative defense would be premature at this time.'"); *Maloney v. Cnty. of Nassau*, 623 F.Supp.2d 277, 292 (E.D.N.Y. 2007) ( "Because this defense necessarily involves a fact-specific inquiry, it is generally premature to address the defense of qualified immunity in a motion to dismiss." (internal quotation marks and citation omitted)); *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y. 2004) ("Resolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.").

Plaintiff is entitled to develop through discovery the facts bearing on her constitutional claims and the possible qualified immunity defense.  Plaintiff "is entitled to all reasonable inferences from the facts alleged, not only those that support [her] claim, but also those that defeat the immunity defense."  *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004).  To grant a motion to dismiss based on qualified immunity, "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief").  *Id.* (citations and internal quotation marks omitted).  At this stage of the case, it would be premature to dismiss Jane's constitutional claims based on qualified immunity.

## <u>CONCLUSION</u>

The motion should be denied.

Respectfully submitted,
THE PLAINTIFF


 /s/ David N. Rosen
David N. Rosen
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 789-1605 Fax
CT00196
drosen@davidrosenlaw.com


Sarah French Russell, *Guardian Ad Litem*
Legal Clinic, Quinnipiac University School of Law
275 Mt. Carmel Avenue
Hamden, CT 06518
(203) 382-3238
(203) 582-3237
CT26604
sarah.russell@quinnipiac.edu


## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2016, a copy of the foregoing Memorandum in Opposition to Defendants' Motion to Dismiss was filed electronically as an attachment to Plaintiff's Motion for Permission to Exceed Page Limitation.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


   /s/ David N. Rosen
David N. Rosen

**Appendix – Legislative History Materials**
**Juvenile Justice Amendments of 1980, S. 2441, P.L. 96-509, 94 Stat. 2750**

**REAUTHORIZATION OF THE JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT OF 1974: HEARINGS BEFORE THE S. COMM. ON THE JUDICIARY, 96TH CONG. 27-160 (MARCH 27 AND 28, 1980) (EXCERPTS)** .................. 2

Statement of Hon. Charles B. Renfrew Deputy Attorney General U.S. Department of Justice. 2
Prepared Statement of Regene Schroeder, Representing the Child Welfare League ................ 5
Prepared Statement of Sally Maxton, Executive Director, Ohio Youth Network .................... 6
Testimony of Mara Lozier, Reporter, Children's Express........................................................ 6
Testimony of Barbara Sylvester, on behalf of the National Advisory Committee.................... 8
Office of Juvenile Justice and Delinquency Prevention (OJJDP), Department of Justice, Rationale Utilized in Determining the Level of Separation for Compliance With Section 223(a)(13) of the JJDP Act ........................................................................................................ 9
Prepared Statement of Robbie Callaway, Member, Maryland State Advisory Group ............ 11

**JUVENILE JUSTICE AMENDMENTS OF 1980: REPORT TOGETHER WITH SUPPLEMENTAL AND INDIVIDUAL MINORITY VIEWS, H. COMM. ON EDUCATION AND LABOR, H. RPT. 96-946 (MAY 13, 1980), "REMOVAL OF JUVENILES FROM JAILS AND LOCK-UPS FOR ADULTS," 24-25** ..................... 11

**JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT AMENDMENTS OF 1980: REPORT OF THE S. COMM. ON THE JUDICIARY, S. RPT. 96-705 (MAY 14, 1980), PP. 6, 7** ....................................................................................................... 13

**REP. KOGOVSEK (CO). QUESTIONS AND ANSWERS REGARDING THE REMOVAL OF JUVENILES FROM ADULT JAILS AND LOCKUPS. 126 CONG. REC. P. E3377-8 (JULY 2, 1980)** ................................................................................................. 14

**FLOOR DEBATE, JUVENILE JUSTICE AMENDMENTS OF 1980. 126 CONG. REC. 10920-23 (NOV. 19, 1980)** ................................................................................................ 15

Statement of Rep. Andrews (NC). 126 Cong. Rec. p. H10920. ............................................. 15
Statement of Rep. Coleman (MO). 126 Cong. Rec. p. H10921. ............................................ 15
Statement of Res. Comm. Corrada (PR). 126 Cong. Rec. p. H10922. ................................... 15
Statement of Rep. Railsback (IL). 126 Cong. Rec. p. H10922. .............................................. 15
Statement of Rep. Weiss (NY). 126 Cong. Rep. p. H10923. .................................................. 15

**PRESIDENT JAMES E. CARTER, JUVENILE JUSTICE AMENDMENTS OF 1980, STATEMENT ON SIGNING S. 2441 INTO LAW. DECEMBER 8, 1980. 16 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 50, P. 2787-88** .............................. 16

**REAUTHORIZATION OF THE JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT OF 1974: HEARINGS BEFORE THE S. COMM. ON THE JUDICIARY, 96TH CONG. 27-160 (MARCH 27 AND 28, 1980) (EXCERPTS)**

**Statement of Hon. Charles B. Renfrew, Deputy Attorney General, U.S. Department of Justice**

Mr. RENFREW. This is the first appearance that I am making as Deputy Attorney General before a Senate committee. I cannot think of a more important topic or one that is of more interest or concern to me than the reauthorization of the Juvenile Justice and Delinquency Prevention Act.

As you may know, I spent over 8 years as a Federal district court judge. I have had an intimate, and too often painfully personal, acquaintance with the juvenile justice system in this country.

I can think of no greater area of greater priority or need than bringing attention to the juvenile justice system and the concerns that this legislation seeks to address.

You are looking today—

Senator THURMOND. We are glad to have you here. I want to commend you for being willing to give up a Federal judgeship to become the Deputy Attorney General. There aren't, very many people who would give up a lifetime job like that to come and serve the country as you are doing.

Mr. RENFREW. Well, I hope that doesn't impair my credibility. [Laughter.]

Senator, I do speak with great feeling about this topic. The topic here, of course, is the reauthorization of legislation of great significance to our Nation's youth, the Juvenile Justice and Delinquency prevention Act.

On behalf of the administration and the Department of Justice, I strongly urge that this important program be continued.

The Juvenile Justice and Delinquency Prevention Act is change oriented and has had an impact far greater than many other Government programs of comparable size.

Since 1974, great progress has been made in removing status offenders and nonoffenders such as dependent and neglected youth from juvenile detention and correction facilities. Most States have pledged to separate juveniles in institutions from regular contact with accused or adjudicated adult offenders. New alternatives to traditional juvenile justice system processing of children have been demonstrated. Government agencies and private, nonprofit organizations are joining together in cooperative programing to help young people.

Perhaps most importantly, we are moving away from merely reacting to youthful offenders. To a greater extent than ever before, we are working to prevent delinquency before it occurs. Prevention programs are being supported which focus on the schools and the educational process, which target the employment problems of young persons, and which deal with entire families as well as individuals.

The Juvenile Justice and Delinquency Prevention Act has caused officials at all levels of Government to rethink the ways they have been doing business, including those of us at the Federal level.

2

One place where an improvement must be made is in the area of coordination. It has been difficult to interrelate the varied missions and responsibilities of separate Federal units to reflect a national youth strategy.

The Coordinating Council on Juvenile Justice and Delinquency Prevention presents a unique opportunity for Federal agencies administering programs which impact on youth to marshal their forces and act in a unified manner.

I am very pleased to note that, with the strong support of the Attorney General, the groundwork has been laid by the Coordinating Council for more effective action.

This mechanism for promoting consistency among Federal agencies is being better utilized than in the past. It is receiving the personal attention of policymakers and has set out to accomplish some very realistic objectives that have far-reaching implications.

As you know, last May, the administration submitted to Congress its proposal to continue the authorization of the Juvenile Justice and Delinquency Prevention Act beyond fiscal 1980. I will not go into all the details of that proposal now, but I would like to address one issue of particular importance.

It has long been recognized that children require special protections when they come into contact with the criminal justice system.

An initial reason for the development of juvenile courts was to provide such protections and separate children from the adult criminal justice system. One area where we have failed to provide the necessary protection, however, is the placement of juveniles in adult jails and lockups.

The detention of juveniles in adult jails and lockups has long been a moral issue in this country which has been characterized by sporadic public concern and minimal action toward its resolution.

Perhaps the general lack of public awareness and low level of official action is due to a low level of visibility of juveniles in jails—but they are there.

Not until 1971, with the completion of the National Jail Census, did a clear and comprehensive picture of the jailing of juveniles surface.

On one day in 1970, the census revealed 7,800 juveniles living in 4,037 jails. A comparable census in 1974 estimated that the number of children held had grown to 12,744.

Significantly, these surveys excluded facilities holding persons less than 48 hours. This is critical with respect to juveniles because it is the police lockup and drunk tank to which alleged juvenile offenders are often relegated awaiting court appearance.

It has been conservatively estimated that 500,000 juveniles are admitted to adult jails and lockups each year. Who these children are is also significant. A recent nine-State survey by the Children's Defense Fund indicated that 18 percent of the juveniles in jails had not even been charged with an act which would be a crime if committed by an adult.

Four percent had committed no offense at all. Of those jailed on criminal-type offenses, 88 percent were there on property and minor charges.

The jailing of children is harmful to them in several ways. The most widely known harm is that of physical and sexual abuse by adults in the same facility. Even short-term pretrial or relocation detention exposes juveniles to assault, exploitation, and injury.

Sometimes, in an attempt to protect a child, local officials will isolate the child from contact with others. Because juveniles are highly vulnerable to emotional pressure, isolation of the type provided in adult facilities can have a long-term negative impact on an individual child's mental health.

Having been built for adults who have committed criminal acts, jails do not provide an environment suitable for the care and maintenance of delinquent juveniles or status offenders.

In addition, being treated like a prisoner reinforces a child's negative self-image. Even after release, a juvenile may be labeled as a criminal in his community as a result of his jailing, a stigma which can continue for a long period.

The impact of jail on children is reflected by another grim statistic— the suicide rate for juveniles incarcerated in adult jails during 1978 was approximately seven times the rate among children held in secure juvenile detention facilities.

Mr. Chairman, I could give other reasons why it is bad policy to place children in adult jails and lockups, both in social and economic terms. I am pleased to note a growing number of court decisions which concur in this view.

Placing children in jails has been found to violate their rights to treatment, to constitute a denial of due process, and to be cruel and unusual punishment.

Leading national organizations have been working together to address the jailing of juveniles, as well.

On April 25.1979, the National Coalition for Jail Reform adopted, by consensus, the position that no person under age 18 should be held in an adult jail.

Members of the coalition include the American Correctional Association, the National Sheriff's Association, the National Association of Counties, the National League of Cities, the National Association of Blacks in Criminal Justice and the American Civil Liberties Union.

Despite this important attention, Mr. Chairman, the jailing of children remains a national catastrophe—one which this committee has an opportunity to address.

Great strides have been made under the Juvenile Justice Act m deinstitutionalizing status offenders and nonoffenders.

Pursuant to section 223(a) (13), of the act, fewer juveniles are detained in all types of institutional settings where they have regular contact with adults. But more can be done through the act to assure that juveniles are completely removed from adult jails and lockups, the most inappropriate of these institutional settings.

The current position of the Office of Juvenile Justice and Delinquency Prevention is that section 223(a) (13), requires at a minimum "sight and sound" separation of juveniles and adults in all institutions, including jails and lockups.

Such separation has been particularly difficult to accomplish in county jails and municipal lockups because adequate separation, as intended by the act, is virtually impossible within most of these institutions.

As a result, juveniles are often isolated in what are the most undesirable areas of the facilities, such as solitary cells and drunk tanks.

Also, there is no guarantee that children held in jails, though separated from adults, will receive even minimal services required to meet their special needs.

I propose to you that in reauthorizing the Juvenile Justice and Delinquency Prevention Act, Congress absolutely prohibit the detention or confinement of juveniles in any institution to which adults, whether convicted or awaiting trial are confined. Incentives should be provided to encourage the complete removal of children from adult jails and lockups as soon as possible.

I realize that it would be impossible to expect that the practices of prior decades can be changed overnight. It would also be unreasonable to suddenly demand that States which are making a good-faith effort to comply with current provisions of the act be immediately given an additional burden.

4

The requirement of the act that juveniles and adults be separated in all institutions is laudatory, but with respect to jails and lockups we must go further than separation.

I suggest that a requirement be included that within an additional 5 years, participating jurisdictions remove all juveniles from adult jails and lockups. This will enable the thorough planning and preparation which will be needed to initiate such major changes, particularly on the part of State juvenile justice advisory groups. Further incentives could be placed in the statute to encourage effective action.

Please note, I am not advocating the release from detention facilities of all youth. Juveniles alleged to have committed serious crimes against persons may need to be detained, but just not in adult jails and lockups.

I might add, we have made an initial analysis of the cost that might be incurred in such a program. This analysis suggests that there will be a net savings in the long rim for the proposal which I have suggested to be adopted compared with continuing to place juveniles in adult jails and lockups.

A more detailed cost analysis is being prepared and will be submitted to this committee upon its completion.

The Office of Juvenile Justice stands ready to provide appropriate technical assistance in the planning and implementation of efforts to remove children from jails. Special programs are now being developed to demonstrate the efficacy of this course of action. Many jurisdictions may be surprised to find that the benefits of removal go beyond assuring the basic rights of juveniles, but that there are also economic considerations.

Ira Schwartz, the Administrator of the Office of Juvenile Justice and Delinquency Prevention, as well as Mr. Henry Dogin of OJARS and Homer Broome of LEAA, who is here on my right, share my concern regarding this matter. Mr. Schwartz and Mr. Broome are accompanying me.

Mr. Schwartz has a statement for submission to the committee.

Thank you for inviting us and for your consideration of our views.

There is one thing I would like to add. That is an area that with which both the Attorney General and I are concerned to which we have given attention to. That is the indication that our juvenile justice system may have placed undue burdens upon minority children. This is a matter of concern which we are examining in some detail. Mr. Schwartz is more familiar with the details of this study and analysis. I want you to know it is a particular aspect of the juvenile justice system which we are examining at this time.

I thank you kindly for permitting me to testify here on this topic which means a great deal to me and to the Department of Justice.


**Prepared Statement of Regene Schroeder, Representing the Child Welfare League**

The Child Welfare League wishes to thank the Committee on the Judiciary for inviting us to testify on the Reauthorization of the Juvenile Justice and Delinquency Prevention Act, and to discuss the amendments to this important piece of legislation which are outlined in S. 2434, S. 2441, and S. 2442. . . .

While there is admittedly a problem with violent juvenile crime, we believe that to title the reauthorization the "Violent Juvenile Crime Control Act of 1980" is to divert Congress and the states from the needs of the juvenile justice system at this time. Such an emphasis obscures the need for attention to be given to the completion of the mandates of the Juvenile Justice Act, to the examination of services to juveniles who are incarcerated in secure detention, to the

removal of juveniles from adult jails, and to the need for continued delinquency prevention services. . . .

In addition, we would recommend to the Committee that the separation mandate of 223(a) (13) be changed to require the removal of juveniles from adult jails. There has been a reaction to serious delinquents within the states which has resulted in the "Scared Straight" type of program which Senate bill S. 2441 addresses. Jails are now being used not only for the detention of juveniles, but to "teach them a lesson" for an undetermined period of time . . . .

**Prepared Statement of Sally Maxton, Executive Director, Ohio Youth Network**

Second, the Act must be strengthened to mandate that no youth in this country be held in jail with adults. Youth held in jail with adults face a "Scared Straight" situation every day without the controls of a monitoring media. Instances of rape, sexual and physical abuses and young suicides as a result of this practice are seldom reported, but must be recognized as unconscionable. . . .

Even Ohio juvenile judges wrote in their report "Let's Get Kids Out of Adult Jails" regarding the need to give juvenile justice concerns a high priority. . . .

Although Ohio faces the loss of OJJDP funds due to non-compliance, we support the Act. To exempt states with youth authorities from the mandate to remove youth from adult jails would be a tremendous mistake and would turn the tide of the progress Ohio has made in this area thus far.

**Testimony of Mara Lozier, Reporter, Children's Express**

Ms. LOZIER. Good morning. I am Mara Lozier. I represent Children's Express.

For the last 2 years, a small group of us have been studying child abuse and incarceration. We have conducted hearings on two occasions, and the information that I am going to give you this morning is gathered from my experiences as a hearing examiner.

The first hearing that we conducted was in April 1978, at the Children's Embassy here in Washington, D.C.

The second one was held in December 1979, at the New York Chamber of Commerce, in New York City.

The Washington hearings were supported and funded by the Office of Juvenile Justice and Delinquency Prevention.

During the hearings, I listened to young witnesses telling about their experiences as incarcerated children.

I also heard testimony from such experts as Dr. James Prescott, who is the health and science administrator for National Institute of Child Health and Human Development, National Institute of Health, Senator George McGovern, and Dr. Edward Kaufman, who is the associate clinical professor of psychiatry at the University of California.

Our principal concern during the Washington hearings was the status offender. It is he who seems to stay in care the longest, since he has more than likely been given an indeterminate sentence.

Some of the testimony was incredibly horrifying and shocking to me, and I am sure, if enough people were aware of the current abuses of children's rights, some important changes would come about.

6

I am supporting the reauthorization of the Juvenile Justice Act and the Runaway and Homeless Youth Act.

I will first give a brief outline of what we have found and then I will try to answer any questions.

First, I would like to speak about solitary confinement, that is, locking a person in a room with four bare walls.

The room typically might have only a mattress or a window and would rarely include a toilet. Perhaps in place of a toilet there would be an old coffee can or a hole in the floor. They rarely have lights because a light cord could easily be used by a child to hang himself. They are hot in summer and cold in winter.

Children are placed there in their pajamas or underwear. Reasons for placing them in solitary confinement range from tearing a tag out of jeans or writing, " I love you," to a teacher, to attempted suicide. None are justifiable.

The activities in solitary consist of eating a scanty meal of bread and water or something similar which is pushed under the door administered by a guard, sleeping, dreaming or just staring at the four walls.

In laboratory tests, scientists put mice in confined spaces like solitary confinement and took them out days later. After their confinement, the experimental mice could not adjust to their normal lives or to the mice around them.

Administrators of institutions have no qualms about this sort of treatment of children, however. Solitary confinement is an easy answer for administrators. It is inexpensive since no psychiatric help is involved in its authorization. Suicide is too often committed in the cells by lieht cords or twisted sheets if the cells are equipped with them. One child even decided to eat broken glass.

In 1978, we had testimony from a girl who had been in solitary confinement for 50 davs. She was asked if there was suicide among her friends at the institution. She replied, "Well, there was a girl who tried suicide and got put in isolation for it. While I was in isolation there was another girl who tried to set herself on fire and they put her in isolation for that." There was another girl who tried to hang herself, so they took her bed away.

In his book, "Weeping in the Playtime of Others," Ken Wooden states that one boy scratched, on the thick wire glass window, the message: "As you are, I was once. As I am, you will be." Then he climbed to the upper bunk, pushed his bed out from the wall so his legs could hang over, placed his head under the arched safety bar, and violently flipped his body over the bed, breaking his neck.

It was necessary to cut off the bar to remove the boy's body.

Many other cases, some of which are not so tragic, but many which are, have never been reported. Suicide over the last decade has increased by 200 percent among children aged 14 to 19, and is now the second highest cause for death in Americans aged 15 to 24.

I have a poem which was written by a girl in solitary confinement, in Illinois, right before her suicide:

>There is a crack in the Earth
>And I have fallen in.
>Down in the darkness where I have never been.
>People are looking, staring at me;
>I lie here and wonder what do they see?
>Shall I be here forever?

7

> I cannot climb back
> Rotting and dying in this horrible crack.
> Am I alive or am I dead?
> Oh God, who will save me
> From this crack in my head?

Physical abuse is another common practice at many institutions. Beatings or strenuous work are dealt out most mercilessly. The beatings are done with a belt, stick, or wooden paddle about 2 inches thick.

The strenuous exercise may consist of being changed by guards on horsebacks, being made to wash a dormitory door with a toothbrush, or other similar chores.

Through the hearings I learned that when adults enter a mental hospital, reformatory, or other such institutions, he is examined and evaluated and given correct medication, if that is indicated.

This is not so in the case of juveniles. On arrival, common admission practice includes a physical examination, clothes confiscation, shower, and a 25-milligram dose of thorazene.

Dr. Edward Kaufman testified in 1978 that one institution in New York State will increase that original dose by one half again, and more will come if the staff feels it necessary.

Massive doses are given instead of therapeutic help. Thorazene is the most common drug used, but many others are prominent. In his book, Ken Wooden calls thorazene "the new solitary confinement."

In some ways, drug abuse is much worse than the old solitary confinement. In the old way, one might maintain control of his mind.

When we absorb all this, we tend to say, "Well, it is awful, but the people on the receiving end of the awfulness are pretty bad, too." That is not necessarily so.

In 1971, 56.4 percent of all incarcerated children were status offenders.

Of the remaining 43.6 percent, well under 10 percent are violent criminals. That is a terrible injustice. This injustice is widespread, too. We aren't discussing one small area. We are discussing a situation that has spread all around the country.

Although some progress is being made, children everywhere need help. It is up to us to provide that help.

Thank you.


**Testimony of Barbara Sylvester, on behalf of the National Advisory Committee**

Ms. SYLVESTER. The NAC, in its Standards for Juvenile Justice, supports the Attorney General's proposal. It is standard 4.26, and I read that to you now:

> Detention facilities should be located within the community from which they draw their population. Such facilities should not be on the grounds of an institution used to house adults accused or convicted of committing a criminal offense.

That is one of the NAC's standards.

The harms and tragedies that result from the jailing of juveniles are well documented in the testimony of Dr. Rosemary Sarri and other experts, who were before the U.S. Senate Subcommittee to Investigate Juvenile Delinquency of the Committee on the Judiciary, for the hearings on the detention and jailing of juveniles, in 1979.

8

Surely we all know that placement of juveniles in adult jails, under the condition that they are to remain separate and apart from the adults, has repeatedly failed, over and over and over again.

In the study entitled "Children in Adult Jails: 1976," conducted by the Children's Defense Fund, 449 jails were visited in States with separate and apart provisions on the books, and only 35.9 percent could assure substantial separation, 42.3 percent of the jails provided partial separation, and 21.8 percent assured no separation.

Mr. Chairman, we hope that your committee will consider the reauthorization proposal presented by the Attorney General for further strengthening the intent of the Juvenile Justice and Delinquency Prevention Act by amending section 223(a) (13), to require the removal of juveniles from inappropriate facilities, and thus help to insure that juveniles will receive the services and treatment they may require and deserve, as well as the safety to which they are entitled while being detained.

It is absolutely no secret that the National Advisory Committee has very emphatically stated that States not meeting that requirement of section 223 (a) (13) should not be allowed to continue participation in the JJD P Act. . . .

## Office of Juvenile Justice and Delinquency Prevention (OJJDP), Department of Justice, Rationale Utilized in Determining the Level of Separation for Compliance With Section 223(a)(13) of the JJDP Act

[A] principle area of concern was the intent of Congress as developed in testimony before the Senate Subcommittee to Investigate Juvenile Delinquency. The hearings on the Detention and Jailing of Juveniles in 1973 provided the following observations from the Senate Subcommittee:

Regardless of the reasons that might be brought forth to justify jailing juveniles, the practice is destructive for the child who is incarcerated and dangerous for the community that permits youth to be handled in harmful ways.

Despite frequent and tragic stories of suicide, rape and abuses, the placement of juveniles in jails has not abated in recent years. A significant change in spite of these circumstances has not occurred in the vast majority of states. An accurate estimate of the extent of juvenile jailing in the United States does not exist. There is, however, ample evidence to show that the volume of juveniles detained has increased in recent years. The National Council on Crime and Delinquency in 1985 reported an estimate of 87,591 juveniles jailed in that year. Sarri found that some knowledgeable persons estimate that this has increased to today's high of 300.000 minors in one year. Approximately 66 percent of those juveniles detained in jail were awaiting trial. The lack of any alternatives has been most frequently cited as a reason for detaining more and more youngsters in adult jails. (Subcommittee to Juvenile Delinquency. Committee on the Judiciary, U.S. Senate Hearings on the Detention and Jailing of Juveniles, 1973).

In expanding on this observation by the Senate Subcommittee, consideration was given to a variety of information sources including research and surveys, informed opinion and standards, state legislation, court litigation, and common usage in the field.

RESEARCH

9

Recent research and surveys formed a frame of reference concerning the extent of the problem being addressed and established a philosophical foundation for the consideration of "separation." It is important to note that the principle source of information used below was formulated by the Children's Defense Fund in their pioneering study of Children in Adult Jails (1976) and includes on-site survey of nearly 500 jails and lockups in 126 counties in nine states. This is an important consideration given the historical controversy which exist* of Juvenile Corrections' Under Lock and Key which did not include the magnitude of on-site evaluation, but provides an exhaustive survey of the existing literature on the subject of juveniles in adult jails and lockups.

The studies found that the placement of children in adult jails and lockups has long been a moral issue in this country which has been characterized by sporadic public concern and only minimal action towards resolution of the problem.
It is suspected that the general lack of public awareness with respect to this problem and the low level of official action is exacerbated by the absence of meaningful information as to the extent of the practice and the low visibility of juveniles placed in jails and lockups. This situation is perpetuated by official rhetoric which cloaks the practice of jailing juveniles in a variety of poorly conceived rationales. In fact, the time honored but unsubstantiated "rationales" of public safety, protection from themselves or their environments, and lack of alternatives break down under close scrutiny. In reality, the aggressive, unpredictable threat to public safety perceived by the community is often small, shy, and frightened. The Children's Defense Fund indicates that 18 percent of the juveniles in jail, in a nine state area, have not even been charged with an act which would be a crime if committed by an adult; 4 percent have committed no offense at all. Of those jailed on criminal-type offenses, a full 88 percent are there on property and minor offenses. As is the case with all public institutions, minorities and the poor are disproportionately represented.

Not until 1971 did a clear and comprehensive picture of jails surface with the completion of the National Jail Census. By its own admission, the Census showed only a snapshot of American jails and the people who live in them. Significantly, the Census excluded those facilities holding persons less than 48 hours. This is critical with respect to juveniles in that is it the police lockup and the drunk tank to which juveniles are so often relegated under the guise of "separation." The Census did, however, give us the first clear indication of the number of juveniles held in jail. On March 15, 1970, 7.800 juveniles were living in 4,037 jails. A comparable census in 1974 estimated that the number had grown to 12,744. The inadequacy of the data is compounded when a determination of the number of juveniles admitted to adult jails and lockups each year is sought. Surveys conducted by the National Council on Crime and Delinquency and the National Assessment of Juvenile Corrections indicate that this figure ranges from 50,000 to 500.000. The Children's Defense Fund, in its study of children in adult jails, indicates that even the half million figure is "grossly understated" and that "there is an appalling vacuum of information . . . when it comes to children in jail." Regardless of the true figure, it is clear that the practice of jailing juveniles has not diminished during the last decade.

While the arguments for placing juveniles in jails are fragile and founded on incomplete and contradictory information, the arguments against holding juveniles in jail are pervasive and along scientific lines. They are summarized below.

. . . the "criminal" label creates a stigma which will exist far longer than the period of incarceration. This stigma increases as the size of the community decreases and affects the availability of social, educational, and employment opportunities available to youth. Further, it is

doubtful if the community's perception of the juvenile quarters in the county jail is any different than that of the jail itself.

. . . the negative self image which a youth often adopts when processed by the juvenile system is aggravated by the impersonal and destructive nature of adult jails and lockups. Research continues to document the deleterious effects of incarceration and the conclusion that this experience, in and of itself, may be a contributing factor to continued delinquent activity.

. . . the practice of holding juveniles in adult jails is contrary to the development of juvenile law and the juvenile justice system which, during the past 79 years has adamantly emphasized the separation of the juvenile and adult systems.

. . . the occurrence of physical harm and sexual abuse of juveniles by adults is well documented and greatly increased within the secure and obscure confines of an adult jail or lockup.

In 1974, the National Assessment of Juvenile Corrections assumed and defended the position that "placing juveniles in adult jails and lockups should lie entirely eliminated." Similarly, the Children's Defense Fund advocated, "to achieve the goal of ending jail incarceration of children, states should review their laws to prohibit absolutely the holding of children of juvenile court age in jails or lockups v used for adult offenders."

**Prepared Statement of Robbie Callaway, Member, Maryland State Advisory Group**

[A]n alarming number of children under 18 are being held today, right now, in adult jails. Many have committed no crime and the majority of those that have are there for property offenses.

Charles Renfrew. Deputy Attorney General, in testimony before the House Subcommittee on Human Resources and before this Committee stated that conservative estimates are that 000,000 juveniles are admitted to adult jails and lock-ups each year.

I wholeheartedly agree with Judge Renfrew when he asks Congress to "absolutely prohibit the detention or confinement of juveniles in any institution in which adults, whether convicted or awaiting trail are confined."

I concur with his recommendation that states be granted five years to remove all juveniles from adult jails and lock-ups. This recommendation, coupled with incentives to the states could significantly alter the miscarriage of justice that happens every time a youngster is inappropriately placed in an adult jail.

I thank you Mr. Chairman and distinguished members of this committee for hearing my testimony and considering my suggestions.


**JUVENILE JUSTICE AMENDMENTS OF 1980: REPORT TOGETHER WITH SUPPLEMENTAL AND INDIVIDUAL MINORITY VIEWS, H. COMM. ON EDUCATION AND LABOR, H. RPT. 96-946 (MAY 13, 1980), "REMOVAL OF JUVENILES FROM JAILS AND LOCK-UPS FOR ADULTS," 24-25**

REMOVAL OF JUVENILES FROM JAILS AND LOCK-UPS FOR ADULTS

The committee bill would add a new section 223(a)(14) to current law to require the removal of juveniles from jails and lock-ups for adults. States participating in the formula grant

program would have five years from the enactment of the Juvenile Justice Amendments of 1980 to achieve compliance with this new provision. States that are in substantial compliance with the requirement after five years, through the achievement of at least 75 percent removal of juveniles from jails and lock-ups for adults, may be given up to two additional years to achieve full compliance if the State has made, through appropriate executive or legislative action, an unequivocal commitment to achieving full compliance within a reasonable period of time not to exceed two years.

This new paragraph complements the existing deinstitutionalization and separation provisions of the act. Section 223(a)(12) requires that participating States remove all juveniles who have committed offenses that would not be criminal if committed by an adult (status offenders) and non-offenders such as dependent or neglected children, from secure juvenile detention or secure correctional facilities. Most States are in the process of completing this effort. Section 223(a)(13) of the act requires participating States to provide that juveniles who are alleged to be or found to be delinquent, as well as juveniles within the scope of section 223(a)(12), shall not be detained or confined in any institution in which they are in regular contact with adults incarcerated because they have been convicted of a crime or are awaiting trial on criminal charges.

The committee believes, based on evidence presented during hearings on H.R. 6704, that the time has come to go farther. Statistics from recent surveys covering nine states indicated that 18 percent of the juveniles jailed in adult facilities had not committed a criminal offense. It was reported that 4 percent had committed no offense at all. Furthermore, it was reported that of those juveniles in jail for criminal offenses, 88 percent were there on property and minor charges. Witnesses during the hearings pointed to potential physical and sexual abuse encountered by juveniles incarcerated in adult jails. It was pointed out that during 1978, the suicide rate for juveniles incarcerated in adult jails was approximately seven times the rate of children held in secure juvenile detention facilities. One Department of Justice official termed this a "national catastrophe."

Statistics on inappropriate placements, the evidence of harm, the growing body of constitutional law, and the expressed belief that properly planned and implemented removal of juveniles from all adult jails and lock-ups is economically feasible, promoted the committee amendment. Among those on record supporting the removal of juveniles from adult jails and lock-ups were the Justice Department; the National Coalition for Jail Reform; the American Correctional Association; the National Council of Juvenile and Family Court Judges; the National Sheriffs Association; the National Association of Counties; the National League of Cities; the National Association of Blacks in Criminal Justice; the Association of Junior Leagues; the National Council on Crime and Delinquency; the Child Welfare League of America; and the American Civil Liberties Union.

The new provision does not require the release of any juvenile delinquent offenders from secure detention or secure correctional facilities. Juveniles alleged to have committed delinquent offenses can still be detained in secure facilities—but not in adult jails and lock-ups.

The committee intends the new provision to extend to all juveniles who may be subject to the exercise of juvenile court jurisdiction for purposes of adjudication and treatment based on age and offense limitations established by State law. If a juvenile is formally waived or transferred to criminal court by a juvenile court and criminal charges have been filed or a criminal court with original or concurrent jurisdiction over a juvenile has formally asserted its

jurisdiction through the filing of criminal charges against a juvenile, the section 223(a)(14) prohibition no longer attaches.

The committee recognizes that flexibility may be required in the case of juveniles who are waived or otherwise come under criminal court jurisdiction. Appropriate alternative secure placements for serious and violent juvenile criminal offenders waived or bound over to adult court are often not available. For these juveniles, a judicial or legislative determination has been made that they are not to be processed in the juvenile justice system. However, the new provision is not intended to encourage increased waivers of juveniles to criminal court, a decrease in the age of original or concurrent criminal court jurisdiction, or a lowering of the age of juvenile court jurisdictions for specific categories or classes of offenses committed by juveniles.

The new provision requires removal of juveniles from adult jails and lock-ups. For the purposes of this provision, a jail for adults is defined as a locked facility, administered by State, county, or local law enforcement and correctional agencies, the purpose of which is to detain adults charged with violating criminal law, pending trail. Also considered as adult jails are those facilities used to hold convicted adult criminal offenders sentenced for less than one year. The new provision is intended to require the removal of juveniles from such facilities. A lock-up for adults is similar to a jail for adults except that it is generally a municipal or police facility of a temporary nature which does not hold persons after they have been formally charged.

Facilities which are not authorized to or do not in practice hold adults convicted of a crime or awaiting trial on criminal charges are not considered adult jails or lock-ups. Also, institutions and facilities that are used exclusively for the post-conviction or postadjudication detention or confinement of offenders who have been convicted of crimes or adjudicated delinquent are not adult jails or lock-ups. Juveniles adjudicated delinquent, if confined in an institution that incarcerates adult criminal offenders, would continue to have to be separated from regular contact with adults in order for the State to be in compliance with the section 223(a)(13) separation requirement.

The committee expects a "rule of reason" to be followed in the implementation of section 223(a)(14). For example, it would be permissible for OJJDP to permit temporary holding in an adult jail or lock-up by police of juveniles arrested for committing an act which would be a crime if committed by an adult for purposes of identification, processing, and transfer to juvenile court officials or juvenile shelter or detention facilities. Any such holding of juveniles should be limited to the absolute minimum time necessary to complete this action, not to exceed six hours, but in no case overnight. Section 223(a)(13) would prohibit such juveniles who are delinquent offenders from having regular contact with adult offenders during this brief holding period.


**JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT AMENDMENTS OF 1980: REPORT OF THE S. COMM. ON THE JUDICIARY, S. RPT. 96-705 (MAY 14, 1980), PP. 6, 7**

During two days of hearings held March 26 and 27, 1980, forty-five witnesses provided testimony on the three bills to reauthorize the Juvenile Justice and Delinquency Prevention Act of 1974: S. 2434, introduced by Senator Robert Dole: S. 2441, introduced by Senator Birch Bayh; and S. 2442, introduced by Senator Bayh on request of the Administration. The Committee Amendment incorporated concepts and provisions from each of the considered measures, witnesses and other organizations.

. . .

The Committee is concerned that this important provision of the 1974 Act, which was intended to prohibit the placement of juveniles in any adult facility, including jails, has not been properly implemented. . . . It is obvious to the Committee that much remains to be done to make the 1974 Act programs a reality. . . .

**REP. KOGOVSEK (CO). QUESTIONS AND ANSWERS REGARDING THE REMOVAL OF JUVENILES FROM ADULT JAILS AND LOCKUPS. 126 CONG. REC. P. E3377-8 (JULY 2, 1980)**

4. WHAT HAPPENS TO CHILDREN IN ADULT JAILS AND LOCK-UPS? 4. The following harms to children in adult Jails and lock-ups have been documented:
—Rape, physical assault, exploitation, and injury by adults in the same facility or staff;
 —Isolation in maximum security cells or drunk tanks, with sensory deprivation;
 —Emotional stress (demonstrated by a suicide rate for children in adult facilities seven times the rate for children in juvenile detention facilities);
—Failure to provide services to meet the needs of Juveniles;
—Negative labeling as a result of the first placement decision;
—Negative impact on preparation of defense;
 —Adverse impact on a judge's decision to release a child to a non-secure post-trial setting.

Jails and lock-ups have been constructed for adults; they were not intended for children and staff is not trained to deal with children.

10 . WHAT SPECIFICALLY DOES THE AMENDMENT PROPOSE? 10. The amendment currently included in H.R. 6704 adds to the Juvenile Justice and Delinquency Prevention Act, as a condition of assistance, a requirement that each State plan for formula grants provide that, beginning 5 years after enactment of the amendment, no juveniles shall be detained or confined in any jail or lock-up for adults. When enacted, a State need not immediately remove all juveniles from jails, but just must start planning for removal in 5 years. An additional 2 years can be granted if there is substantial compliance. Juveniles may be held for a short period for identification and placement, even after fully implemented.

21. WHAT ORGANIZATIONS SUPPORT REMOVAL FROM ADULT JAILS AND LOCKUP? 21. While not all addressing the specific amendment, many groups have called for removal of juveniles from all adult jails and lock-ups, including the U.S. Department of ' Justice, President's Commission on Law Enforcement and Criminal Justice (1967), American Bar Association and Institute for Judicial Administration, National Council of Juvenile and Family Court Judges, National Advisory Committee on Criminal Justice Standards and Goals, and Los Angeles Times (Editorial of March 28,1980). All members of the National Coalition for Jail Reform support removal of juveniles from jails and lock-ups. Members Include: American Correctional Association, ACLU, National Assoc, of Counties, Natl. League of Cities, Natl. Center for State Courts, Natl. Sheriffs Assn., Natl. Urban League, NLADA, Jail Managers Assn. NCCD, Criminal Justice Planners, and 16 others

14

**FLOOR DEBATE, JUVENILE JUSTICE AMENDMENTS OF 1980. 126 CONG. REC. 10920-23 (NOV. 19, 1980).**

**Statement of Rep. Andrews (NC). 126 Cong. Rec. p. H10920.**

At the urging of the Attorney General and a large number 'of national groups, including the American Bar Association, the National Council of Juvenile Court Judges, the National Sheriffs Association, the National Association of PTA's, the National Council of Jewish Women, and the National Association of Counties, to mention only a few, H.R. -6704 requires that States who participate in the formula grant program agree, within 5 years, to remove juveniles from jails and lockups intended for adults. Two additional years would be available for States who substantially-comply within the first 5 years.

**Statement of Rep. Coleman (MO). 126 Cong. Rec. p. H10921.**

Research has demonstrated that exposing juveniles to the environment of adult jails has adverse effects on them—both in terms of their becoming involved in further delinquent and criminal acts and in terms of preserving their physical and mental well-being. The Juvenile Justice Act addresses the problems of the juvenile placed in a secure detention or correctional facility by requiring "sight and sound" separation of juveniles from adults housed in the same secure facility. In H.R. 6704, a new mandate is added which requires the complete removal of all juveniles from adult jails and lockups within a maximum of 7 years after the date of enactment.

**Statement of Res. Comm. Corrada (PR). 126 Cong. Rec. p. H10922.**

Recognizing the detrimental effect of allowing close contact with convicted criminals, this act requires participating States to remove juveniles from adult jails.

**Statement of Rep. Railsback (IL). 126 Cong. Rec. p. H10922.**

One of the most significant provisions of this legislation is the program to completely remove juveniles from secure correction facilities over the next 7 years rather than using the so-called sight and sound separation now required. Some, young people simply lack the maturity' to cope with the adult offender, and as a matter of fact many of them have even committed suicide rather than continue to endure abuse. During 1978, for instance, the suicide rate of young people in adult jails was approximately seven times the rate of children held in juvenile detention facilities. For these reasons, the commitment to remove juveniles from jails is a goal worth striving to achieve

**Statement of Rep. Weiss (NY). 126 Cong. Rep. p. H10923.**

In particular, the requirement that juveniles be removed from adult prisons and lockups is critically important. In testimony before the Subcommittee on Human Resources, a variety of organizations including the Justice Department, the National Sheriff's Association, the Child Welfare League, and the American Civil Liberties Union endorsed this concept. Witnesses stated that during 1978 the suicide rate for juveniles incarcerated in adult jails was about seven times

the rate for children in juvenile facilities. The full committee also removed language adopted in the subcommittee which would permit children who are status offenders and violate court orders to be placed in secure detention and correctional facilities. Status offenses are those which if committed by an adult would not be considered a criminal offense, such as running away or incorrigibility. The committee's action was supported by the Child Welfare League, National Association of Counties, and the National Council on Crime and Delinquency. To place a child in an adult facility with convicted criminals for not attending schools or running away, is certainly callous and inhumane. The possible damage to the child could be irreparable. I strongly oppose any attempt to reinstate the subcommittee amendment.

**PRESIDENT JAMES E. CARTER, JUVENILE JUSTICE AMENDMENTS OF 1980, STATEMENT ON SIGNING S. 2441 INTO LAW. DECEMBER 8, 1980. 16 WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS 50, P. 2787-88.**

I am particularly pleased that Congress accepted an amendment advocated by the administration which will result in the removal of juveniles from adult jails and lockups. This provision will go a long way toward addressing what the Deputy Attorney General termed a "national catastrophe" when testifying before Congress last March.

16